JOSHUA D. HURWIT, IDAHO STATE BAR NO. 9527
UNITED STATES ATTORNEY
**JAMES P. SCHAEFER, CALIFORNIA STATE BAR NO. 250417**
**ASSISTANT UNITED STATES ATTORNEY**
DISTRICT OF IDAHO
1290 W. MYRTLE STREET, SUITE 500
BOISE, ID 83702
TELEPHONE: (208) 334-1211
FACSIMILE:   (208) 334-9375
Email: James.Schaefer@usdoj.gov

Attorneys for Defendants Roderick Coffin and James Pinette

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROBERT PURBECK,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>RODERICK COFFIN III, JAMES PINETTE, and ADA COUNTY,<br><br>　　　　Defendants. | Case No. 1:21-cv-00047-BLW<br><br>**MEMORANDUM IN SUPPORT OF DEFENDANTS RODERICK COFFIN AND JAMES PINETTE'S MOTION TO AMEND SCHEDULING ORDER AND FOR LEAVE TO FILE AN AMENDED ANSWER** |

　　　　Defendants Roderick Coffin (Agent Coffin) and James Pinette (Agent Pinette) (collectively, Defendants) respectfully request that this Court grant their Motion to Amend Scheduling Order and for Leave to File an Amended Answer to permit them to assert a single additional affirmative defense.  Specifically, Defendants seek leave to assert that the doctrine of collateral estoppel bars re-litigation of issues in this case that were recently decided by the United States District Court for the Northern District of Georgia in *United States v. Purbeck*, 3:21-cr-0004-TCB-RGV (Georgia Criminal Case).  Good cause exists to allow Defendants to amend their Answer (ECF No. 67) because the factual basis to assert collateral estoppel did not

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO AMEND SCHEDULING ORDER AND FOR LEAVE TO FILE AN AMENDED ANSWER – 1

exist until after Defendants filed their Answer in this case and the Scheduling Order deadline for amending pleadings had passed.

I.   BACKGROUND

On August 21, 2019, the Federal Bureau of Investigation (FBI) executed a search warrant at Purbeck's home in Meridian, Idaho. ECF No. 19 ¶7. The FBI did so as part of a cybercrime investigation being conducted by the United States Attorney's Office for the Northern District of Georgia. *Id.* ¶¶ 5-6 and 23. While other agents searched Purbeck's home, Agents Coffin and Pinette interviewed Purbeck in his backyard over a cup of coffee. *Id.* ¶11. During that interview, Purbeck admitted he was responsible for several ransomware attacks. *Id.* ¶¶ 24 and 27; *see also* ECF No. 1 at 23:18-19 and 27:15-16; ECF No. 6-4 at 5-6.

On January 31, 2021, after plea negotiations between Purbeck and the United States Attorney's Office for the Northern District of Georgia broke down, Purbeck filed this civil lawsuit asserting claims related to the search of his home. ECF No. 1.

On March 2, 2021, Purbeck was indicted in the United States District Court for the Northern District of Georgia on: (1) three counts of Computer Fraud and Abuse – Unauthorized Access; (2) one count of Computer Fraud and Abuse – Extortion; (3) four counts of Wire Fraud; and (4) three counts of Access Device Fraud. *See* Indictment, ECF No. 1 in the Georgia Criminal Case.

On April 20, 2021, after conducting an initial review of Purbeck's complaint pursuant to 28 U.S.C. § 1915, this Court ordered Purbeck to file an amended complaint within 28 days. ECF No. 15.

On May 18, 2021, Purbeck filed an Amended Complaint against three Assistant United States Attorneys (AUSAs), three FBI agents, and Ada County. ECF No. 19. On September 27,

2021, after conducting an initial review of Purbeck's Amended Complaint pursuant to 28 U.S.C. § 1915, this Court entered an order allowing Purbeck to proceed on: (1) excessive force claims against Special Agents Pinette and Coffin, as outlined in Counts I and VIII; (2) Fourth Amendment claims against Agent Clark Harshbarger and AUSA Nathan Kitchens as outlined in Count IX; and (3) substantive due process claims against Ada County as outlined in Count VII. ECF No. 23 at 31-32. This Court further ordered that "Plaintiff may not proceed on any other claims against any other Defendants at this time." *Id.* at 32.[1] This Court subsequently granted Agent Harshbarger's and AUSA Kitchens' motions to dismiss all of Purbeck's claims against them. ECF No. 56. Accordingly, the only remaining defendants in this case are Agent Coffin, Agent Pinette, and Ada County. *See* ECF No. 23 at 32.

As to Agent Coffin, the sole remaining claim is an excessive force claim outlined in Count I. *Id*. As summarized by this Court, "Purbeck claims Pinette and Coffin violated his right to be free from excessive force by interrogating him for hours in the hot sun. Purbeck claims he consequently suffered heat-related illness, dehydration, and sunburn." *Id.* at 9.

As to Agent Pinette, the only remaining claims are the excessive force claims outlined in Counts I and VIII. As summarized by this Court, Count VIII alleges that Agent Pinette "searched Purbeck's groin thoroughly for at least a minute to humiliate him." *Id.* at 12.

On December 13, 2021, Purbeck filed three motions to suppress and a motion to dismiss in the criminal case pending against him in the Northern District of Georgia. *See* ECF Nos. 25, 26, 27 and 30 in the Georgia Criminal Case. Based on the same excessive force allegations underlying his claims against Defendants in this civil case, Purbeck argued *inter alia* that his August 21, 2019, confession was involuntary.

---

[1] Purbeck's subsequent attempts to amend his Complaint were denied. *See* ECF Nos. 53 & 61.

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO AMEND SCHEDULING ORDER AND FOR LEAVE TO FILE AN AMENDED ANSWER – 3

On September 1, 2022, and September 2, 2022, the United States District Court for the Northern District of Georgia held an evidentiary hearing on Purbeck's motions to suppress and motion to dismiss.  *See* Min. Entry, ECF No. 64; Tr. Vol. 1 of Evidentiary Proceeding on 9/1/22, ECF No. 76; and T. Vol. 2 of Evidentiary Proceeding on 9/2/2022, ECF No. 77 in the Georgia Criminal Case.

On March 20, 2023, Agents Coffin and Pinette filed their Answer in this case, denying Purbeck's allegations.  ECF No. 67.

On March 23, 2023, the Court entered a Scheduling Order that set June 1, 2023, as the deadline for amending pleadings.  ECF No. 66.

On May 18, 2023, Judge Russel G. Vineyard, United States Magistrate Judge, issued a *sealed* Report and Recommendation (R&R) that recommended the denial of Purbeck's motions to suppress and motion to dismiss.  *See* R&R, ECF No. 87 in the Georgia Criminal Case.

On May 26, 2023, Purbeck filed objections to Judge Vineyard's R&R.  *See* ECF No. 92 in the Georgia Criminal Case.

On July 26, 2023, Judge Timothy C. Batten, Sr., Chief United States District Judge, issued a *sealed* order that overruled Purbeck's objections to Judge Vineyard's R&R, adopted the R&R, and denied Purbeck's motions to suppress and motion to dismiss.  Order Adopting the R&R, ECF No. 96 in the Georgia Criminal Case.

On August 2, 2023, Judge Batten unsealed this order.  ECF No. 100 in the Georgia Criminal Case.

Judge Vineyard's R&R and Judge Batten's Order Adopting the R&R both address issues and contain factual findings relevant to the excessive force claims pending against Defendants in this civil case, including, but not limited to:

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO AMEND SCHEDULING ORDER AND FOR LEAVE TO FILE AN AMENDED ANSWER – 4

- "Agents Coffin and Pinette introduced themselves to Purbeck, informed him that the FBI was executing a search warrant but that he was not under arrest, and asked him if he was willing to speak with them as they believed he 'could be of assistance in [the] investigation.'"  R&R at 15.

- "Purbeck agreed to speak with the agents."  R&R at 15.

- "Upon entering the residence through the front door, Agent Pinette informed Purbeck that he did not have to stay, but that if he did, they would be limiting his movements."  R&R at 15.

- "Once they were inside the residence, Agents Coffin and Pinette found that it was 'very cluttered' and had a 'foul odor' so they decided to conduct the interview in the backyard, which was fenced-in with a gate to the street that was not blocked."  R&R at 15.

- "[I]t is undisputed that Purbeck was provided coffee after he requested a refill and that the coffee was prepared 'the way [he] wanted it[.]'"  R&R at 16.

- "The agents interviewed Purbeck while seated in plastic lawn chairs that were arranged in a somewhat triangular formation about two to five feet apart."  R&R at 15-16.

- "When the agents began the interview, it was approximately 8:00 a.m. and the temperature was 'cool' and 'pleasant' outside."  R&R at 16-17.

- "[D]uring the course of the interview, Purbeck appeared to be calm, articulate, and intelligent."  R&R at 17.

- "At this time, Purbeck was not restrained in any way, was not threatened with arrest, and though Purbeck testified that neither Agent Coffin nor Agent Pinette advised him that he could leave at any time, they also never advised him that he had to speak with them, he never asked to leave or attempted to leave, and Agent Coffin testified that had Purbeck requested to leave, he would have been allowed to do so.  Moreover, Purbeck never indicated that he did not want to talk to Agents Coffin and Pinette."  R&R at 17.

- "The agents informed [Purbeck] that they could not provide legal advice, but that he 'was under no obligation to speak to [them] at this time[] and that it was his right to seek legal counsel before answering additional questions.'"  R&R at 18.

- "Purbeck continued to speak with the agents and admitted to being '[L]ifelock,' which was 'the identity of one of the hackers that [the FBI was] investigating.'"  R&R at 19.

- "Thereafter, sometime close to 11:00 a.m., Purbeck agreed to provide passwords for his encrypted devices and consented to the FBI assuming his online identities and gaining access to multiple email accounts."  R&R at 19.

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO AMEND SCHEDULING ORDER AND FOR LEAVE TO FILE AN AMENDED ANSWER – 5

- "At this time, the agents asked Purbeck whether he would sign a 'Consent to Assume Online Identify Authorization Form,' which provided, in relevant part, that Purbeck 'voluntarily authorize[d] . . . agents of the FBI to assume and use [his] . . . "online identity[.]"'" The form also provided:

    > I give this consent freely and voluntarily, without fear, threats, coercion, or promises of any kind. I have been advised of my right to refuse to allow the FBI to assume my . . . online identity, and I hereby voluntarily waive this right.

    R&R at 19-20.

- "During the course of the interview, the agents and Purbeck moved their chairs to try to stay in the shade because it was getting warmer outside, but at some point, Purbeck stopped moving his chair." R&R at 21.

- "Purbeck appeared calm throughout the interview, and at no point did he appear dehydrated, sick, in pain or discomfort, or sunburned, nor did he ask for food, water, medication, or a hat or sunscreen, and he was allowed to use the bathroom in his house once or twice, though he was escorted for officer safety." R&R at 21-22.

- "Ada County personnel arrived prior to lunch, sometime around 11:30 a.m., and Agent Pinette observed the interview, which involved Purbeck, his immediate supervisor, and an Ada County detective, but he did not participate in this interview by asking any questions." R&R at 23.

- "[D]uring the Ada County interview, Agent Pinette learned that Purbeck had a hard drive in his pocket after Purbeck handed it to him and realized that Purbeck had not been searched for evidence or weapons other than the initial search of his waist area when they first arrived. Agent Pinette then conducted a search of Purbeck for approximately five to ten seconds for any weapons or other evidence." R&R at 23.

- "The search of the residence concluded at approximately 2:00 p.m." R&R at 23.

- "During the course of the interview with Agents Coffin and Pinette, and after the agents concluded speaking with him, Purbeck was not placed under arrest and nor was he threatened, restrained, coerced, or promised anything in return for his statement or his signature on the consent form." R&R at 23.

- "The agents were calm and cordial and they never raised their voices, though at some points they were stern, nor did the agents display their weapons to Purbeck . . . ." R&R at 24.

- "During the interview, Purbeck seemed to understand everything that was being asked of him and did not appear to be under the influence of drugs or alcohol, nor did he request that the agents cease interviewing him or express a desire to leave, and no one ever told him he would lose his job if he did not speak with the agents." R&R at 24.

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO AMEND SCHEDULING ORDER AND FOR LEAVE TO FILE AN AMENDED ANSWER – 6

- "The agents left Purbeck's residence at the conclusion of the interview without arresting him."  R&R at 24.

- "[T]he certified climate data showed the dry bulb temperatures outside throughout the morning were between 75 and 84 degrees with low humidity." R&R at 24.

- Purbeck's expert, "Dr. Allen[,] also testified that the temperature through 11:00 a.m. was at 84 degrees and 'would not be sufficient to subject [Purbeck] to the potential for a heat-related illness.'" R&R at 25.

- "[Dr. Allen] further testified that the degree of temperature that was accepted in the literature to have a 'significant effect on the mental and physical performance [was] 85 degrees ambient,' but that the focus should be on the wet bulb temperature, which takes into account the relative humidity and solar radiance, and that the wet bulb temperature on August 21, 2019, did not exceed 62 degrees from 7:53 a.m. to 11:53 a.m., which was 'well below the wet bulb temperatures that [the article] identifie[d] as where there [were] concerns about the effects of heat on cognitive performance[.]'" R&R at 25-26.

- "During his encounter with Agents Coffin and Pinette, Purbeck was unrestrained in a familiar environment; he was never advised that he was under arrest or that he could not leave; and his freedom of movement was not restrained as evidenced by the fact that he was not handcuffed or retrained in any way and was interviewed in his own backyard where egress and ingress through a gate was not blocked."  R&R at 34-35.

- "Moreover, the evidence is undisputed that [Agents Coffin and Pinette] interviewed [Purbeck] in a conversational, non-confrontational manner, the atmosphere was cordial and [Purbeck] was cooperative, which shows that the overall [] tone of the interview was not such that it indicated that compliance with the officers would be compelled[.]" R&R at 35-36 (citations and quotation marks omitted).

- "[A]fter considering all the testimony, as well as the demeanor and interests of the witnesses, the Court finds that Purbeck's testimony regarding all of the circumstances surrounding the interview was not fully credible as it was contradicted by the more credible and consistent testimony of Agents Coffin and Pinette. Therefore, to the extent Purbeck's testimony conflicts with Agents Coffin and Pinette, the Court finds credible and accepts the agents' testimony over that of Purbeck, who admitted multiple times on direct and cross-examination that he had 'some memory problems' associated with that day and conceded that several items in his affidavit and civil pleadings were wrong, and he actually corroborates much of what Agents Coffin and Pinette said about the interview, including admitting that no one ever told him he was under arrest, he was never physically restrained, and that he never indicated that he did not want to talk to them or requested that the agents stop the interview.  Indeed, Purbeck's testimony at the hearing was illogical and even fanciful at times as he seemed to embellish and speculate about circumstances that he stated as fact." R&R at 37-39.

- "[N]othing suggests that a reasonable person in Purbeck's position would not have felt free to terminate the interview at any time[.]"  R&R at 46.

- "Purbeck argues that his statements were made in a inhumane setting, involving sitting for hours in direct sunlight while being worried about his girlfriend who was trapped incommunicado inside their home with multiple armed agents, where, due to suffering symptoms of heat exhaustion, he would not have understood that he could voluntarily refuse to answer the agents' questions, so his statements were not the product of a rational intellect and a free will, and thus, should be suppressed.  The government contends that every factor weighs in favor of finding that Purbeck's statements were voluntary, pointing out that [a]t the outset, the agents asked if Purbeck wished to answer their questions; they did not compel him to participate in the interview; they never handcuffed or otherwise restrained Purbeck (aside from the brief safety check); Purbeck agreed that the interviewing agents never threatened him, drew their weapons, exerted physical force, or yelled at him; Purbeck was highly educated, ha[d] been employed in a technically sophisticated job for nearly two decades, and admitted that he understood the agents' questions and could intelligently answer them; and that the length of the interview also suggest[ed] that Purbeck's statements were made voluntarily, since he made his critical admissions within the first three hours of speaking with the agents in the backyard (and more likely within the first ninety minutes). Again, the Court agrees with the government."  R&R at 50-51 (citations and quotation marks omitted).

- "While Purbeck argues that he was suffering from symptoms of heat exhaustion, the evidence shows that the dry bulb temperatures outside throughout the morning were between 75 and 84 degrees, while the wet bulb temperatures, which Dr. Allen testified should be the focus, did not exceed 62 degrees, and Dr. Allen confirmed that 85 degrees ambient was the degree of temperature that was accepted to have a significant effect on the mental and physical performance of an individual and that 84 degrees dry bulb temperature would not be sufficient to subject Purbeck to the potential for a heat-related illness[.]"  R&R at 54.

- "[D]espite Purbeck's incredible testimony that he thought he was on the verge of organ failure after sitting in the direct sunlight for hours on August 21, 2019, he admitted he never sought any medical attention, and he even subsequently flew to Atlanta for a proffer session with the agents just weeks later." R&R at 54.

- "And, as the government points out, Purbeck 'had two cups of coffee, was permitted to go the bathroom, and was never deprived of anything if he asked' and thus, Purbeck's assertion that he 'was subjected to inhumane physical conditions,' is not supported by the credible evidence of record."  R&R at 87.

- "The R&R found, and this Court agrees, that Purbeck was not restrained beyond what was necessary for officer safety while they conducted a search of his home.  He was told that he was not required to speak with agents and could instead leave the premises. And he was informed that if he chose to speak with agents, his movements would be somewhat restricted while other agents conducted the search." Order Adopting R&R at 19.

- "After agreeing to speak with the agents, Purbeck was in his backyard and his egress

- was not blocked by agents. He was not restrained or handcuffed. He was told on multiple occasions that he was free to leave. He was permitted to go to the bathroom and was provided coffee upon request. And though he was at times isolated from his girlfriend, who remained inside the home, he never asked to speak with or see her—and the agents testified he would have been allowed to if he had asked." Order Adopting R&R at 19.

- "Purbeck was interviewed in an open-air backyard with an unblocked exit gate. He was told he could terminate the interview at any time. Indeed, when the interview reached a natural conclusion, Purbeck left without difficulty." Order Adopting R&R at 20.

- "The Court finds that a reasonable person would have felt free to leave and terminate the interview at any time." Order Adopting R&R at 21.

Based on these findings, Defendants seek to add the following affirmative defense to their Answer:

**SIXTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred, in whole or in part, by the doctrine of collateral estoppel based, in part, on: (1) the Report and Recommendation issued by Judge Russel G. Vineyard, United States Magistrate Judge, in *United States v. Robert Purbeck*, Case No. 3:21-CR-0004-TCB-RGV at ECF No. 87 (R&R); and (2) the Order issued by Judge Timothy C. Batten, Sr., Chief United States District Judge, adopting Judge Vineyard's R&R, *id.* at ECF No. 96.

A copy of Defendants' proposed Amended Answer is attached hereto as **Exhibit A**.

A redline comparison of Defendants' current Answer to their proposed Amended Answer is attached hereto as **Exhibit B**.

II.     ARGUMENT

The Ninth Circuit has held that motions for leave to file an amended pleading that are filed after the Scheduling Order deadline for amending pleadings are governed by Rule 16(b) of the Federal Rules of Civil Procedure, which requires a showing of "good cause." *See Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 608 (9th Cir. 1992). Courts routinely find good cause exists when the movant shows that the factual basis for the amendment is either new or newly discovered. *See, e.g., U.S. Equal Emp. Opportunity Comm'n v. Bay Club Fairbanks Ranch, LLC*,

475 F. Supp. 3d 1099, 1102 (S.D. Cal. 2020) (finding good cause to amend the scheduling order eight months after the deadline for amendments where the new information was uncovered); *Circus Circus LV, LP v. AIG Specialty Ins. Co.*, 525 F. Supp. 3d 1269, 1279 (D. Nev. 2021) (finding good cause to amend the complaint after the deadline set in a scheduling order because the "critical" and "behind-the-scenes" facts that justified the proposed amendment could not have been known until discovery responses were served, which occurred after the scheduling order's deadline to amend the complaint); *Richmond v. Mission Bank*, No. 1:14-cv-00184 JLT, 2014 WL 6685989, at *5 (E.D. Cal. November 26, 2014) (granting motion to amend scheduling order and for leave to amend answer to add affirmative defense based on newly discovery facts).

Here, good cause exists to amend the Scheduling Order to allow Defendants to amend their Answer because the factual basis for Defendants' proposed amendment did not exist until after the June 1, 2023, deadline for amending pleadings had passed. Specifically, the factual basis for Defendants to allege collateral estoppel as an affirmative defense did not exist until Judge Batten issued his order adopting Judge Vineyard's R&R on July 26, 2023. Moreover, the content of Judge Batten's order was not known to Defendants until that order was unsealed on August 2, 2023.

Where good cause exists to amend the scheduling order to permit a party to request leave to amend a pleading, Rule 15 of the Federal Rules of Civil Procedure governs whether the specific amendment should be allowed. Under Rule 15, courts "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Rule 15 reflects the "strong policy permitting amendment." *Boy Scouts of Am. v. Graham*, 86 F.3d 861, 863 (9th Cir. 1996) (citing *Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 798 (9th Cir. 1991); *see also Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 537 (9th Cir. 1989).

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO AMEND SCHEDULING ORDER AND FOR LEAVE TO FILE AN AMENDED ANSWER – 10

"Courts may decline to grant leave to amend only if there is strong evidence of 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment, etc.'" *Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*, 708 F.3d 1109, 1117 (9th Cir. 2013) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "[I]t is the consideration of prejudice to the opposing party that carries the greatest weight . . . . Absent prejudice, or a strong showing of any of the remaining *Foman* factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). "The party opposing leave to amend bears the burden of showing prejudice." *Clarke v. Upton*, 703 F. Supp. 2d 1037, 1041 (E.D. Cal. 2010) (internal quotations and citation omitted).

Here, all of these considerations weigh in favor of granting Defendants leave to amend their Answer. There is no undue delay, bad faith, or dilatory motive on Defendants' part. Rather, they are promptly seeking leave to amend their Answer to assert a newly available affirmative defense. Moreover, Mr. Purbeck cannot establish that he will be prejudiced if the Court allows Defendants to amend their Answer to allege a collateral estoppel defense. Collateral estoppel is a legal issue that does not require additional discovery. In the event Mr. Purbeck wishes to conduct discovery related to Defendants collateral estoppel defense, he is free to do so because discovery has not closed in this case.

### III.   CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion to Amend Scheduling Order and for Leave to File an Amended Answer.

Respectfully submitted this 18th day of August 2023.

        JOSHUA D. HURWIT
        UNITED STATES ATTORNEY
        By:


        */s/ James P. Schaefer*
        JAMES P. SCHAEFER
        Assistant United States Attorney

        *Attorneys for Defendants Roderick Coffin*
        *and James Pinette*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 18, 2023, the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO AMEND SCHEDULING ORDER AND FOR LEAVE TO FILE AN AMENDED ANSWER** was electronically filed with the Clerk of the Court using the CM/ECF system, and that a copy was served on the following party by:

| | |
|---|---|
| Robert Purbeck<br>451 W. Waterbury Dr.<br>Meridian, Idaho 83646 | ☒ United States Mail, postage prepaid<br>☐ Fax<br>☐ ECF filing<br>☒ Email |
| Ada County Prosecutor's Office | ☐ United States Mail, postage prepaid<br>☐ Fax<br>☐ ECF filing<br>☒ Email |

                                        /s/ *Chelsie Black*
                                        Paralegal