# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### NEWNAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | :: | |
| | :: | CRIMINAL CASE NO. |
| v. | :: | 3:21-cr-00004-TCB-RGV |
| | :: | **UNDER SEAL** |
| ROBERT PURBECK | :: | |

## <u>MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER</u>

Defendant Robert Purbeck ("Purbeck") is charged in an eleven-count indictment with computer fraud and abuse, in violation of 18 U.S.C. §§ 1030(a)(2)(C), 1030(a)(7)(B), 1030(c)(2)(B)(i), 1030(c)(2)(B)(iii), 1030(c)(3)(A), and 2; wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; and access device fraud, in violation of 18 U.S.C. §§ 1029(a)(2), 1029(c)(1)(A)(i), and 2.  [Doc. 1].[1]  Purbeck has filed a motion to dismiss, [Doc. 30], which the government opposes, [Doc. 43]. Purbeck also has filed a motion and amended motion to suppress searches and seizures related to the search of his residence, [Docs. 26 & 38], as well as a motion and amended motion to suppress email searches, items covered by search warrant No.:121-MC-1981, and a search of one of his computers on January 13, 2022, [Docs 27 & 39], all of which the government opposes, [Docs. 44 & 45], and Purbeck has

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

filed replies in support of these motions, [Docs. 46 & 47]. Finally, Purbeck has filed a motion to suppress statements, [Doc. 25], and following evidentiary hearings on this motion on September 1 and 2, 2022,[2] the parties filed post-hearing briefs, see [Docs. 80, 82, & 85]. For the reasons that follow, it is **RECOMMENDED** that Purbeck's motions to dismiss and to suppress, [Docs. 25, 26, 27, 30, 38, & 39], be **DENIED**.

## I. INTRODUCTION

On March 2, 2021, a federal grand jury in the Northern District of Georgia returned an indictment against Purbeck, a resident of Meridian, Idaho, charging him with computer fraud and abuse, wire fraud, and access device fraud in connection with a series of computer breaches involving medical practices in Griffin, Georgia, and Locust Grove, Georgia; the government of the City of Newnan, Georgia; and an orthodontist in Wellington, Florida. See [Doc. 1]. In particular, the indictment alleges that from June 2017 until about June 2018, Purbeck purchased access credentials, including usernames and passwords, on a criminal marketplace and then later used these stolen access credentials to access

---

[2] See [Doc. 76] for a transcript of the evidentiary hearing held on September 1, 2022, which will be referred to as "(Sept. 1 Tr. at __)." See [Doc. 77] for a transcript of the evidentiary hearing held on September 2, 2022, which will be referred to as "(Sept. 2 Tr. at __)." In addition, the parties submitted exhibits at the evidentiary hearings, which will be referred to as "(Gov't Ex. __)" for the government's exhibits and "(Def. Ex. __)" for Purbeck's exhibits.

the victims' protected computers without authorization to do so and steal medical records, police reports, and other documents containing sensitive personally identifying information. [Id. at 2-4 ¶¶ 7-14]. The indictment also alleges that in July 2018, Purbeck harassed the orthodontist in Wellington, Florida, and threatened to disclose and sell the stolen patient files unless he paid a ransom demand and that he also allegedly identified the names and social security numbers of the orthodontist's minor children and threatened to disclose and sell their personal information. [Id. at 4 ¶¶ 15-16].

Based on these factual allegations, the indictment specifically charges in Counts One through Three that Purbeck, who was also known as "Lifelock," "Studmaster," and "Studmaster1," intentionally accessed protected computers of the Griffin, Georgia, medical clinic on June 25, 2017; the City of Newnan, Georgia, on February 9, 2018; and the Locust Grove, Georgia, medical practice on April 28, 2018, without authorization, and obtained personally identifying information, including names, addresses, birth dates, and social security numbers, for commercial advantage and private financial gain, in violation of 18 U.S.C. §§ 1030(a)(2)(C), 1030(c)(2)(B)(i), 1030(C)(2)(B)(iii), and 2. [Id. at 5-6 ¶¶ 17-18]. Count Four charges that on or about June 18, 2018, and continuing through about July 9, 2018, Purbeck, with the intent to extort money and other things of value, including funds in Bitcoin, from the orthodontist in Florida, transmitted in interstate and

3

foreign commerce, including this district, a "communication containing a threat to obtain information from a protected computer without authorization and to impair the confidentiality of information obtained from a protected computer without authorization," in violation of 18 U.S.C. §§ 1030(a)(7)(B), 1030(c)(3)(A), and 2. [Id. at 6 ¶¶ 19-20]. Counts Five through Eight charge that Purbeck, having knowingly devised a scheme to defraud and obtain money and property under false pretenses, caused the transmission of wire communications to each of the four victims from "Meridian, Idaho, to computer servers located in the Northern District of Georgia," for the purpose of executing his scheme, in violation of 18 U.S.C. §§ 1343 and 2. [Id. at 6-7 ¶¶ 21-22]. Finally, Counts Nine through Eleven charge that Purbeck, knowingly and with the intent to defraud, used and trafficked unauthorized access devices of the two medical practices in Georgia and the City of Newnan, in violation of 18 U.S.C. §§ 1029(a)(2), 1029(c)(1)(A)(i), and 2. [Id. at 7-8 ¶¶ 23-24]. Purbeck has filed several pretrial motions, [Docs. 25, 26, 27, 30, 38, & 39], which are now fully briefed and ripe for ruling.

## II. DISCUSSION

### A.    Motion to Dismiss, [Doc. 30]

Purbeck moves to dismiss Counts Four and Eight of the indictment, which relate to the orthodontist victim in Florida, for lack of venue. See [Doc. 30]. In particular, Purbeck contends that because he resides in Meridian, Idaho, "[a]ny

and all interactions that [ he] may have had, or may not have had, with [the orthodontist in Florida] were via the internet," but that he "never intentionally entered this district or otherwise interacted with this district insofar as [the Florida orthodontist] is concerned" and that "[b]ased on the discovery reviewed thus far, [ he] has not identified any unintentional connection whatsoever involving [ him], [the Florida orthodontist], and this district."  [Id. at 1].  In support of his arguments, Purbeck relies on "a traceroute from his computer to a server," which "displays each of the routers that a communication takes from the source to the destination," [id. at 1-5], and asserts that "there is no evidence of his having any connection with this district insofar as [the Florida orthodontist] is concerned," [id. at 5].  Therefore, he contends that Counts Four and Eight are due to be dismissed for lack of venue.  [Id.].  In response, the government contends that "[b]ecause the [i]ndictment contains a proper statement of venue and the sufficiency of venue is a question properly reserved for the jury, Purbeck's motion to dismiss Counts Four and Eight for lack of venue should be denied."  [Doc. 43 at 1].  For the reasons that follow, the Court agrees with the government and finds that Purbeck's motion to dismiss is due to be denied.

Count Four of the indictment charges, in relevant part:

From on or about June 18, 2018, and continuing through on or about July 9, 2018, in the Northern District of Georgia, Southern District of Florida, and elsewhere, the defendant, [ Purbeck], a.k.a. "Lifelock," a.k.a. "Studmaster," a.k.a. "Studmaster1," aided and abetted by

5

> others unknown to the Grand Jury, with intent to extort from any
> person, namely Victim-3, any money and other things of value,
> namely funds in Bitcoin, transmitted in interstate and foreign
> commerce, including through the Northern District of Georgia, a
> communication containing a threat to obtain information from a
> protected computer without authorization and to impair the
> confidentiality of information obtained from a protected computer
> without authorization, all in violation of Title 18, United States Code,
> Sections 1030(a)(7)(B) and 1030(c)(3)(A) and Section 2.

[Doc. 1 at 6 ¶ 20]. Counts Five through Eight charge Purbeck with wire fraud with respect to each of the four victims, [id. at 6-7 ¶¶ 21-22], and Count Eight in particular charges Purbeck with wire fraud in relation to an email he sent to the Florida orthodontist on July 3, 2018, from "Meridian, Idaho, to computer servers located in the Northern District of Georgia," and states that the conduct occurred in "the Northern District of Georgia and elsewhere," [id. at 6-7 ¶ 22].

Federal Rule of Criminal Procedure 18 provides that "[u]nless a statute or [the] rules permit otherwise, the government must prosecute an offense in a district where the offense was committed," Fed. R. Crim. P. 18,[3] which "clearly

---

[3] Additionally, the United States Constitution provides that "[t]he Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed." United States v. Ramirez-Bravo, CRIMINAL ACTION FILE NO. 1:16-CR-340-ODE-JKL, 2019 WL 7559786, at *3 (N.D. Ga. Aug. 2, 2019) (quoting U.S. Const. art. III, § 2, cl. 3), adopted by 2019 WL 6210888, at *2 (N.D. Ga. Nov. 21, 2019). And, the "Sixth Amendment likewise provides that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district where the

contemplat[es] that multiple districts might provide a proper venue" and "comports with the long-standing rule that where a crime consists of distinct parts which have different localities the whole may be tried where any part can be proved to have been done," United States v. Touray, CRIMINAL CASE NO. 1:20-CR-00103-TWT-LTW, 2021 WL 6066101, at *5 (N.D. Ga. Sept. 3, 2021) (citations and internal marks omitted), adopted by 2021 WL 5195645, at *1-3 (N.D. Ga. Nov. 8, 2021). Moreover, "venue is an essential element of the government's proof at trial," and "[a]s with resolving other important elements contained in a charge, a jury must decide whether the venue was proper." Ramirez-Bravo, 2019 WL 7559786, at *3 (citation and internal marks omitted). That is, "[w]hile venue must ultimately be established by the jury, the sufficiency of the indictment is another matter," and "[a]n indictment returned by a legally constituted and unbiased grand jury, . . . if valid on its face, is enough to call for trial of the charge on the merits." Id. (citation and internal marks omitted). Therefore, "'[i]f a grand jury returns a facially valid indictment containing a proper statement of venue, pretrial determination of venue on the merits is improper because the issue is reserved for a jury's determination.'" Id. (alteration in original) (quoting United States v. Ruiz-Murillo, 736 F. App'x 812, 818 (11th Cir. 2018) (per curiam) (unpublished)).

---

crime shall have been committed.'" Id. (alteration in original) (emphasis omitted) (quoting U.S. Const. amend. VI).

"The Eleventh Circuit applies the following test in determining whether venue is proper: whether, viewing the evidence in the light most favorable to the government and making all reasonable inferences and credibility choices in favor of the jury verdict . . . the [g]overnment proved by a preponderance of the evidence that the crimes occurred in the district in which the defendant was prosecuted." United States v. Williams, Criminal Action File No. 1:10–CR–150–TCB–AJB, 2010 WL 3488131, at *3 (N.D. Ga. Aug. 2, 2010) (first alteration in original) (citation and internal marks omitted), adopted by 2010 WL 3488130, at *1 (N.D. Ga. Aug. 30, 2010). "The locus delicti [of a crime] must be determined from the nature of the crime alleged and the location of the act or acts constituting it," id. (alteration in original) (citation and internal marks omitted), and wire fraud, as charged in Count Eight of the instant indictment, [Doc. 1 at 6-7 ¶¶ 21-22], is "a continuing offense, . . . [and is] properly tried in any district where a . . . wire communication was transmitted in furtherance of [the] fraud scheme," Williams, 2010 WL 3488131, at *3 (second, third, and fourth alterations in original) (citations and internal marks omitted); see also United States v. Glasgow, Case No. 1:21-cr-437-RAH-SMD, 2021 WL 8443805, at *4 (M.D. Ala. Dec. 16, 2021) (citation omitted) ("As it relates to location, an indictment need not specify the exact location of the offense, but rather must be sufficiently specific to allege that the crime was committed within the

jurisdiction of the court."), adopted by 2022 WL 1014953, at *2 (M.D. Ala. Apr. 5, 2022).

Purbeck argues that Counts Four and Eight of the indictment should be dismissed by pointing to "a traceroute from his computer" to show that the wire transmitted was never transmitted through this district, [Doc. 30 at 1-5], but the law "in this Circuit is clear: in ruling on a motion to dismiss, a district court is limited to reviewing the face of the indictment and, more specifically, the language used to charge the crimes," Williams, 2010 WL 3488131, at *3 (citing United States v. Sharpe, 438 F.3d 1257, 1263 (11th Cir. 2006)). Thus, "[a] court may not dismiss an indictment . . . on a determination of facts that should have been developed at trial." Id. (second alteration in original) (citation and internal marks omitted); see also United States v. Torkington, 812 F.2d 1347, 1354 (11th Cir. 1987). "This is because there is no summary judgment in criminal cases," nor "do the rules provide for a pre-trial determination of sufficiency of the evidence." Williams, 2010 WL 3488131, at *3 (alteration omitted).

As the government points out, [Doc. 43 at 4], paragraph 20 in Count Four of the indictment alleges that the offense charged occurred "in the Northern District of Georgia, Southern District of Florida, and elsewhere" and was "transmitted in interstate and foreign commerce, including through the Northern District of Georgia," [Doc. 1 at 6 ¶ 20], and paragraph 22 in Count Eight likewise alleges that

the offense charged occurred "in the Northern District of Georgia and elsewhere" and involved wire transmissions "issued from in or around Meridian, Idaho, to computer servers located in the Northern District of Georgia . . . for the purpose of executing [the] scheme," [id. at 6-7 ¶ 22]. The "sufficiency of a criminal indictment is determined from its face," and thus, "in ruling on [Purbeck's] motion to dismiss, the Court cannot address [his] contentions that the [g]overnment is unable to prove venue," but rather, "the Court is limited to determining whether the government's allegation that [Purbeck] committed the offenses in the Northern District of Georgia and elsewhere is sufficient." Williams, 2010 WL 3488131, at *3-4 (internal marks omitted); see also United States v. Thomas, CRIMINAL ACTION FILE NO. 1:18-cr-141-MLB-AJB, 2021 WL 3674123, at *19 (N.D. Ga. May 17, 2021) (citations omitted) (explaining that "[i]n resolving a defendant's pretrial motion to dismiss, the court is not determining whether the [g]overnment's evidence is sufficient to find that venue is proper in this District – such a determination is left to the trial jury"), adopted by 2021 WL 2886015, at *10 (N.D. Ga. July 9, 2021). Because "[a]n indictment need not specify the exact location of the offense, but rather must be sufficiently specific to allege that the crime was committed within the jurisdiction of the court," and here, "the indictment alleges that the offenses occurred within the Northern District of Georgia," Counts Four and Eight of the indictment are "properly pleaded." Williams, 2010 WL 3488131, at *4 (footnote

10

and citations omitted); <u>see also</u> <u>Thomas</u>, 2021 WL 3674123, at *20 (citation and internal marks omitted) (finding that Counts One and Three, which alleged that the charged offense occurred "in the Northern District of Georgia and elsewhere," sufficiently alleged venue); <u>United States v. Viskup</u>, Criminal Case No. 1:12–CR–263–ODE–JFK, 2013 WL 6858906, at *10 (N.D. Ga. Dec. 30, 2013) (citations and internal marks omitted) (finding that Counts One and Two, which alleged that the charged offense occurred "in the Northern District of Georgia and elsewhere," sufficiently alleged venue and that defendant "may, of course, after the close of the [g]overnment's case, challenge the sufficiency of evidence offered in support of venue by moving for a judgment of acquittal").  Accordingly, "the Court rejects [Purbeck's] contentions that venue is improper in this District," <u>Williams</u>, 2010 WL 3488131, at *4; <u>see also</u> <u>United States v. Lolo</u>, Case No. 8:18-CR-133-T-17AEP, 2018 WL 6619803, at *2 (M.D. Fla. Dec. 18, 2018) (citation omitted) (explaining that "[w]hen venue is properly pleaded, it becomes a trial issue"), and it is therefore **RECOMMENDED** that his motion to dismiss for lack of venue, [Doc. 30], be **DENIED**.

## B.  <u>Motion to Suppress Statements, [Doc. 25]</u>

Purbeck contends that the statements he made during the execution of a search warrant at his residence in Meridian, Idaho, on August 21, 2019, were

obtained in violation of his <u>Miranda</u>[4] rights. [Doc. 80 at 14-19]. He also contends that the fruits of the violation, including coercing him to divulge his computer encryption passwords and to sign a consent form allowing law enforcement to assume his online identities and take over his accounts, must be suppressed as involuntary. [<u>Id.</u> at 19-23]. Finally, Purbeck contends that his statements and the fruits thereof must be suppressed because law enforcement ignored his requests for an attorney. [<u>Id.</u> at 24-25].[5]

In response, the government argues that under the law in both the Ninth and Eleventh Circuits, Purbeck's motion is due to be denied "because he was not in custody during his interview with agents, and therefore not entitled to any *Miranda* warnings, and the record establishes that his statements were made voluntarily." [Doc. 82 at 1]; <u>see also</u> [<u>id.</u> at 8-26]. The government also argues that even if Purbeck's <u>Miranda</u> rights were violated, the contents of his electronic devices should not be suppressed, since his statements were made voluntarily, and that the contents are admissible under the inevitable discovery doctrine. [<u>Id.</u>

---

[4] <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

[5] Purbeck also contends that because the search of his residence and the interrogation took place in Idaho, "which falls within the boundaries of the United States Court of Appeals for the Ninth Circuit, the law of the Ninth Circuit governs the legality of law enforcement's conduct here." [Doc. 80 at 12-13 (citations omitted)].

at 26-29 (citation omitted)]. Finally, the government argues that Purbeck's statements are admissible because he never unequivocally invoked his right to counsel. [Id. at 29-30]. Purbeck has filed a reply in support of his motion to suppress statements, [Doc. 85], and the Court will address the parties' arguments in turn.

### 1. *Statement of Facts*

On August 21, 2019, nine Federal Bureau of Investigation ("FBI") agents, including Atlanta-based Special Agents Roderick Coffin ("Agent Coffin") and James Pinette ("Agent Pinette"), as well as five other FBI personnel, arrived at Purbeck's residence in Meridian, Idaho, to execute a search warrant obtained on August 19, 2019, from the Honorable Ronald E. Bush, Chief United States Magistrate Judge for the United States District Court for the District of Idaho, based on the FBI's identification of Purbeck, an Information Technology ("IT") professional employed by Ada County, Idaho, as an individual suspected of being involved in a series of computer intrusion attacks. (Sept. 1 Tr. at 6-10, 16, 25, 65, 113-14, 142, 187; Sept. 2 Tr. at 39, 59); see also [Doc. 41-2]. Between 7:30 a.m. and 7:35 a.m., the FBI agents, who were armed and wearing body armor, observed Purbeck exit his residence and walk to a car parked in his driveway. (Sept. 1 Tr. at 9, 12-14, 32, 85, 115-16, 142, 150-51, 187-88, 203; Sept. 2 Tr. at 38-39, 46-48). Agents Coffin and Pinette then approached Purbeck as he was standing on the

driver's side of his vehicle, while another agent conducted a brief safety search of Purbeck's waist area for weapons,[6] and the other agents approached Purbeck's residence in a "stacked" formation and knocked on the front door prior to entering the residence and completing a standard safety sweep.[7]  (Sept. 1 Tr. at 12, 43-46, 85, 143, 154, 189, 204, 207, 223-24; Sept. 2 Tr. at 38-40, 46-48, 124).  Upon approach,

---

[6] Purbeck did not recall the safety search of his waist area during this initial encounter, but Agent Coffin testified that a brief safety search was conducted. (Sept. 1 Tr. at 12, 44; Sept. 2 Tr. at 42-43).  Agents Coffin and Pinette also testified that upon their initial approach and as they walked through the residence and to the backyard, Purbeck was not physically restrained and that neither of the agents physically touched him, (Sept. 1 Tr. at 14-15, 17, 41, 84-85, 87, 90, 117, 145, 151, 153); however, Purbeck testified that he became aware of the agents' presence when Agent Coffin touched him on the shoulder and then spoke his name, that he handed his car keys to an agent that asked for them, and that Agent Pinette held on to his arm and physically guided him through the residence to the backyard, though he confirmed that he was not handcuffed or otherwise physically restrained, (Sept. 2 Tr. at 39-41, 43-45, 52, 125, 128, 140-41).

[7] Purbeck testified that he observed law enforcement agents with their guns drawn while approaching his residence, (Sept. 1 Tr. at 85; Sept. 2 Tr. at 40-41, 48, 70, 129-30), and FBI Special Agent Tucker Heap ("Agent Heap") confirmed that the entry team had their weapons drawn as they approached the residence, while FBI Special Agent Clark Harshbarger ("Agent Harshbarger") and Agent Heap both testified that it was standard operating procedure for agents planning to enter a residence to execute a warrant to line up outside with their firearms unholstered and lowered toward the ground, (Sept. 1 Tr. at 183, 189, 205, 208, 221-23). However, Agents Coffin and Pinette testified that their weapons were not drawn when they approached Purbeck in the driveway and that no guns were pointed at Purbeck, (Sept. 1 Tr. at 10, 14, 47, 85, 115, 151); see also (Sept. 1 Tr. at 221), which Purbeck confirmed, (Sept. 2 Tr. at 41, 126).  Once inside the residence, the entry team encountered Purbeck's girlfriend, Sarah Ganger ("Ganger"), in one of the bedrooms.  (Sept. 2 Tr. at 3, 5).

Agents Coffin and Pinette introduced themselves to Purbeck, informed him that the FBI was executing a search warrant but that he was not under arrest,[8] and asked him if he was willing to speak with them as they believed he "could be of assistance in [the] investigation."   (Sept. 1 Tr. at 13, 15, 48, 117-18, 146, 190). Purbeck inquired about getting to work on time, but Agent Coffin advised him that his employer, Ada County, did not expect him to arrive to work on time that day, and Purbeck agreed to speak with the agents.  (Sept. 1 Tr. at 16, 117; Sept. 2 Tr. at 41-42, 45).

Upon entering the residence through the front door, Agent Pinette informed Purbeck that he did not have to stay, but that if he did, they would be limiting his movements.  (Sept. 1 Tr. at 17, 118, 146-48).[9]  Once they were inside the residence, Agents Coffin and Pinette found that it was "very cluttered" and had a "foul odor" so they decided to conduct the interview in the backyard, which was fenced-in with a gate to the street that was not blocked.  (Sept. 1 Tr. at 18-19, 27, 38, 121-22, 190).[10]  The agents interviewed Purbeck while seated in plastic lawn chairs that

---

[8] In fact, Agents Coffin and Pinette testified that prior to the execution of the search warrant, there was no plan to take Purbeck into custody and that they did not have an arrest warrant for Purbeck that day.  (Sept. 1 Tr. at 9, 114-15).

[9] Purbeck testified that he did not hear the agents inform him that he was free to leave.  (Sept. 2 Tr. at 57-58).

[10] While Agents Coffin and Pinette testified that Purbeck asked if he could refill his coffee and they allowed him to do so prior to going into the backyard, (Sept. 1

were arranged in a somewhat triangular formation about two to five feet apart.

(Sept. 1 Tr. at 20-21, 123, 156-57; Sept. 2 Tr. at 133).[11]  When the agents began the

---

Tr. at 18, 121, 167); see also (Sept. 1 Tr. at 193), Purbeck testified that it was not until they were in the backyard that Agent Pinette said that he would get his coffee and asked if he wanted "milk and sugar," (Sept. 2 Tr. at 45-46, 51).  Either way, it is undisputed that Purbeck was provided coffee after he requested a refill and that the coffee was prepared "the way [he] wanted it[.]"  (Sept. 2 Tr. at 143-45).

[11] Purbeck testified that he tried to sit in one of the chairs that was not facing the sun, but that Agent Pinette directed him to a different chair where the sun was shining directly into his eyes.  (Sept. 1 Tr. at 53-54, 92; Sept. 2 Tr. at 46, 50, 54).  However, Agents Coffin and Pinette testified that the chairs were never intentionally positioned so that Purbeck would be in the sunlight and that Purbeck never expressed any concerns about the sun or weather.  (Sept. 1 Tr. at 21, 129, 160).  Agent Harshbarger similarly testified that he observed Purbeck sitting in the shade and that as the sun moved, Agents Coffin and Pinette and Purbeck moved their chairs and changed orientation, but that he only observed Agent Pinette sitting in the sun.  (Sept. 1 Tr. at 194-95).  Purbeck also testified that sometime at the beginning of the interview, his cat ran out the back door and that when he stood to grab his cat, Agent Pinette ordered him to sit back down and instead, Agent Pinette scooped up his cat and tossed him back inside the residence, (Sept. 2 Tr. at 55-56, 142), but Agent Pinette testified that he never touched the cat, (Sept. 1 Tr. at 161).  Purbeck also testified that around this time, another agent came outside and began yelling at him about the whereabouts of a gun while placing his hand on his own holstered gun, (Sept. 2 Tr. at 69-70, 131), but Agent Coffin denied that this occurred and instead explained that an agent came out and, in a "low key tone," asked about the presence of a gun and Purbeck responded that he had one but it was at a different location, (Sept. 1 Tr. at 26, 110-11).  Purbeck also stated that he had his personal and work cellphones on him when he was in the backyard, but early in the interview, Agent Coffin asked him to hand over his phones and denied his request to keep his work cellphone.  (Sept. 2 Tr. at 55-57).  However, it is undisputed that the search warrant authorized the seizure of the cellphones.  See [Doc. 41-2 at 31].

interview, it was approximately 8:00 a.m. and the temperature was "cool" and "pleasant" outside. (Sept. 1 Tr. at 19, 31, 122-23). At the start of the interview, the agents obtained background information from Purbeck, including information about his education and employment, and during the course of the interview, Purbeck appeared to be calm, articulate, and intelligent. (Sept. 1 Tr. at 21-22, 24-25; Sept. 2 Tr. at 72, 150-51, 153).[12] During this initial questioning, Purbeck offered to be of assistance and stated that he was not part of a hacking organization, at which time the agents advised him that they would discuss his assistance after they finished with the initial background questions. (Sept. 1 Tr. at 25).[13]

Agents Coffin and Pinette then proceeded to interview Purbeck specifically about information related to the investigation, including his involvement in online

---

[12] At this time, Purbeck was not restrained in any way, was not threatened with arrest, and though Purbeck testified that neither Agent Coffin nor Agent Pinette advised him that he could leave at any time, they also never advised him that he had to speak with them, he never asked to leave or attempted to leave, and Agent Coffin testified that had Purbeck requested to leave, he would have been allowed to do so. (Sept. 1 Tr. at 16, 18, 21, 40-41, 121-22, 129; Sept. 2 Tr. at 71). Moreover, Purbeck never indicated that he did not want to talk to Agents Coffin and Pinette. (Sept. 1 Tr. at 40, 131). According to the agents, the interview was not recorded but was memorialized on a FD-302 form. (Sept. 1 Tr. at 22, 125, 137, 139-40).

[13] During the background questions, Purbeck stated that he obtained a Bachelor of Science degree from the University of Phoenix and had taken some Master's level classes from the American Public University and that he was employed by Ada County as an IT professional. (Sept. 1 Tr. at 25; Sept. 2 Tr. at 119-20).

darknet markets and particularly AlphaBay.  (Sept. 1 Tr. at 126).  During the course of the interview, the agents challenged Purbeck's recollection of his AlphaBay usernames, and Purbeck confirmed that he used "Studmaster" and "Studmaster1" on AlphaBay.  (Sept. 1 Tr. at 32-33, 41, 97, 126-27).  The agents then asked Purbeck if he had any other AlphaBay usernames, and at this time, Purbeck indicated that he was nervous and asked if he should have an attorney.  (Sept. 1 Tr. at 32-33, 126-27, 173; Sept. 2 Tr. at 73).  The agents informed him that they could not provide legal advice, but that he "was under no obligation to speak to [them] at this time[] and that it was his right to seek legal counsel before answering additional questions."  (Sept. 1 Tr. at 33, 99-100, 127; Sept. 2 Tr. at 73, 76, 78).  Purbeck then asked, "how much time was he looking at," and the agents responded that they "couldn't make any determination of whether he would [ be] charged or if he was charged what potential sentence he would be looking at."  (Sept. 1 Tr. at 33, 127).  The agents further advised him that if he decided to speak with an attorney, doing so expeditiously would be advantageous because he would be able to cooperate more effectively.  (Sept. 1 Tr. at 99-101; Sept. 2 Tr. at 73, 77-78, 215).[14]  At this point,

---

[14] Purbeck testified that at this point, he told Agents Coffin and Pinette that he wished to contact an attorney and asked if he could have his phone to do so, but that the agents denied his request for his phone for fear he would destroy evidence and that they also denied his request to use one of the agents' phones to call an attorney, as well as his request for one of the agents to contact an attorney on his behalf.  (Sept. 2 Tr. at 74-75, 78, 216-17).  However, Agents Coffin and Pinette

Purbeck continued to speak with the agents and admitted to being "[L]ifelock," which was "the identity of one of the hackers that [the FBI was] investigating." (Sept. 1 Tr. at 33-34, 71, 101; Sept. 2 Tr. at 168).[15]  The agents also interviewed Purbeck regarding hacking victims and the computers inside his residence, and Purbeck identified which computer and external hard drive he had used for hacking activities and explained that they were password-protected by VeraCrypt, a type of encryption software.  (Sept. 1 Tr. at 34, 71).  Thereafter, sometime close to 11:00 a.m., Purbeck agreed to provide passwords for his encrypted devices and consented to the FBI assuming his online identities and gaining access to multiple email accounts.  (Sept. 1 Tr. at 34-37, 73; Sept. 2 Tr. at 170-71).

At this time, the agents asked Purbeck whether he would sign a "Consent to Assume Online Identify Authorization Form," which provided, in relevant part, that Purbeck "voluntarily authorize[d] . . . agents of the FBI to assume and use [his] . . . 'online identity[.]'"  (Sept. 1 Tr. at 34-36; Gov. Ex. 6 (emphasis and all caps omitted)).  The form also provided:

> I give this consent freely and voluntarily, without fear, threats, coercion, or promises of any kind.  I have been advised of my right to

---

testified that Purbeck never asked for an attorney or to call an attorney and that he did not ask to use his or the agents' phones to call an attorney.  (Sept. 1 Tr. at 33, 98-99, 128, 173).

[15] Agent Coffin estimated that Purbeck made this statement within the first 90 minutes of the interview.  (Sept. 1 Tr. at 32, 36, 71).

> refuse to allow the FBI to assume my . . . online identity, and I hereby voluntarily waive this right. This online identity includes the following screen name(s), aliases and/or nickname(s), and/or e-mail addresses, as well as the passwords associated with these accounts.

(Sept. 1 Tr. at 34-36; Gov. Ex. 6). The form further explained that Purbeck's authorization would indicate his consent to allow the FBI full access and use of his accounts, including monitoring incoming and outgoing communications, using and disclosing accessed information, searching stored content in the account, and sending and receiving communications with individuals or groups utilizing the named accounts. See (Gov. Ex. 6). Purbeck provided his account names and passwords, which were recorded on this form, and then he and Agents Coffin and Pinette all signed and dated the form. (Sept. 1 Tr. at 35, 101, 174; Gov. Ex. 6). The form also explained that Purbeck would no longer have access to the accounts provided and that his "authorization [was] valid from the date of signature" and would "continue until such time as [he] revoke[d] this authorization." (Gov. Ex. 6).[16]

---

[16] Purbeck testified that he only disclosed his passwords and signed the consent form because he believed that was the only way he would receive any grace from Agents Coffin and Pinette and because he was a "little bit out of it," since he had consumed no water since the prior evening, was sweaty, and had the sensation that he had been in the sun too long. (Sept. 2 Tr. at 81, 99-101). Additionally, many of the passwords, including the one he provided for VeraCrypt and those found on a handwritten list recovered by agents during the search of the residence, used the dictionary word, "leviathan," and Agent Coffin testified that it would have been "trivially simple" to decrypt Purbeck's devices even if he had not provided

During the course of the interview, the agents and Purbeck moved their chairs to try to stay in the shade because it was getting warmer outside, but at some point, Purbeck stopped moving his chair.[17] (Sept. 1 Tr. at 28, 106-07, 129, 177). Purbeck appeared calm throughout the interview, and at no point did he appear dehydrated, sick, in pain or discomfort, or sunburned, nor did he ask for food, water, medication, or a hat or sunscreen, and he was allowed to use the

---

the password and explained that the FBI had in fact successfully decrypted one of Purbeck's computers using the word "leviathan" and password-cracking technology. (Sept. 1 Tr. at 79-81). Purbeck also testified that at the same time he was presented with the consent form, Agents Coffin and Pinette provided him with his Miranda rights by handing him an FBI Advice of Rights form, which he and the agents signed. (Sept. 2 Tr. at 86-92, 201, 217-18). He further testified that the agents recorded this portion of the interview and asked him whether he understood his Miranda rights, and Purbeck stated that this was the first time he had seen the recorder. (Sept. 2 Tr. at 88-91, 200-04). Agents Coffin and Pinette, however, denied providing Purbeck with his Miranda rights, including any Miranda form, as well as recording any portion of the interview, and in fact, they testified that they did not even have a recorder in their possession that day. (Sept. 1 Tr. at 21-22, 102-05, 123-25, 174-75).

[17] Although Purbeck testified that the agents repeatedly ensured that he was being interviewed while sitting in the direct sunlight, Agents Coffin and Pinette testified that they did not intentionally keep him in the sun, and Purbeck admits that one of the agents asked him whether the sun was in his eyes and that after he responded affirmatively, the agents moved him to a different place in the yard, though Purbeck contends that the sun was again in his eyes after he moved to the different location. (Sept. 1 Tr. at 105-06, 129; Sept. 2 Tr. at 67-68). Ganger, Purbeck's girlfriend, also testified that when she looked through a window, she saw Purbeck sitting in the sun. (Sept. 2 Tr. at 8-13).

bathroom in his house once or twice, though he was escorted for officer safety.[18] (Sept. 1 Tr. at 23-24, 26-27, 40-41, 108, 131, 167-68, 216-17, 235; Sept. 2 Tr. at 92-93, 148, 155-56, 168).  At some point during the interview, Purbeck's plastic lawn chair collapsed and he fell to the ground, at which time the agents helped him up and retrieved a wooden chair from the residence for him to sit on.  (Sept. 1 Tr. at 112, 130; Sept. 2 Tr. at 94, 98-99, 165-66).  The agents testified that the interview did not have a "hard end" time because they went into the residence at various times while Purbeck remained in his backyard for the duration of the search.  (Sept. 1 Tr. at 36-37, 69-70, 131-32).

At some point during the interview, the agents learned that individuals from Ada County were coming to interview Purbeck.  (Sept. 1 Tr. at 88).  Agents Coffin and Pinette testified that prior to executing the search warrant that morning, they were unaware that anyone from Ada County would be coming that day.  (Sept. 1 Tr. at 89, 162).  The Ada County personnel arrived prior to lunch,

---

[18] Purbeck testified that he was suffering from heat cramps and that he had trouble walking to the bathroom and had to be assisted by Agent Pinette.  (Sept. 2 Tr. at 78, 92-94).  He also explained that his urine was a dark brown color, similar to cola.  (Sept. 2 Tr. at 95).  Ganger also testified that following the conclusion of the interview, she observed Purbeck "in a lot of pain," drinking "a lot of water," and that he had what she believed was "third-degree sunburn," but she conceded that she did not have any medical training and that Purbeck never sought medical attention.  (Sept. 2 Tr. at 16-17, 23, 28-29, 31, 115).

sometime around 11:30 a.m., and Agent Pinette observed the interview, which involved Purbeck, his immediate supervisor, and an Ada County detective, but he did not participate in this interview by asking any questions. (Sept. 1 Tr. at 38, 132, 166, 231; Sept. 2 Tr. at 101-03, 164).[19]   However, during the Ada County interview, Agent Pinette learned that Purbeck had a hard drive in his pocket after Purbeck handed it to him and realized that Purbeck had not been searched for evidence or weapons other than the initial search of his waist area when they first arrived. (Sept. 1 Tr. at 133). Agent Pinette then conducted a search of Purbeck for approximately five to ten seconds for any weapons or other evidence. (Id.).

The search of the residence concluded at approximately 2:00 p.m. (Sept. 1 Tr. at 37-38, 75-76). During the course of the interview with Agents Coffin and Pinette, and after the agents concluded speaking with him, Purbeck was not placed under arrest and nor was he threatened, restrained, coerced, or promised anything in return for his statement or his signature on the consent form.[20] (Sept. 1 Tr. at 26,

---

[19] At the beginning of this interview, Detective Ryan Pacheco ("Det. Pacheco") read Purbeck his Miranda rights and then questioned him about various items related to his employment at Ada County. (Sept. 1 Tr. at 226, 230; Sept. 2 Tr. at 104-06). Det. Pacheco recorded this interview, but he testified that the recording was accidentally erased. (Sept. 1 Tr. at 233).

[20] Purbeck testified that he thought that he was going to lose his job if he did not speak with the agents, but he also stated that no one ever told him he would be terminated if he did not agree to talk with Agents Coffin and Pinette, nor was he told that he was under arrest at any point during the day. (Sept. 1 Tr. at 13, 15,

40-41, 129, 133; Sept. 2 Tr. at 140-41, 147). The agents were calm and cordial and they never raised their voices, though at some points they were stern, nor did the agents display their weapons to Purbeck, though Purbeck testified that they were visible in their side holsters. (Sept. Tr. 1 at 24, 128; Sept. 2 Tr. at 126, 132, 150, 215-16). During the interview, Purbeck seemed to understand everything that was being asked of him and did not appear to be under the influence of drugs or alcohol, nor did he request that the agents cease interviewing him or express a desire to leave, and no one ever told him he would lose his job if he did not speak with the agents. (Sept. 1 Tr. at 24, 40, 119, 124; Sept. 2 Tr. at 151-52). The agents left Purbeck's residence at the conclusion of the interview without arresting him. (Sept. 1 Tr. at 133; Sept. 2 Tr. at 109).[21] Subsequently, Purbeck contacted Agent

_____

117-18, 133, 146; Sept. 2 Tr. at 60-63). He also testified that he was kept separate from his girlfriend during the entire encounter that day, but Agents Coffin and Pinette testified that Purbeck never asked to see Ganger and that they would have allowed Purbeck to see her had he made that request. (Sept. 1 Tr. at 89-90, 152, 168-69; Sept. 2 Tr. at 64-66).

[21] Purbeck testified that he was in bad condition after the agents left his residence that day due to the prolonged sun exposure, which was exacerbated by his blood pressure and psychiatric medications, and that he thought he was on the verge of organ failure, (Sept. 2 Tr. at 113-15, 160, 179, 227-30); however, the certified climate data showed the dry bulb temperatures outside throughout the morning were between 75 and 84 degrees with low humidity, (Sept. 1 Tr. at 29-31; Sept. 2 Tr. at 174-75, 239; Gov. Ex. 5), and Agents Coffin and Pinette testified that Purbeck did not appear sick, drenched in sweat, to be in pain, or to be suffering from a heat-related condition and that Purbeck never complained about anything, (Sept. 1 Tr. at 39-40, 108, 130, 177); see also (Sept. 2 Tr. at 164-65). Indeed, Purbeck confirmed

that he did not seek any medical attention following the conclusion of the interview. (Sept. 2 Tr. at 160, 179, 207-09). Additionally, Purbeck repeatedly admitted that he had memory problems with respect to the events that occurred on August 21, 2019, which had led to his amending or seeking to amend a civil complaint he filed against the agents due to inaccurate or false allegations and that he had done "his best to recall from memory," but "as evidence came to light from the government, that [he] considered reliable, then [he] was able to jog [his] memory and make changes as necessary." (Sept. 2 Tr. at 135-36, 138-40, 169, 191-92, 205). For example, Purbeck alleged in July 2022 in his civil action that Assistant United States Attorney Nathan Kitchens ("AUSA Kitchens") was present at his residence in Idaho during the execution of the search warrant on August 21, 2019, and directed the agents during the execution, but Purbeck then withdrew the allegation six weeks later and testified that he no longer believed AUSA Kitchens was present, despite his allegation that he had "great confidence" that AUSA Kitchens was at his residence during the search. (Sept. 2 Tr. at 192, 195, 197-200). Emergency physician Jonothan Allen, M.D. ("Dr. Allen"), also testified at the evidentiary hearing and stated that if the Court believed the recitation of events as testified by Agents Coffin and Pinette, his opinion was that Purbeck was not suffering from a heat-related illness, but that if Purbeck's recitation of events was accurate, his opinion was that Purbeck was suffering from heat exhaustion based on his symptoms and would not be in a position to make an informed medical care decision, though he also admitted he never personally examined Purbeck and that someone suffering from a heat-related illness such as heat exhaustion could still be "100 percent cognitively intact" and does not "exclude the possibility that [the individual] could perfectly comprehend and answer the agents' questions[.]" (Sept. 2 Tr. at 218-19, 226, 233-36, 243, 255, 260-61). However, Dr. Allen also testified that the temperature through 11:00 a.m. was at 84 degrees and "would not be sufficient to subject [Purbeck] to the potential for a heat-related illness" and that he was relying on the symptoms presented as testified by Purbeck to diagnose heat exhaustion. (Sept. 2 Tr. at 240-41). He further testified that the degree of temperature that was accepted in the literature to have a "significant effect on the mental and physical performance [was] 85 degrees ambient," but that the focus should be on the wet bulb temperature, which takes into account the relative humidity and solar radiance, and that the wet bulb temperature on August 21, 2019, did not exceed 62 degrees from 7:53 a.m. to 11:53 a.m., which was "well below the wet bulb temperatures that [the article] identifie[d] as where there

Coffin and explained that he had additional information he wanted to share with the FBI, and in early September 2019, Purbeck flew to Atlanta for a proffer session at the FBI's office with Agents Coffin and Pinette. (Sept. 1 Tr. at 39, 42-43, 134; Sept. 2 Tr. at 115, 182, 190). Thereafter, in December 2019, Purbeck contacted Agent Pinette to discuss the investigation and during this conversation, Purbeck was calm and friendly. (Sept. 1 Tr. at 134-36; Sept. 2 Tr. at 188-89; Gov. Ex. 7).

Purbeck moves to suppress statements he made during the interview on August 21, 2019, including the disclosure of his password. [Docs. 25 & 80]. The government opposes his motion, [Doc. 82], and Purbeck has filed a reply in support of his motion, [Doc. 85]. The Court will address the parties' arguments.

### 2. Analysis

#### a. Applicable Standard

"A threshold question is what law a district court should apply when a defendant seeks suppression of evidence that derives from alleged federal constitutional violations that occurred in a different circuit." United States v. Restrepo, 890 F. Supp. 180, 191 (E.D.N.Y. 1995). Rather than address the factors that have been established by the Eleventh Circuit for determining whether an individual is in custody for purposes of Miranda, Purbeck relies on factors and

---

[were] concerns about the effects of heat on cognitive performance[.]" (Sept. 2 Tr. at 240, 263-69).

precedent set forth by the Ninth Circuit. See [Doc. 80 at 12-17]. In particular, Purbeck maintains that "[b]ecause the search of [his] home and his custodial interrogation took place in Idaho, which falls within the boundaries of the United States Court of Appeals for the Ninth Circuit, the law of the Ninth Circuit governs the legality of law enforcement's conduct here." [Id. at 12-13 (citations omitted)]; see also [Doc. 85 at 1-12].

The government responds that while "the few federal cases to have considered the choice-of-law issue in the criminal context have mainly adopted the *lex loci* approach," meaning, "the law of the forum in which the officer's conduct occurred," this case is distinguishable because it involves agents from the prosecuting jurisdiction and one court has suggested that "where agents are based in the prosecuting forum—the law of that forum, rather than the forum in which conduct occurred, should apply," since the primary purpose is to deter future police misconduct. [Doc. 82 at 9 (citations omitted)]. The government also contends that despite Purbeck's argument to the contrary, see [Doc. 80 at 13], the Court "need not resolve this issue, because . . . regardless of which circuit's law applies, the result is the same—[Purbeck's] motion fails because the interview was non-custodial," [Doc. 82 at 8 (footnote and citation omitted)].

As a general matter, this Court "must apply the caselaw of the Eleventh Circuit—not the Ninth Circuit," S.S. v. Warden, Stewart Det. Ctr., CASE NO. 4:20-

CV-59-CDL-MSH, 2020 WL 7701520, at *3 (M.D. Ga. Oct. 15, 2020), adopted by 2020 WL 7700582, at *1 (M.D. Ga. Dec. 28, 2020), but "several district courts have held that where, as here, a court in one circuit is considering the propriety of officers' actions in another circuit, the court should apply the law of the circuit where the officers' challenged conduct occurred, i.e., the 'lex loci,'" reasoning "that officers should be able to rely on their understanding of the law as their circuit has interpreted it," United States v. Maley, Cr. No. 13-3696 RB/KK, 2020 WL 1041545, at *6 (D.N.M. Mar. 3, 2020) (citations omitted) (citing United States v. Ozuna, 129 F. Supp. 2d 1345, 1354 (S.D. Fla. 2001), aff'd, 48 F. App'x 739 (11th Cir. 2002) (unpublished)), aff'd, 1 F.4th 816 (10th Cir. 2021). However, in this case, the agents whose conduct in Idaho is being challenged were based in Atlanta, and "the investigation leading to the [search] warrant's issuance occurred in [Atlanta]," and thus, "[t]hese circumstances make it more difficult to ascertain which law should apply" since Atlanta-based FBI agents executing a search warrant "arising out of a[n Atlanta ] investigation should have been able to rely on their understanding of the law as the [Eleventh] Circuit has interpreted it." Maley, 2020 WL 1041545, at *6 (internal citations omitted); see also Restrepo, 890 F. Supp. at 191 (explaining that the "Memphis officers should have been able to rely on their understanding of the law in the Sixth Circuit and could not have been expected to know the law in circuits other than the one in which they were operating" and thus,

"suppression of evidence inadmissible in [the Second] circuit but admissible in the Sixth Circuit would not deter misconduct of officers based in Memphis; rather, it would penalize officers' good faith efforts to comply with the law"). However, the Court need not "decide whether Ninth or [Eleventh] Circuit law applies because . . . there was no constitutional violation even under the Ninth Circuit's . . . precedent." Maley, 2020 WL 1041545, at *6 (citation omitted).

### b. Custodial Interrogation

Purbeck first argues that because "the FBI extracted [ his] computer passwords and other incriminating statements during a custodial interrogation without first advising him of his Miranda rights, those statements must be suppressed." [Doc. 80 at 14]. The ruling in Miranda requires law enforcement officers to apprise a defendant in custody of his Fifth Amendment rights before engaging in interrogation. See Stansbury v. California, 511 U.S. 318, 322 (1994) (citations omitted); United States v. Crawford, 372 F.3d 1048, 1059 (9th Cir. 2004) (citations omitted); Garcia v. Singletary, 13 F.3d 1487, 1489 (11th Cir. 1994).[22] "Statements made in violation of Miranda are not admissible at trial." United

---

[22] Interrogation for Miranda purposes "means 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" United States v. Gomez, 927 F.2d 1530, 1538 (11th Cir. 1991) (alteration in original) (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)); see also United States v. Williams, 842 F.3d 1143, 1147 (9th Cir. 2016) (citation omitted).

States v. Barry, 479 F. App'x 297, 299 (11th Cir. 2012) (per curiam) (unpublished) (citation omitted); see also United States v. Gomez, 725 F.3d 1121, 1125 (9th Cir. 2013) (citation omitted).

The agents' questioning of Purbeck at his residence on August 21, 2019, clearly constituted interrogation, but the parties dispute whether he was in custody for Miranda purposes at the time of the interview. See [Doc. 80 at 14-17; Doc. 82 at 10-21]. A defendant is in custody under Miranda when there has been a "'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'"[23] United States v. Brown, 441 F.3d 1330, 1347 (11th Cir.

---

[23] To the extent Purbeck argues that he was in custody for purposes of Miranda because a reasonable person in his situation would not have felt free to leave, see [Doc. 80 at 16-17], the "Supreme Court [has] clarified 'that the freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody,'" United States v. Parker, Criminal Case No. 1:10-CR-0176-JEC-JFK, 2010 WL 5313758, at *8 (N.D. Ga. Nov. 18, 2010) (quoting Maryland v. Shatzer, 559 U.S. 98, 112 (2010)), adopted by 2010 WL 5313449, at *1 (N.D. Ga. Dec. 17, 2010). In other words, "'a free-to-leave inquiry reveals only whether the person in question was seized.' While 'seizure is a necessary prerequisite to Miranda, . . . a court must [also] ask whether . . . a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest.'" United States v. Luca-Encinas, 603 F.3d 876, 881 (11th Cir. 2010) (alterations in original) (citations omitted); see also United States v. McGhee, CRIMINAL CASE NO.: 1:16-cr-00015-25-AT-JSA, 2016 WL 8857016, at *3 (N.D. Ga. Nov. 10, 2016), adopted by 2017 WL 1745055, at *1 (N.D. Ga. May 2, 2017). Thus, "the standards are different," and a person is in custody for Miranda purposes only where there is a "restraint on freedom of movement to the degree associated with a formal arrest." United States v. Street, 472 F.3d 1298, 1310 (11th Cir. 2006) (citation and internal marks omitted); see also Crawford, 372 F.3d at 1059 (citation omitted);

2006) (citation omitted) (quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983));
<u>see also</u> <u>Crawford</u>, 372 F.3d at 1059 (citation omitted). However, "[a]n
interviewee's 'status as a suspect, and the coercive environment that exists in
virtually every interview by a police officer of a crime suspect,' does not
automatically create a custodial situation." <u>United States v. Matcovich</u>, 522 F.
App'x 850, 851 (11th Cir. 2013) (per curiam) (unpublished) (quoting <u>United States
v. Muegge</u>, 225 F.3d 1267, 1270 (11th Cir. 2000) (per curiam)); <u>see also</u> <u>Oregon v.
Mathiason</u>, 429 U.S. 492, 495 (1977); <u>United States v. Phillips</u>, 812 F.2d 1355, 1360
(11th Cir. 1987) (per curiam) (citation omitted) (quoting <u>Minnesota v. Murphy</u>, 465
U.S. 420, 431 (1984)) ("'[T]he mere fact that an investigation has focused on a
suspect does not trigger the need for *Miranda* warnings in noncustodial
settings[.]'"). Instead, whether a suspect is in custody "depends on whether under
the totality of the circumstances, a reasonable [person] in his position would feel a
restraint on his freedom of movement to such extent that he would not feel free to
leave." <u>Barry</u>, 479 F. App'x at 299 (quoting <u>Brown</u>, 441 F.3d at 1347); <u>see also</u>
<u>United States v. Bassignani</u>, 575 F.3d 879, 883 (9th Cir. 2009) (citation omitted).

---

<u>United States v. Dix</u>, Criminal Case No. 3:12–cr–00007–TCB–RGV, 2013 WL
610219, at *3 n.15 (N.D. Ga. Jan. 29, 2013) (citation and internal marks omitted)
("Custody for *Miranda* purposes requires a greater restraint on freedom than
seizure under the Fourth Amendment."), adopted by 2013 WL 609458, at *1 (N.D.
Ga. Feb. 19, 2013).

This test is objective, and "the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." Brown, 441 F.3d at 1347 (citation and internal marks omitted); see also Bassignani, 575 F.3d at 883 (citation omitted). Thus, "[t]he 'initial step' in determining whether a person was in 'custody' under *Miranda* 'is to ascertain whether, in light of the objective circumstances of the interrogation' and the totality of all the circumstances, 'a reasonable person would have felt that he . . . was not at liberty to terminate the interrogation and leave.'" Matcovich, 522 F. App'x at 851 (quoting Howes v. Fields, 132 S. Ct. 1181, 1189 (2012)); see also United States v. Kim, 292 F.3d 969, 973–74 (9th Cir. 2002) (citations omitted). "[T]he reasonable person from whose perspective 'custody' is defined is a reasonable innocent person." Street, 472 F.3d at 1309 (internal marks omitted) (quoting United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996)); see also United States v. Guzman-Padilla, 573 F.3d 865, 884 (9th Cir. 2009) (citations omitted). "Thus, [t]he mere fact that an investigation has focused on a suspect does not trigger the need for Miranda warnings in noncustodial settings." United States v. Dudley, Criminal Case No. 1:10–CR–075–CAP–RGV, 2011 WL 1100607, at *4 (N.D. Ga. Feb. 3, 2011) (alteration in original) (citation and internal marks omitted), adopted by 2011 WL 1060659, at *1 (N.D. Ga. Mar. 24, 2011); see also Kim, 292 F.3d at 973-74 (citations omitted); United States v. Sharma, No. 6:09–CR–1–ORL–19GRJ, 2009 WL 152868, at *6 (M.D. Fla.

Jan. 21, 2009) ("[W]hat the government agents thought or knew about [d]efendant's situation is wholly irrelevant in the absence of evidence showing that the circumstances were such that a reasonable innocent person would not have felt free to leave."), adopted at *1.

In the Eleventh Circuit, the Court must "consider several factors in determining custody, 'including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled.'" Barry, 479 F. App'x at 299 (quoting Street, 472 F.3d at 1309). "Other factors include the duration of the questioning, statements made during the interview, the presence of physical restraints during questioning, and the release of the interviewee at the end of the questioning[.]" United States v. Young, CRIMINAL CASE NO. 3:16-cr-00006-TCB-RGV, 2017 WL 653556, at *3 (N.D. Ga. Jan. 25, 2017) (alteration in original) (footnote, citation, and internal marks omitted), adopted by 2017 WL 635120, at *1 (N.D. Ga. Feb. 16, 2017). That is, factors relevant to this determination include but are not limited to "the location of the interview, the existence of any physical restraints such as handcuffs or drawn weapons, whether the suspect asked to leave, the officers' demeanor, the degree of pressure applied to the suspect, and whether the officers brandished weapons, touched the suspect or used language or a tone that indicated that compliance with the officers could be compelled." United States v. Martinez-Leal,

33

Criminal Action No. 1:11-CR-19-TCB-CCH, 2011 WL 3328907, at *15 (N.D. Ga. July

6, 2011) (citations and internal marks omitted), adopted by 2011 WL 3328682, at *3

(N.D. Ga. Aug. 2, 2011); see also United States v. Santos, Criminal Action No. 1:11–

CR–259–WBH–CCH, 2012 WL 2061613, at *15 (N.D. Ga. Apr. 24, 2012) (citations

omitted), adopted by United States v. Hill, Civil Action No. 1:11–CR–0259–WBH,

2012 WL 2062419, at *4 (N.D. Ga. June 7, 2012).[24]

Applying these factors to the interview of August 21, 2019, the Court finds

that Purbeck was not in custody for purposes of Miranda.  During his encounter

with Agents Coffin and Pinette, Purbeck was unrestrained in a familiar

environment; he was never advised that he was under arrest or that he could not

leave; and his freedom of movement was not restrained as evidenced by the fact

---

[24] "The Ninth Circuit determined that drawing the line between a non-custodial in-home interrogation from a custodial one hinges on the extent to which the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of the home into a police-dominated atmosphere." United States v. Akpan, No. 2:05–cr–00304–RCJ–RJJ, 2009 WL 418599, at *14 (D. Nev. Feb. 17, 2009) (citation and internal marks omitted).  The factors considered in the Ninth Circuit in determining whether the circumstances present a "police-dominated atmosphere" include: "(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made." Id. (citation and internal marks omitted); see also United States v. Craighead, 539 F.3d 1073, 1084 (9th Cir. 2008).

that he was not handcuffed or retrained in any way and was interviewed in his own backyard where egress and ingress through a gate was not blocked. (Sept. 1 Tr. at 13, 15, 19, 38, 117-18, 146; Sept. 2 Tr. at 140-42). While Purbeck contends that Agent Coffin initially made physical contact with him by tapping him on the shoulder and pronouncing his name and that Agent Pinette held on to his arm as they guided him through the residence to the backyard, he admits that neither agent drew their weapons, nor made any show of force or display of authority beyond identifying themselves as FBI agents, and at the conclusion of the interview, Purbeck was allowed to leave. (Sept. 2 Tr. at 39-41, 43-45, 52, 125-26, 128, 140-41).[25] "Moreover, the evidence is undisputed that [Agents Coffin and

---

[25] While there is a discrepancy regarding whether Agent Coffin touched Purbeck's shoulder and Agent Pinette had his hand on Purbeck's arm and actually guided him, without force, through the residence to the backyard for the interview, see (Sept. 1 Tr. at 14-15, 17, 41, 84-85, 87, 90, 117, 145, 151, 153; Sept. 2 Tr. at 39-40, 43-45, 52, 124-25, 128, 140-41), it is undisputed that neither Agent Coffin nor Agent Pinette physically touched Purbeck during the interview and that Purbeck was never physically restrained or threatened in any way during the entire encounter, which was largely calm and cordial, see (Sept. 1 Tr. at 16, 18, 21-22, 24, 26, 40-41, 121-22, 128-29, 133; Sept. 2 Tr. at 71, 126, 132, 140-41, 147, 150, 215-16). Even under Purbeck's version of events, Agent Pinette's "touching [Purbeck] briefly to guide him to a specific area . . . could not reasonably suggest to [him] that his . . . interaction with [ them] was suddenly compulsory." United States v. Jackson, Criminal No. 09–475, 2011 WL 2580758, at *3 (E.D. Pa. June 28, 2011) (citation omitted). Indeed, assuming Agent Coffin touched Purbeck's shoulder in the driveway and Agent Pinette had his hand on Purbeck's shoulder or arm as they walked to the backyard, such "touching did not amount to 'a laying on of hands

Pinette] interviewed [Purbeck] in a conversational, non-confrontational manner, the atmosphere was cordial and [Purbeck] was cooperative," United States v. Damiani, Criminal Action File No. 1:10–CR–519–AT/AJB, 2011 WL 7574628, at *5 (N.D. Ga. Sept. 23, 2011) (citations omitted), adopted by 2012 WL 983726, at *1 (N.D. Ga. Mar. 20, 2012); see also (Sept. 1 Tr. at 15, 21-22, 24, 40, 43, 119, 124, 128-29, 134; Sept. 2 Tr. at 26, 126, 132, 150-52, 215-16), which shows that the "overall [] tone of the interview was not such that it indicated that compliance with the officers would be compelled," Asher, 2010 WL 4192883, at *11 (citation and internal marks omitted).

Additionally, while Purbeck contends that he was never informed that he was free to leave, both Agents Coffin and Pinette testified that Purbeck was advised at the outset that he was not under arrest, and Agent Pinette testified that he advised Purbeck that he did not have to stay, but that if he did, his movements would be limited. (Sept. 1 Tr. at 13, 15, 117-18, 146-48; Sept. 2 Tr. at 57-58). Purbeck "never attempted to leave and was not told that he was not free to leave." United States v. Willoughby, CRIMINAL CASE NO. 1:11-CR-0280-CAP-JFK, 2011 WL 13136957, at *3 (N.D. Ga. Oct. 21, 2011) (citation omitted); see also (Sept. 1 Tr. at 16,

_____

or application of physical force to restrain movement.'" Id. (quoting California v. Hodari D., 499 U.S. 621, 626 (1991)).

18, 21, 40-41, 121-22, 129; Sept. 2 Tr. at 71).[26]  Moreover, the duration of the interview with the FBI agents, which was at most three and a half hours before the Ada County personnel arrived and interviewed Purbeck, also factors in favor of finding that Purbeck was not in custody.  See United States v. McDowell, 250 F.3d 1354, 1363 (11th Cir. 2001) (finding four-hour interview was not converted into a custodial interrogation, explaining that there was "no fixed limit to the length of questioning"); see also (Sept. 1 Tr. at 19, 31, 34-38, 73, 122-23, 132, 166, 231; Sept. 2 Tr. at 101-03, 164, 170-71).

Furthermore, after considering all the testimony, as well as the demeanor and interests of the witnesses, the Court finds that Purbeck's testimony regarding

---

[26] Purbeck asserts that he was never offered food or water during the interview, see [Doc. 80 at 16]; however, it is undisputed that he was provided coffee and a bathroom break upon his request, and he has not shown that he made any other requests during the interview that were denied, (Sept. 1 Tr. at 23-24, 26-27, 40-41, 89-90, 108, 131, 152, 167-69, 216-17, 235; Sept. 2 Tr. at 64-66, 92-93, 143-45, 148, 155-56, 168).  And, while Purbeck asserts that the agents intentionally positioned him in the direct sunlight throughout the duration of the interview, Agents Coffin and Pinette testified that they did not deliberately place Purbeck in the sun and that they were moving their chairs throughout the interview as the position of the sun changed, but that at some point, Purbeck stopped moving his chair.  (Sept. 1 Tr. at 28, 105-07, 129, 177; Sept. 2 Tr. at 67-68).  Indeed, Agent Harshbarger testified that when he observed the agents and Purbeck outside, Purbeck was in the shade and that the only person he saw in the sun was Agent Pinette.  (Sept. 1 Tr. at 194-95).  Agent Heap testified that when he observed the interview taking place, it appeared that all of them were in the sun, not just Purbeck.  (Sept. 1 Tr. at 214-15, 229).

all of the circumstances surrounding the interview was not fully credible as it was contradicted by the more credible and consistent testimony of Agents Coffin and Pinette.  See United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing that credibility determinations are within the province of the factfinder); see also United States v. Anderson, 56 F.4th 748, 759 (9th Cir. 2022) (per curiam) (citation omitted) (explaining that "special deference [is given] to the district court's credibility determinations").   "In making its credibility determination[s], the Court must take into consideration not only the interests of the witness[es], but also 'the internal consistency of the [witnesses'] testimony, or [their] candor or demeanor on the stand.'"  United States v. Tyler, No. CR 106-075, 2006 WL 2094538, at *7 (S.D. Ga. July 26, 2006) (quoting United States v. Ramirez-Chilel, 289 F.3d 744, 749-50 (11th Cir. 2002) (citations omitted)), adopted at *1; see also United States v. Ramos, 65 F.4th 427, 436 (9th Cir. 2023) (citation omitted). Therefore, to the extent Purbeck's testimony conflicts with Agents Coffin and Pinette, the Court finds credible and accepts the agents' testimony over that of Purbeck, who admitted multiple times on direct and cross-examination that he had "some memory problems" associated with that day and conceded that several items in his affidavit and civil pleadings were wrong, and he actually corroborates much of what Agents Coffin and Pinette said about the interview, including admitting that no one ever told him he was under arrest, he was never physically

restrained, and that he never indicated that he did not want to talk to them or requested that the agents stop the interview. (Sept. 2 Tr. at 60-63, 135-36, 138-41, 147, 151-52, 169, 191-92, 195, 197-200, 205). Indeed, Purbeck's testimony at the hearing was illogical and even fanciful at times as he seemed to embellish and speculate about circumstances that he stated as fact. See generally (Sept 2 Tr. at 38-218).[27]

The Court is simply not persuaded that the circumstances of Purbeck's interview "present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." United States v. Peck, 17 F. Supp. 3d 1345, 1359 (N.D. Ga. 2014) (citation omitted). The circumstances under which Purbeck spoke with Agents Coffin and Pinette fall far short of the degree of restraint necessary to trigger Miranda advisements. See Yarborough v. Alvarado, 541 U.S. 652, 661 (2004); Mathiason, 429 U.S. at 495; United States v. Hampton,

---

[27] For the same reasons, the Court finds Agents Coffin and Pinette's testimony that they never provided Purbeck with his Miranda rights, including any Miranda form, or recorded any portion of the interview, but only provided him the consent to assume his online identities authorization form more credible than Purbeck's version of events, (Sept. 1 Tr. at 21-22, 102-05, 123-25, 174-76), and the credible record demonstrates that Purbeck was not provided his Miranda rights until Ada County personnel, including Det. Pacheco, arrived to interview Purbeck and that it was Det. Pacheco who recorded that interview, (Sept. 1 Tr. at 226, 230, 233; Sept. 2 Tr. at 104-06). Therefore, the Court need not address Purbeck's argument that the agents' belated Miranda warnings do not save his post-Miranda statements. See [Doc. 80 at 18-19].

Criminal Case No. 1:11–cr–00410–RWS–RGV, 2012 WL 1354579, at *15 (N.D. Ga. Mar. 5, 2012) (citation and internal marks omitted) ("Lack of arrest is a [v]ery important factor weighing against custody."), adopted by 2012 WL 1354574, at *1 (N.D. Ga. Apr. 17, 2012), aff'd, 553 F. App'x 955 (11th Cir. 2014) (per curiam) (unpublished).

Although Purbeck, relying on the Ninth Circuit decision in Craighead, 539 F.3d at 1073, argues that his "home was dominated by police activity, and no reasonable person in his situation would have believed he could end the interrogation and leave," [Doc. 80 at 16-17], the circumstances present in Craighead are distinguishable from this case. In Craighead, the Ninth Circuit first explained that "courts have generally been much less likely to find that an interrogation in the suspect's home was custodial in nature" as "the suspect is in familiar surroundings," but that "[n]evertheless an interrogation in the suspect's home may be found to be custodial under certain circumstances." 539 F.3d at 1083 (citations and internal marks omitted). Craighead involved eight law enforcement officers representing three different agencies, including the FBI, a sheriff's department, and Air Force Special Investigations, accompanied by the defendant's Air Force superior officer, all of whom were armed and some of whom had unholstered firearms in the defendant's presence, who entered the defendant's home to execute a search warrant and interviewed the defendant, who was an

electronic warfare technician in the United States Air Force. Id. at 1078-79, 1085-86. Although the defendant in Craighead was informed he was free to leave and would not be arrested that day, he was interviewed in a closed-door storage room within his home located on the military base, with an agent "block[ing his] exit from the room" throughout the interview. Id. at 1079, 1085-86. Indeed, the Craighead Court found it significant that although the defendant was not physically restrained or handcuffed, he was interviewed in a closed-door storage room that was blocked by law enforcement while he was also isolated from others, including the military personnel who was brought for the defendant's emotional support, emphasizing that the interview occurred in the unfinished storage room instead of "a suspect's kitchen, living room, or bedroom [which] might allow the suspect to take comfort in the familiar surroundings of the home and decrease the sensation of being isolated in a police-dominated atmosphere." Id. at 1086-88.

Here, in contrast, Purbeck, was advised that he was not under arrest prior to any questioning and was not ordered to submit to any questioning but was initially approached in his driveway and agreed to be interviewed, was questioned in his own backyard by two FBI agents, who did not unholster their weapons in Purbeck's presence, though a larger search team of FBI agents had their weapons drawn upon entry into the residence, and the agents who interviewed Purbeck remained calm and cordial and did not raise their voices, though at some points

they were stern, (Sept. 1 Tr. at 10, 13-17, 21-22, 24, 38, 43, 47-48, 85, 115, 117-18, 124, 128-29, 134, 146, 151, 183, 189-90, 205, 208, 221-23; Sept. 2 Tr. at 40-41, 48, 70, 126, 129-30, 150, 221), and the fact that "Craighead was in the military, living in base housing and the search team was accompanied by one who was a superior officer, is completely different from this case, where [Purbeck] lived in his private home with his [girlfriend] and was not effected by the military chain of command," United States v. Asher, Criminal Indictment No. 1:09–CR–414–JOF/AJB, 2010 WL 4192883, at *13 (N.D. Ga. Feb. 25, 2010), adopted by 2010 WL 4237579, at *7 (N.D. Ga. Oct. 21, 2010); see also United States v. Quackenbush, 728 F. App'x 777, 778 (9th Cir. 2018) (unpublished) (distinguishing Craighead based in part on its "military undertone"); United States v. Ornelas, Case No.: SACR 14-00183-CJC, 2016 WL 5422034, at *8 (C.D. Cal. Sept. 27, 2016) (citations omitted) (noting that the "environment where the interview took place was nothing like that in Craighead," since the "interview was held in [d]efendant's familiar, open-aired, and verdant backyard"). Although Purbeck was isolated from his girlfriend, who remained inside the residence while he was in the backyard, Purbeck never requested to see her and would have been allowed to do so had he asked. (Sept. 1 Tr. at 89-90, 95-96, 152, 168-69; Sept. 2 Tr. at 64-66). And, while Purbeck points out that the agents seized his car keys, [Doc. 80 at 16], this fact does not transform an otherwise non-custodial interrogation into a custodial one under Ninth Circuit

precedent. See United States v. Guadagni, 583 F. App'x 778, 779 (9th Cir. 2014) (unpublished) (citations omitted) (finding the district court did not err in denying defendant's motion to suppress statements, explaining that "[t]hough [defendant] was physically restrained when law enforcement took his keys and parked his car into his driveway, and was isolated from others in his house," he had voluntarily agreed to answer questions "and was interrogated in a cordial manner in a physically open setting"); see also Ornelas, 2016 WL 5422034, at *7 (citations omitted) (rejecting defendant's arguments that the fact that he "was not permitted to enter the house," make a phone call, and "that his keys and wallet were taken by law enforcement" transformed the interrogation into a custodial one, explaining defendant "was prohibited from entering the house because the search was ongoing," his "mobile phones and car were among the items and places specifically to be searched," and "[t]his scenario is typical of interrogations conducted while a search warrant is being executed").[28]

Purbeck's reliance on Craighead is simply misplaced, and instead, this case is more akin to other Ninth Circuit decisions finding that defendants were not

---

[28] Additionally, although Purbeck asserts that the FBI "also ignored his requests for counsel," [Doc. 80 at 17], his "out-of-custody request for an attorney did not trigger protection under *Miranda* or *Edwards*," United States v. Ramos, No. CR-20-00051-002-TUC-JAS (DTF), 2021 WL 409758, at *8 (D. Ariz. Feb. 5, 2021), adopted by 2021 WL 10429455, at *3 (D. Ariz. Mar. 16, 2021), aff'd, 65 F.4th 427 (9th Cir. 2023).

subject to a custodial interrogation. See Quackenbush, 728 F. App'x at 778-79 (finding defendant was not in custody during the interrogation where defendant "was not a member of the military," he was interviewed in his "dining room, in view of his apartment's open front door," there was "no evidence that anyone was barred from entering the apartment," and he was advised that he was not under arrest and was free to leave); United States v. Young, 622 F. App'x 694, 695 (9th Cir. 2015) (unpublished) (citations omitted) (finding defendant's "statements made in his home should not be suppressed," since defendant "was not in 'custody' under the meaning of *Miranda*," where defendant's "home had not become a police-dominated atmosphere," even though "many officers forcefully entered [defendant's] residence at 6 a.m.," because the "totality of the circumstances demonstrate[d] that [defendant] was not in custody," including that the "door connecting the garage to the main portion of the house remained open and unblocked during the entire interview"; defendant "was not moved to the garage to isolate him, but because the rest of the house was too cluttered to arrange three chairs in one area"; defendant "was told at least twice, including once at the outset of the interview, that he was not under arrest"; the "tone of the interview was non-confrontational"; and "a reasonable person in [defendant's] position would have felt free to terminate the interview and leave the garage"); United States v. Wilder, 627 F. App'x 639, 639-40 (9th Cir. 2015) (unpublished) (finding

the district court properly denied defendant's motion to suppress statements where defendant, "an educated, middle-aged man who was interviewed in the backyard of his home," failed to show that his "will was overborne at the time he confessed" and the "conduct of the agents in [the] interview did not amount to impermissible coercion"); United States v. Murray, 696 F. Supp. 2d 1044, 1054-56 (D. Ariz. 2010) (finding interrogation was not custodial where although the search of defendant's home involved ten armed federal agents, two armed state police officers, and a photographer in the early morning hours and law enforcement who were part of the entry team initially had their weapons drawn when entering defendant's home, defendant was not restrained or placed in handcuffs, was informed twice that he was not under arrest, was interviewed in his backyard with only two officers present while the other officers were searching the house, and there was no evidence of any pressure or coercion). "Under these circumstances, even if [the Court] appl[ies] the four-factor *Craighead* test, [it] would not find that [Purbeck] could succeed in showing that his interrogation gave rise to the kind of police-dominated atmosphere that triggers *Miranda* protections." United States v. Saylor, 705 F. App'x 369, 374 (6th Cir. 2017) (unpublished); see also United States v. Dacorta, Case No. 8:19-cr-605-WFJ-CPT, 2021 WL 5055049, at *14-16 (M.D. Fla. Sept. 24, 2021) (footnote omitted) (applying "the same factors that the Ninth Circuit applied in *Craighead*" and finding that, although "the search team . . .

consisted of more officers than those utilized in *Craighead*," defendant's residence was larger "than the presumably more modest confines of the standard military quarters at issue in *Craighead*," he was interviewed in a well-lit room with large windows, his family was on the other side of the door had he wished to speak with them or end his conversation, and "none of the officers unholstered their weapons following their initial encounter with [the defendant] at the inception of the search," and that while the officers' seized defendant's vehicles, leaving him with no way to leave his home, the evidence did not support a finding that defendant "was unable to leave his home without the use of his vehicles, or that he could not have simply stopped talking to the officers," and therefore, defendant "was not in *Miranda* custody at the time he made the challenged statements").

In sum, there is simply no evidence that Purbeck was physically restrained in any manner comparable to being placed in custody or that he reasonably felt compelled to stay until the questioning had been completed, and the Court finds that Purbeck's freedom of movement was not restrained at any point during the encounter to the degree associated with a formal arrest under either the Eleventh or Ninth Circuits' precedent. See Muegge, 225 F.3d at 1269-71; Young, 622 F. App'x at 695. Indeed, nothing suggests that a reasonable person in Purbeck's position would not have felt free to terminate the interview at any time and therefore, no Miranda warnings were required prior to the agents' questioning of

Purbeck.  See United States v. Augustin, Criminal Case No. 1:11–CR–41–AT–LTW, 2011 WL 5358526, at *3 (N.D. Ga. Aug. 19, 2011), adopted by 2011 WL 5331743, at *5 (N.D. Ga. Nov. 4, 2011); see also Ornelas, 2016 WL 5422034, at *6-10 (concluding that based on "the totality of circumstances," defendant "was not in custody while the officers questioned him at his house" as the "circumstances [] were significantly less coercive than, and distinct from, those in *Craighead*, and that a reasonable person in [d]efendant's position would have felt free to leave or terminate the interview").  Accordingly, under the totality of the circumstances here, the agents were not required to provide Purbeck with Miranda warnings prior to interviewing him as he was not in custody for purposes of Miranda.  The statements were not obtained in violation of Miranda, and they are not due to be suppressed on that basis.  See United States v. Harder, 180 F. Supp. 3d 355, 364 (E.D. Pa. 2016).

### c.    Voluntariness

Purbeck also argues that the "disclosure of his passwords was involuntary, so any information obtained through [the] use of the passwords must be suppressed as fruit of the poisonous tree."  [Doc. 80 at 20]; see also [Doc. 85 at 13]. In particular, Purbeck maintains that the "totality of the circumstances show that [ his] statements to police were not freely given," including that he "was subjected to inhumane physical conditions by being forced to sit for hours in direct sunlight

in [] August heat without water or food," that he was "worried about his disabled girlfriend," that he "fear[ed] for his job," and that agents "ignore[d] his requests for counsel,[] telling him that he had to hurry up and cooperate without the benefit of counsel." [Doc. 80 at 20-21].

Although the Court finds that Purbeck's statements were not taken in violation of Miranda, "the [C]ourt still must determine that any confessions or incriminatory statements made by [Purbeck] were voluntary in order to admit them at trial." United States v. Lazarus, 552 F. App'x 892, 895 (11th Cir. 2014) (per curiam) (unpublished) (citing United States v. Bernal–Benitez, 594 F.3d 1303, 1317–18 (11th Cir. 2010)). Whether a statement was voluntarily given must be examined in light of the totality of the circumstances. United States v. Shepherd, Criminal Case No. 1:11–cr–00058–ODE–RGV–1, 2011 WL 4443440, at *7 (N.D. Ga. Aug. 23, 2011) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); Hubbard v. Haley, 317 F.3d 1245, 1252 (11th Cir. 2003)), adopted by 2011 WL 4443435, at *1 (N.D. Ga. Sept. 21, 2011). "This totality of the circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of 'an essentially free and unconstrained choice.'" United States v. Villaverde-Leyva, Criminal Action File No. 1:10-CR-035-RWS/AJB, 2010 WL 5579825, at *11 (N.D. Ga. Dec. 9, 2010) (citation omitted), adopted by 2011 WL 121932, at *1 (N.D. Ga. Jan. 14, 2011); see also Crawford, 372 F.3d at 1060 (citations omitted). "Among the

48

factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." Villaverde-Leyva, 2010 WL 5579825, at *11 (citations omitted); see also United States v. Moran-Can, No. CR-22-01661-001-TUC-SHR (LCK), 2023 WL 2727824, at *5 (D. Ariz. Mar. 31, 2023) (citations omitted).

The focus of the voluntariness inquiry is whether Purbeck was coerced by the government into making the statement, so "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421 (1986); see also Berghuis v. Thompkins, 560 U.S. 370, 382 (2010) (citation omitted); Collazo v. Estelle, 940 F.2d 411, 415 (9th Cir. 1991) (citation omitted); United States v. Cordova, 829 F. Supp. 2d 1342, 1353 (N.D. Ga. 2011) (citation omitted), adopted at 1345. Thus, "[t]hose cases where courts have found confessions to be involuntary 'have contained a substantial element of coercive police conduct.'" United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *4 (N.D. Ga. Aug. 10, 2007) (quoting Colorado v. Connelly, 479 U.S. 157, 164 (1986)), adopted at *1; see also Connelly, 479 U.S. at 167 ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary[.]'"); United States v. Preston, 751 F.3d 1008, 1019 (9th Cir. 2014)

(citation omitted); <u>Demarest v. Sec'y, Dep't of Corr.</u>, Case No. 8:13-cv-75-T-36TBM, 2016 WL 951913, at \*6 (M.D. Fla. Mar. 14, 2016) (citation omitted). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." <u>United States v. Jones</u>, 32 F.3d 1512, 1517 (11th Cir. 1994) (per curiam) (citation omitted); <u>see also</u> <u>Preston</u>, 751 F.3d at 1016; <u>Trethewey v. Farmon</u>, 39 F. App'x 591, 593 (9th Cir. 2002) (unpublished) (citation omitted); <u>Martin v. Wainwright</u>, 770 F.2d 918, 926 (11th Cir. 1985) (alteration in original) (citation and internal marks omitted) (noting that the test for determining voluntariness of a confession and whether coercion was present is whether the defendant's "will [was] overborne and his capacity for self-determination critically impaired"), <u>modified in unrelated part by</u>, 781 F.2d 185 (11th Cir. 1986) (per curiam).

Purbeck argues that his statements were made in a "inhumane" setting, involving sitting "for hours in direct sunlight" while being worried about his girlfriend "who was trapped incommunicado inside their home with multiple armed agents," where, due to "suffering symptoms of heat exhaustion," he would not have understood that he could voluntarily refuse to answer the agents' questions, so his statements were "not the product of a rational intellect and a free will," and thus, should be suppressed. [Doc. 80 at 20-21 (citation and internal

marks omitted)]. The government contends that "every factor weighs in favor of finding that Purbeck's statements were voluntary," pointing out that "[a]t the outset, the agents asked if Purbeck wished to answer their questions; they did not compel him to participate in the interview"; they "never handcuffed or otherwise restrained Purbeck (aside from the brief safety check)"; Purbeck agreed that the "interviewing agents never threatened him, drew their weapons, exerted physical force, or yelled at him"; Purbeck was "highly educated, ha[d] been employed in a technically sophisticated job for nearly two decades, and admitted that he understood the agents' questions and could intelligently answer them"; and that the "length of the interview also suggest[ed] that Purbeck's statements were made voluntarily," since he "made his critical admissions within the first three hours of speaking with the agents in the backyard (and more likely within the first ninety minutes)." [Doc. 82 at 22-23 (citations omitted) (citing (Sept. 1 Tr. at 41-42; Sept. 2 Tr. at 84, 119-21, 152-53))]. Again, the Court agrees with the government.

"A confession is involuntary if the suspect's 'will was overborne in such a way as to render his confession the product of coercion.'" Demarest, 2016 WL 951913, at *6 (quoting Arizona v. Fulminante, 499 U.S. 279, 288 (1991)); see also Doody v. Ryan, 649 F.3d 986, 1008 (9th Cir. 2011) (citation omitted); United States v. Pinder, CRIMINAL ACTION FILE NO. 1:08-CR-421-03-MHS/AJB, 2009 WL 10670633, at *30 (N.D. Ga. Dec. 23, 2009) (citation and internal marks omitted)

("Determining if a confession is voluntary requires examining whether a defendant's will was overborne by the circumstances surrounding the giving of a confession."), adopted by 2010 WL 11507903, at *14 (N.D. Ga. Mar. 6, 2010), aff'd, 437 F. App'x 816 (11th Cir. 2011) (per curiam) (unpublished).  As previously noted, the Court must consider the totality of the circumstances, including the location of the interview, to determine whether Purbeck's statements were voluntary.  Pinder, 2009 WL 10670633, at *30 (citations omitted); see also Preston, 751 F.3d at 1016 (citations omitted); Bernal-Benitez, 594 F.3d at 1319 (citation omitted) ("[The Court] consider[s] the totality of the circumstances, including the details of the interrogation and the defendant's characteristics, when deciding whether a confession was voluntary.").

"Considering the totality of the circumstances as established by the evidence adduced at the evidentiary hearing, the Court finds that the government has demonstrated by a preponderance of the evidence that [Purbeck's] statements were entirely voluntary."  United States v. Lynn, 547 F. Supp. 2d 1307, 1311 (S.D. Ga. 2008), adopted at 1308 (citations omitted); see also Murray, 696 F. Supp. 2d at 1056.  The interview with the FBI agents on August 21, 2019, which was conducted in Purbeck's backyard and lasted no more than three and a half hours, was not unreasonably long, see Shriner v. Wainwright, 715 F.2d 1452, 1455 (11th Cir. 1983) (concluding that statements made during a five-hour interrogation were not

involuntary); see also United States v. Manning, 312 F. App'x 34, 35-36 (9th Cir. 2009) (unpublished) (finding defendant's confession voluntary where she "was questioned for over four hours," but "she made her first confession 70 minutes into the interview").  Additionally, the agents generally maintained a calm and cordial tone, albeit stern at times, during the interview, did not brandish their weapons, and did not use any physical force against Purbeck or threaten him in any way, nor did they make any promises to him, see (Sept. 1 Tr. at 15, 26, 40-41, 128-29, 133; Sept. 2 Tr. at 140-41, 147); see also Moran, 475 U.S. at 421 (citation omitted) ("[T]he record is devoid of any suggestion that police resorted to physical or psychological pressure to elicit the statements."); Manning, 312 F. App'x at 36 (finding confession was voluntary where there was "no evidence in the record to suggest that the [] agents obtained the statements by the use of any physical or psychological coercion or by improper inducement so that [the defendant's] will was overborne"); Miller v. Dugger, 838 F.2d 1530, 1537 (11th Cir. 1988) (finding that "there was no official overreaching that could have rendered [defendant's] statement involuntary" under the totality of the circumstances, including that "[t]he transcript [did] not suggest, nor d[id] [defendant] allege, that the police either applied physical force or threatened to do so").

While Purbeck argues that he was suffering from symptoms of heat exhaustion, [Doc. 80 at 21], the evidence shows that the dry bulb temperatures

outside throughout the morning were between 75 and 84 degrees, while the wet bulb temperatures, which Dr. Allen testified should be the focus, did not exceed 62 degrees, and Dr. Allen confirmed that 85 degrees ambient was the degree of temperature that was accepted to have a significant effect on the mental and physical performance of an individual and that 84 degrees dry bulb temperature would not be sufficient to subject Purbeck to the potential for a heat-related illness, (Sept. 1 Tr. at 29-31; Sept. 2 Tr. at 174-75, 239-41, 263-69; Gov. Ex. 5).  In fact, Dr. Allen also confirmed that even if an individual was suffering from a heat-related illness such as heat exhaustion, he could still be "100 percent cognitively intact" and could comprehend and answer questions.  (Sept. 2 Tr. at 218-19, 226, 233-36, 243, 255, 260-61).  Purbeck confirmed that he understood what was being asked of him and was "able to intelligently respond to the question[s] . . . . for the most part," (Sept. 2 Tr. at 151-52), while Agents Coffin and Pinette testified that Purbeck never appeared sick, dehydrated, sunburned, sweaty, or to be suffering from a heat-related condition and that Purbeck never complained about anything or made any requests, (Sept. 1 Tr. at 39-40, 108, 130, 177).  Indeed, despite Purbeck's incredible testimony that he thought he was on the verge of organ failure after sitting in the direct sunlight for hours on August 21, 2019, he admitted he never sought any medical attention, and he even subsequently flew to Atlanta for a proffer session with the agents just weeks later.  (Sept. 1 Tr. at 39, 42-43, 134; Sept.

2 Tr. at 113, 115, 160, 179, 182, 190, 207-09, 227-30).  And, as the government points out, Purbeck "had two cups of coffee, was permitted to go the bathroom, and was never deprived of anything if he asked," [Doc. 82 at 23], and thus, Purbeck's assertion that he "was subjected to inhumane physical conditions," [Doc. 80 at 20], is not supported by the credible evidence of record.

Purbeck argues that the "agents hounded him for his computer passwords," while "ignoring his requests for counsel, and telling him that he had to hurry up and cooperate without the benefit of counsel."  [Doc. 80 at 21].  He asserts that he "said he wanted a lawyer when the agents badgered him about his computer passwords," but that the "agents made it clear that [ he] was allowed no access to any phone" and denied his request for the agents to call a lawyer, and that any statements made after he invoked his right to counsel should be suppressed.  [Id. at 24].  Specifically, Purbeck contends that he made "multiple unambiguous requests for counsel" and that the agents "should have ceased the interrogation until a lawyer could be made available to him," but instead, "they tried to discourage him from getting a lawyer, saying he had to move expeditiously and cooperate with the government before someone else cooperated," which "was a clear violation of [ his] rights."  [Id. at 24-25 (citations omitted)]; see also [Doc. 85 at 13-14].  The Court finds Purbeck's arguments unpersuasive.

"[A] suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning," Davis v. United States, 512 U.S. 452, 458 (1994), and "if a suspect requests counsel at any time during [an] interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation," id. (citation omitted) (citing Edwards v. Arizona, 451 U.S. 477, 484-85 (1981)).  Courts have to "determine whether the accused *actually invoked* his right to counsel," which is an objective inquiry.  United States v. Gonzalez-Delgado, 4:16-cr-259-AKK-TMP, 2017 WL 874571, at *3 (N.D. Ala. Feb. 7, 2017) (citations and internal marks omitted) (quoting Davis, 512 US. at 458-59), adopted by 2017 WL 840591, at *1 (N.D. Ala. Mar. 3, 2017), aff'd, 709 F. App'x 670 (11th Cir. 2018) (per curiam) (unpublished); see also United States v. Younger, 398 F.3d 1179, 1187 (9th Cir. 2005) (citations omitted); Ford v. Schofield, 488 F. Supp. 2d 1258, 1290 (N.D. Ga. 2007) (citation omitted), aff'd sub nom., Ford v. Hall, 546 F.3d 1326 (11th Cir. 2008).  "Invocation of the *Miranda* right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney."  Gonzalez-Delgado, 2017 WL 874571, at *3 (citation and internal marks omitted) (quoting Davis, 512 US. at 458-59); see also Younger, 398 F.3d at 1187 (citations omitted).  That is, "[t]he suspect's request for counsel must be unambiguous and unequivocal."  United States v. Propst, 369 F. App'x 42, 46 (11th

Cir. 2010) (per curiam) (unpublished) (citation omitted) (citing <u>Davis</u>, 512 U.S. at 452); <u>see also</u> <u>Tobias v. Arteaga</u>, 996 F.3d 571, 580 (9th Cir. 2021) (citation omitted). If a suspect "makes a statement concerning the right to counsel that is ambiguous or equivocal or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his . . . *Miranda* rights." <u>United States v. Thomas</u>, Criminal Action No. 4:13-CR-22-RLV, 2014 WL 793359, at *7 (N.D. Ga. Feb. 25, 2014) (internal marks omitted) (quoting <u>Berghuis</u>, 560 U.S. at 381), <u>aff'd</u>, 621 F. App'x 618 (11th Cir. 2015) (per curiam) (unpublished).

Although Purbeck asserts that he clearly and unambiguously expressed a desire for a lawyer during the interview, [Doc. 80 at 21, 24], as the government points out, [Doc. 82 at 29], even assuming Purbeck had been subjected to a custodial interrogation,[29] he asked the agents "if he should have an attorney," (Sept. 1 Tr. at 32-33, 98, 126), which Purbeck confirmed and admitted was equivocal, (Sept. 2 Tr. at 73), at which time, the agents advised him that they could

---

[29] To be clear, "*Miranda* rights cannot be asserted outside the context of custodial interrogation," and an "individual cannot, therefore, assert his . . . *Miranda* right to counsel before he . . . is in custody." <u>United States v. Clark</u>, 600 F. Supp. 3d 251, 272 (W.D.N.Y. 2022) (citation and internal marks omitted); <u>see also</u> <u>United States v. Sater</u>, 477 F. Supp. 3d 372, 383 (M.D. Pa. 2020) (citation omitted) (explaining that the "right to remain silent and the right to counsel pursuant to *Miranda* can only be involved during a custodial interrogation[]").

not provide legal advice, but that he was under no obligation to speak with them and that it was his right to seek legal counsel prior to answering additional questions and that if he decided to speak with an attorney, he should do so expeditiously as it would be to his advantage, (Sept. 1 Tr. at 33, 99-101, 127; Sept. 2 Tr. at 73, 76-78, 215). Purbeck's question about whether he should have an attorney present "is at best an ambiguous request to speak to counsel," United States v. Creech, 52 F. Supp. 2d 1221, 1232 (D. Kan. 1998) (citation omitted), aff'd, 221 F.3d 1353 (10th Cir. 2000) (unpublished), and is legally indistinguishable from the statement made in Davis, 512 U.S. at 455, 462 (citation and internal marks omitted) ("Maybe I should talk to a lawyer"), which was found to not constitute an unambiguous request for counsel, id. at 462; see also United States v. Peters, 435 F.3d 746, 751-52 (7th Cir. 2006) (citations omitted) (observing that circuits have held that a statement such as "I might want to talk to an attorney" or "[d]o you think I need a lawyer?" or a request to call someone about possible representation is too ambiguous to constitute invocation of right to counsel); Soffar v. Cockrell, 300 F.3d 588, 595 (5th Cir. 2002) (finding defendant did not unequivocally invoke his right to counsel when he asked the officer whether he should get an attorney, how he could obtain one, and how long it would take to have an attorney appointed); United States v. Zamora, 222 F.3d 756, 766 (10th Cir. 2000) (finding the statement "I might want to talk to an attorney" was not "an unequivocal request

for counsel"); Diaz v. Senkowski, 76 F.3d 61, 63-66 (2d Cir. 1996) (finding continued questioning was permissible because defendant's question, "Do you think I need a lawyer?" was not a clear, unambiguous invocation of his right to counsel); United States v. Doe, 60 F.3d 544, 546 (9th Cir. 1995) (per curiam) (citation and internal marks omitted) (finding mother's statement that "maybe he ought to see an attorney," was "not clear and unambiguous" and that the "officers were not required to clarify [the] ambiguous statement"); United States v. Ramirez, No. CR02–3008MWB, 2002 WL 31933026, at *7-8 (S.D. Iowa Apr. 16, 2002) (finding defendant's initial question to the officer about whether he should speak with an attorney was not an unambiguous request to speak to an attorney, especially in light of the fact that the officer responded by "telling him it was entirely his choice and they would provide an attorney if he wanted one"). Moreover, despite Purbeck's assertion that he was pressured to cooperate without the assistance of counsel, [Doc. 80 at 21, 25], the credible evidence of record simply does not support this assertion, and in fact, demonstrates that no promises or threats were made in exchange for his statements, (Sept. 1 Tr. at 18, 26, 41, 129). And, as the government points out, [Doc. 82 at 24], an "interrogating agent's promise to inform the government prosecutor about a suspect's cooperation does not render a subsequent statement involuntary, even when it is accompanied by a promise to recommend leniency or by speculation that cooperation will have a positive

effect," United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th Cir. 1988) (citations omitted); see also United States v. Harrison, 34 F.3d 886, 891 (9th Cir. 1994) (citation omitted) (explaining that a statement that a defendant would receive a benefit upon cooperation was permissible speculation and in most cases, would not be "sufficiently compelling to overbear a defendant's will").

Thereafter, Purbeck contends that he told Agents Coffin and Pinette that he would like to use a phone to call an attorney or that he asked "if [he] could use [his] phone to call a lawyer," but that the agents denied his request to use his phone and also denied his request to use one of their phones or for one of the agents to contact an attorney on his behalf. (Sept. 2 Tr. at 74-75, 78, 216-17). However, Agents Coffin and Pinette clearly testified that Purbeck never asked for an attorney, to call an attorney, or for the agents' phones to call an attorney for them to contact one on his behalf, (Sept. 1 Tr. at 33, 98-99, 128, 173), and as stated earlier, the Court finds the agents' testimony credible on this point, especially considering that following this alleged interaction, Purbeck voluntarily spoke to Ada County personnel after being advised his Miranda rights and agreed to waive his rights without requesting to speak with an attorney at that time and Purbeck's admission that he had memory problems with regard to the events that took place that day which has led to a number of inaccurate and false allegations as asserted in his affidavit filed in civil litigation. (Sept. 1 Tr. at 226, 230; Sept. 2 Tr. at 104-06,

135-36, 138-40, 169, 191-92, 195, 197-200, 205).  "In general, [Purbeck's] testimony was incredible" in that he "contradicted himself . . . and told an untenable story," and "[h]is testimony was not plausible."  Ramos, 2021 WL 409758, at *9.

Purbeck also argues that he "reasonably feared that failure to answer the agents' questions would result in the loss of his job" and that he was forced to choose between incriminating himself or losing his job and that his statements were therefore involuntary.  [Doc. 80 at 21-22 (citing Garrity v. New Jersey, 385 U.S. 493 (1967))].  Specifically, Purbeck contends that he was employed by Ada County "and was required, as a condition of his employment, to cooperate with any county-initiated investigation[]," as well as any "official internal and external investigation conducted by or at the request of Ada County" per the Ada County Employee Manual and that "he could be terminated if he did not."  [Id. at 22 (citations omitted)].  He further contends that because Agent Coffin advised him during the initial encounter that his employer did not expect him to arrive to work on time on August 21, 2019, "he was placed in a penalty situation."  [Id. (citation and internal marks omitted)].

In Garrity, the Supreme Court ruled that statements made by police officers during an internal investigation were not voluntary where they were told that they did not have to answer questions that would tend to incriminate them, but if they refused to answer, they would be subject to termination because "[t]he option to

lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent."  385 U.S. at 497. However, as the government points out, [Doc. 82 at 25-26], Purbeck did not face a similar dilemma here, since there is no evidence in the record that the agents explicitly threatened Purbeck's employment, but asked him if he would be willing to speak to them, and Purbeck admitted that aside from the background questions about his employment, neither Agent Coffin nor Agent Pinette asked him about any problems or wrongdoing at his place of employment and that no one ever advised him that he would lose his job if he did not speak with the agents, but that was simply his belief.  (Sept. 1 Tr. at 13, 15, 24-25, 117-18, 133, 146; Sept. 2 Tr. at 60-63, 153-54).  And, the evidence demonstrates that Purbeck was advised that he was not under arrest and that he could leave but that if he stayed, his movements would be limited, and that he was advised that he did not have to speak with the agents.  See (Sept. 1 Tr. at 13, 15, 33, 114, 117-18, 133, 146-48).  "[F]or an employee to be coerced, he must both be objectively threatened with a substantial adverse employment consequence for refusing to incriminate himself and be subjectively aware of that penalty," and "it is only when both elements are satisfied that the employee is denied the free choice to admit, to deny, or to refuse to answer incriminating questions, and thus entitled to suppression of his statements[.]" United States v. Wells, 55 F.4th 784, 797 (9th Cir. 2022) (citation and internal marks

omitted); see also United States v. Smith, 821 F.3d 1293, 1302 (11th Cir. 2016). And, while the employee manual provides for the discipline of an employee, up to and including termination, for various violations, including "[i]mpeding, interfering with, or failing to cooperate in an official internal or external investigation conducted by or at the request of the County," [Doc. 71-17 at 5-6]; see also (Sept. 2 Tr. at 61-62), "the mere possibility of future discipline [was] not enough to trigger *Garrity* protection," and "*Garrity* does not stand for the proposition that a statement is coerced whenever there is a speculative possibility of termination if the [] employee refuses to answer incriminating questions," Wells, 55 F.4th at 795 (first alteration in original) (citations and internal marks omitted) (quoting Smith, 821 F.3d at 1303). Thus, Purbeck did not face the dilemma presented in Garrity, and his statements were not involuntarily made on this basis.[30]

---

[30] Purbeck also contends that his consent and signing of the consent form allowing the agents to assume his online accounts was not voluntary because he signed the form "only because of the physical and psychological coercion" and that "all evidence or information gained through that consent form must be suppressed." [Doc. 80 at 23 (footnote and internal marks omitted)]. However, "[c]onsent to search is 'voluntary' if it is 'the product of an essentially free and unconstrained choice by its maker.'" United States v. Whitworth, 856 F.2d 1268, 1279 (9th Cir. 1988) (quoting Schneckloth, 412 U.S. at 225). Whether consent "was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances," Schneckloth, 412 U.S. at 227, and factors generally considered in determining whether a person voluntarily consented include: (1) whether defendant was in custody; (2) whether the officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether defendant was notified that he had a right not

In sum, because Purbeck's statements were made voluntarily, and he did not make an unequivocal or unambiguous statement invoking his right to counsel, his statements on August 21, 2019, are not due to be suppressed.  See <u>United States v. Grant</u>, Criminal Action No. 1:09–CR–482–TWT–LTW, 2011 WL 2580867, at *7

---

to consent; and (5) whether defendant had been told a search warrant could be obtained, <u>United States v. Patayan Soriano</u>, 361 F.3d 494, 502 (9th Cir. 2004) (citations omitted).  Here, as the government contends, "[f]or many of the same reasons that Purbeck's statements were made voluntarily, he knowingly, intelligently, and voluntarily consented to the FBI taking over his online and email accounts."  [Doc. 82 at 27].  That is, despite Purbeck's assertion of "physical and psychological coercion," [Doc. 80 at 23], Agents Coffin and Pinette credibly testified that Purbeck's physical and mental condition at the time of his consent seemed normal and that he did not appear to be under the influence of drugs or alcohol, dehydrated, sick, or suffering from a heat-related condition; he was calm and coherent and did not indicate that he misunderstood anything the agents asked of him; he was not physically restrained and was in his backyard when he signed the consent form; there was no evidence that any agent threatened or otherwise coerced him into consenting and signing the consent form; he was not in custody or under arrest; and the consent form, which was signed by Purbeck and the agents, advised Purbeck that he had a right to refuse consent, (Sept. 1 Tr. at 23-24, 26-27, 34-37, 40-41, 73, 101, 108, 131, 167-68, 174, 216-17, 235; Sept. 2 Tr. at 92-93, 148, 155-56, 168, 170-71; Gov. Ex. 6).  And, while Purbeck was not apprised of his <u>Miranda</u> rights prior to consenting, "[t]he lack of a . . . <u>Miranda</u> warning . . . does not preclude a finding of voluntariness," and in fact, the "Ninth Circuit Court of Appeals has questioned the relevance of <u>Miranda</u> warning to whether a consent . . . was voluntary," suggesting "that such an inquiry provides no insight into the voluntariness of a consent," even though it "remains [] one factor to consider pursuant to binding law in the Ninth Circuit."  <u>United States v. Iwai</u>, Criminal No. 15-00723 HG, 2016 WL 2770785, at *8 (D. Haw. May 13, 2016) (alteration, citations, and internal marks omitted), <u>aff'd</u>, 930 F.3d 1141 (9th Cir. 2019).  Thus, the Court finds Purbeck's consent was "voluntary under the totality of the circumstances." <u>Id.</u>, at *9.

(N.D. Ga. May 4, 2011), adopted by 2011 WL 2580779 (N.D. Ga. June 29, 2011),

aff'd, 521 F. App'x 841 (11th Cir. 2013) (unpublished).  Thus, "the totality of the

circumstances demonstrates that [Purbeck] made his statements voluntarily."[31]

United States v. Nettleton, Case No. 3:19-cr-1-J-32PDB, 2019 WL 5102803, at *6

(M.D. Fla. Oct. 11, 2019); see also Eggers v. State, 2:13-cv-1460-LSC, 2015 WL

7567551, at *32 (N.D. Ala. Nov. 25, 2015) (citations omitted) (noting that the judge's

initial denial of a motion to suppress would not have changed where the

defendant "never indicated that he had a mental impairment that hindered the

voluntariness of his confession," and "both [of the defendant's] . . . confessions

[were] lucid and organized," and the defendant "calmly explained what he did to

law enforcement," and "he never once indicated that he was incapable of . . .

making informed decisions," and he "simply did not exhibit any bizarre behavior

during his confessions that would indicate that he was suffering from a mental

impairment at the time").  Thus, Purbeck's arguments regarding the voluntariness

---

[31] Since the Court finds that the questioning of Purbeck did not run afoul of Miranda and that his statements were made voluntarily, "it need not address the government's [] argument that the evidence would have been inevitably discovered through lawful means," United States v. Brownlee, CRIMINAL NO. 3:19-CR-211, 2020 WL 3172779, at *8 (M.D. Pa. June 15, 2020); see also [Doc. 82 at 28-29], or its argument that suppression of the contents of his electronic devices would not be the proper remedy if Purbeck's Miranda rights had been violated, [Doc. 82 at 26-27].

of his statements on August 21, 2019, are without merit, and because he has not identified any legitimate basis for suppression, it is **RECOMMENDED** that his motion to suppress statements, [Doc. 25], be **DENIED**.

## C.   <u>Motions to Suppress Evidence, [Docs. 26 & 38]</u>

Purbeck moves to suppress evidence obtained from the August 21, 2019, search of his residence in Meridian, Idaho. [Docs. 26 & 38]. In particular, Purbeck contends that evidence obtained following the search of his residence and seizure of various items pursuant to the search warrant issued on August 19, 2019, should be suppressed on a number of grounds: (1) the agents "did not have and/or did not show or leave with [] Purbeck the search warrant affidavit and/or any other information describing either the place to be searched or the items to be seized"; (2) "the search warrant was based on illegally-obtained probable cause, the unreliable allegations of a confidential informant, and contained false and/or omitted material statements that were intentionally or recklessly included or left out, and removing the offending portions results in a warrant that is not based on probable cause"; (3) "the search warrant was overbroad and did not meet the Fourth Amendment's particularity requirement"; (4) the agents "seized far more than what was authorized under the warrant"; and (5) "the information presented to the magistrate judge in 2019 concerned events in 2016-2017 and thus was stale, precluding probable cause." [Doc. 38 at 2-3 (footnote and citation omitted)]. The

government opposes Purbeck's motions, [Doc. 45], and for the reasons that follow, his motions, [Docs. 26 & 38], are due to be denied.[32]

### 1.   *Statement of Facts*

On August 19, 2019, Agent Coffin submitted an affidavit and application for a search warrant for Purbeck's residence located at 451 W. Waterbury Drive, Meridian, Idaho.  [Doc. 41-2].  A search warrant was issued for the target residence

---

[32] Purbeck again maintains that because the "warrant was issued and the searches and seizures occurred . . . within the boundaries of the United States Court of Appeals for the Ninth Circuit, the law of the Ninth Circuit governs the legality of the government's conduct."  [Doc. 38 at 2 n.3 (citation omitted)].  The government responds that although Purbeck maintains that the Ninth Circuit law applies, "he does not contend that there is a conflict of law issue with the Eleventh Circuit" and therefore, "it is appropriate to apply the law of the circuit in which the motion to suppress is made."  [Doc. 45 at 7 n.3 (citation and internal marks omitted)]. Purbeck filed a reply, [Doc. 47], in which he urges the Court to "reject the government's suggestion that the Court may ignore Ninth Circuit precedent because [ he] pointed to no particular conflict in the Ninth Circuit's case law versus the Eleventh Circuit's case law" and reiterates that "Ninth Circuit law . . . is the applicable law here," [id. at 2 n.1].  However, as with Purbeck's motion to suppress statements, the Court "need not decide which law to apply because the difference between Ninth and [Eleventh] Circuit law is immaterial here," Maley, 2019 WL 6717612, at *13 (citations omitted), and because there was no violation under either circuit's precedent, "it is unnecessary to engage in a choice-of-law determination at this stage of the analysis," Ozuna, 129 F. Supp. 2d at 1352.  That is, "it appears that the [Eleventh] and [Ninth] Circuit approaches to the critical issues raised . . . are quite similar," as well as the fact that "Supreme Court precedents directly control a number of the issues" and thus, "the applicable law is analyzed according to [Eleventh Circuit] case law that would apply in this district, with agreement by the [Ninth] Circuit either noted or assumed."  Restrepo, 890 F. Supp. at 191-92.

that same day by Judge Bush, Chief United States Magistrate Judge for the United States District Court for the District of Idaho.  See [id.]; see also [Doc. 28-6].

The application sought a warrant to search Purbeck's residence for "[e]vidence, instrumentalities, fruits and contraband concerning violations of 18 U.S.C. §§ 1343 and 1349 (conspiracy to commit wire fraud) 1956(a) and (h) (laundering of monetary instruments), 18 U.S.C. § 1030 (computer fraud and abuse), and 18 U.S.C. § 875 (extortion)," including various records related to the alleged criminal offenses; routers, modems, and network equipment used to connect computers to the internet; computers, mobile communication devices, and storage media used as a means to commit the violations; and passwords, encryption keys, and other access devices that may be necessary to access computers, among other items such as "evidence indicating the [computer] user's state of mind as it relates to the crime under investigation[.]"  [Doc. 41-2 at 1, 28-33]; see also [id. at 20-26 ¶¶ 64-70].  The probable cause summary statement for this application provided:

> []      The FBI has been investigating a computer data theft and extortion scheme perpetrated by a hacking group calling themselves thedarkoverlord ("TDO").  These hackers are known to have attacked the computer networks of over 60 organizations since at least June 2016 to include medical facilities, corporations, and educational institutions, to have stolen information stored on the networks such as personally identifiable information ("PII"), personal health information ("PHI"), personal financial information ("PFI"), and to have threatened to disclose the information unless the victim submits to a payment demand.  TDO has also breached the computer

networks of at least two school districts and extorted an unspecified school district with the threat to publicly release private and embarrassing school counseling records of students with the intention that the release would lead to the suicide of young children.

[]     As set forth below, I have probable cause to believe that a computer criminal using the nickname Lifelock is linked with TDO because, in part, (1) Lifelock has claimed to an FBI source to be TDO, (2) Lifelock runs a similar computer hacking and extortion scheme as TDO, and (3) Lifelock sells data similar to data stolen by TDO in online criminal marketplaces.

[]     I further believe that Lifelock is also linked to the nickname Studmaster1 in online criminal marketplaces because, in part, (1) both the Lifelock and Studmaster1 online accounts received virtual currency from the same source, (2) virtual currency withdrawn from the Lifelock account was deposited to the Studmaster1 account, (3) Studmaster1 was referenced in the creation of the Lifelock account, and (4) in private messages Studmaster1 indicates a desire to sell stolen healthcare databases two weeks before such information was posted for sale by Lifelock.

[]     As set forth below, I have probable cause to believe and do believe that [] Purbeck, who resides at [the target residence], is linked to Studmaster1 and Lifelock because, in part, (1) two virtual accounts opened in Purbeck's name have indirectly funded the Studmaster1 and Lifelock accounts, and (2) online purchases made from virtual currency sources that have conducted online transactions using Purbeck's email address and computer network addresses have also made deposits to both the Studmaster1 and Lifelock accounts.

[Id. at 5-6 ¶¶ 9-12].

The affidavit submitted in support of the search warrant application further

provided, in relevant part, that on June 26, 2016, an online website "published an

article on the sale of approximately 655,000 personal health records on [a] darknet

marketplace," that included "that TDO was selling three databases containing

personal health records," one of which contained records for "397,000 patients from an unidentified health care provider in Georgia[.]"  [Id. at 10 ¶ 17].  After the FBI identified the Georgia provider, the FBI contacted the provider on June 30, 2016, and the Georgia provider "confirmed that an unknown individual contacted [it] via email and claimed to have hacked [its] computer systems" and then "demanded a payment of 500 bitcoin, or approximately $355,000 based on the prevailing exchange rate . . ., in exchange for deleting and not leaking or releasing any of the stolen patient records."  [Id. at 10 ¶¶ 18-19].  On July 1, 2016, an FBI undercover employee located in the Northern District of Georgia contacted TDO through private messages and also through an encrypted chat application and subsequently purchased 300 Georgia healthcare provider records from TDO for $1,000.  [Id. at 10-11 ¶¶ 20-21].

On June 2, 2017, a dentist in California received an email signed by "Lifelock" that "demanded a payment of $10,000 in Bitcoin" or "Lifelock" would sell the stolen information on the "darknet marketplace AlphaBay."  [Id. at 11 ¶ 23 (footnote and internal marks omitted)].  From at least February 2016 through November 2017, an FBI confidential human source ("CHS")[33] had been in direct

---

[33] Agent Coffin explained that the CHS had "provided information to the FBI since September 25, 2017," and that the information "provided by the CHS ha[d] been found to be reliable" and was "believed to be motivated by patriotism to the United States and a willingness to assist the FBI with cyber investigative matters."

communication with Lifelock through email, and in two of the emails to the CHS, an individual who identified himself as Lifelock claimed responsibility for the extortion of the California dentist and "also claimed to have stolen over 42,000 records from . . . an eye care clinic in Michigan" and attempted to extort this clinic for $10,000 and sold the Michigan clinic's data in small batches on AlphaBay. [Id. at 11-12 ¶ 25]. Similarly, on March 3, 2017, a Massachusetts law firm received an extortion threat from an individual identifying himself as "Lifelock" and "demanded a payment of $10,000 in Bitcoin[.]" [Id. at 12 ¶ 26 (internal marks omitted)].

Agent Coffin further explained in his affidavit in support of the application for the warrant that he had "identified an AlphaBay vendor named Lifelock who sells PII, PHI, and PFI" and that the Lifelock vendor had "claimed in messages sent through AlphaBay to have access to a number of medical databases . . . mostly from dentists, eye doctors, and plastic surgery clinics" and provided two sample records to a potential buyer, one of which was represented by Lifelock "to be from an eye care clinic in Michigan[.]" [Id. at 12 ¶ 28 (alteration in original) (internal marks omitted)]. Agent Coffin also stated that his "review identified three occasions when the Lifelock AlphaBay vendor transferred Bitcoin from AlphaBay

_____

[Doc. 41-2 at 9 n.1]. He also explained that the CHS "was able to acquire the information directly through his/her employment." [Id.].

to a cluster of Bitcoin addresses," which is "a collection of Bitcoin addresses that ha[ve] been identified through Bitcoin analysis as being likely controlled by the same individual," and that based on email messages between the CHS and Lifelock and his analysis of Lifelock bitcoin cluster, he believed "that the Lifelock extortionist and the Lifelock AlphaBay vendor [were] the same person." [Id. at 12-13 ¶¶ 29-31].

As for the link between Lifelock and TDO, Agent Coffin explained that "Lifelock and TDO operated similar criminal schemes," which "involved stealing hacked information from victims" and "then contacting the victims via email and attempting to extort the victims for Bitcoin" and that extortion payments made by victims of Lifelock and TDO "indicated that after the extortion payment was made, the extortionist attempted to launder the extortion payments by transferring them through a Bitcoin service named Bitcoin Blender," which was a "hidden service that operated from at least in or about January 2018 to in or about May 2019." [Id. at 13 ¶¶ 32-33]. Agent Coffin also explained that the CHS had been in contact with both Lifelock and TDO and that "[i]n a chat with Lifelock, Lifelock claimed to the CHS to be TDO," but that "[i]n a separate chat with TDO, TDO claimed to the CHS that Lifelock was actually an imposter and not a part of TDO." [Id. at 14 ¶ 34]. However, the CHS believed that the "writing style of Lifelock [was] similar to the writing style of the earlier TDO spokesperson," though the CHS "noted that at

some point the spokesperson for TDO, whom the CHS had been communicating with, appeared to change." [Id.].  Agent Coffin then stated that "[b]ased on the similarities in their criminal schemes, and on the claim by Lifelock to be TDO," he believed that it was "likely that Lifelock [was] or ha[d] been associated with TDO and related criminal activities." [Id. at 14 ¶ 35].

With respect to the link between Lifelock and Studmaster1, Agent Coffin explained that he had "determined that the Lifelock AlphaBay account was created on or about July 8, 2016"; that on that same day, Bitcoin "was deposited to the Lifelock AlphaBay account and almost immediately spent to pay Lifelock's AlphaBay vendor bond"; and that an analysis revealed that "the deposit to Lifelock's AlphaBay account came from a cluster of Bitcoin addresses associated with an AlphaBay buyer named Studmaster1[.]" [Id. at 14 ¶¶ 36-37].  Agent Coffin stated that he had "determined that the Studmaster1 account had been used to purchase approximately 247 stolen items from AlphaBay including bank account information, identities, credit cards, gift cards, and malware." [Id. at 14-15 ¶ 38]. He also stated that based on his analysis of Bitcoin transactions and the withdrawals made from Lifelock's AlphaBay account, he believed that Lifelock was coordinating with Studmaster1, which was also supported by his determination "that the Lifelock AlphaBay account listed its referrer at Studmaster1" and that in private message on June 13, 2016, from Studmaster to

73

another AlphaBay user, Studmaster1 claimed to have six to seven healthcare databases to sell records from and that the Lifelock account was created two weeks later on July 8, 2016, and began selling similar stolen healthcare data.  [Id. at 15-16 ¶¶ 40-42].  Agent Coffin averred that he therefore believed that it was "likely that the same individual controls the Studmaster1 AlphaBay buyer account and the Lifelock AlphaBay vendor account."  [Id. at 16 ¶ 43].

Agent Coffin also provided information linking Purbeck to Studmaster1, which included that records obtained from the digital currency exchange Coinbase identified the subscriber who sent Bitcoin to the Studmaster1 AlphaBay account as Purbeck.  [Id. at 16-17 ¶¶ 44-48].  Agent Coffin also stated that records from Bitpay, a Bitcoin payment processor, linked a transaction from the Studmaster1 account that occurred on September 17, 2017, to Purbeck's email with an Internet Protocol ("IP") address of 67.60.251.160, which was an IP address registered to Cable One Inc. ("Cable One"), "an Internet Service Provider that provide[d] service to the Meridian, Idaho area."  [Id. at 17 ¶¶ 49-50].  Agent Coffin similarly linked this IP address to another email associated with Purbeck and also explained that additional records from Bitpay linked a transaction from the Studmaster 1 account that occurred on July 15, 2016, to an IP address of 67.61.55.127, which was also registered to Cable One, and that this IP address was linked to one of Purbeck's emails.  [Id. at 18 ¶¶ 51-54].  Based on the fact that Purbeck controlled

the Bitcoin clusters associated with Studmaster1, Agent Coffin averred that there was "probable cause to believe that [] Purbeck also control[led] the Studmaster1 AlphaBay account." [Id. at 18 ¶ 55].

Agent Coffin also described that information provided by Coinbase identified a bank account as being associated with Purbeck's two Coinbase accounts and that this bank account was linked to Purbeck at the address of the target residence, as were four credit cards. [Id. at 18-19 ¶¶ 56-57]. He also described that the Coinbase account associated with one of Purbeck's email addresses was accessed on June 8, 2019, from the IP address of 24.117.83.148, which "provides service to the Meridian, Idaho area," and was registered to Purbeck at the target residence. [Id. at 19 ¶¶ 58-59]. Agent Coffin averred that "Purbeck has conducted apparent money laundering activities at Coinbase" from the target residence and that he currently lived at that residence and lived there "during the time periods when criminal activities were conducted by Studmaster1, Lifelock, and TDO" and that he believed that there was "probable cause to believe that the [target residence would] contain evidence of the crimes," including conspiracy to commit wire fraud, money laundering, computer fraud and abuse, and extortion. [Id. at 20 ¶ 63]; see also [id. at 26 ¶ 71].[34]

---

[34] Attachment A, describing the residence to be searched, and Attachment B, listing the items to be seized, were attached to the application and affidavit for the search

In addition to Agent Coffin's affidavit, Judge Bush asked Agent Coffin questions in open court to obtain further information with respect to several paragraphs in his affidavit. See [Doc. 42]. After receiving this oral testimony from Agent Coffin, Judge Bush signed the search warrant for the residence on August 19, 2019, see [Docs. 41-2 & 42]; see also [Doc. 28-6], and on August 21, 2019, the FBI, including Atlanta-based agents, Agent Coffin and Agent Pinette, executed the search warrant and seized computer equipment, electronic storage devices, cell phones, financial documents, and other items and also provided Purbeck a copy of the front page of the search warrant and a handwritten inventory of items seized from the residence, [Doc. 38 at 4]; see also (Sept. 1 Tr. at 74, 198-99; Sept. 2 Tr. at 42, 47; Def. Ex. 14). Purbeck moves to suppress the evidence obtained from the search of his residence, [Docs. 26 & 38], which the government opposes, [Doc. 45], and Purbeck has filed a reply in support of his motions, [Doc. 47].

**2.** *Analysis*

Purbeck moves to suppress evidence seized from his residence pursuant to the search warrant issued by Judge Bush, [Docs. 26 & 38], arguing that the FBI agents did not have or did not show or leave with Purbeck the search warrant

---

warrant. See [Doc. 41-2 at 28-33]. These attachments were incorporated by reference on the face of the warrant. See [Doc. 41-2]; (Def. Ex. 14); see also [Doc. 28-6].

affidavit or any other information describing either the place to be searched or the items to be seized, "in violation of the Fourth Amendment's particularity requirement as stated in United States v. McGrew, 122 F.3d 847, 849-50 (9th Cir. 1997)," [Doc. 38 at 2-7 (footnote omitted)]; that the search warrant was based on illegally-obtained information, as well as the unreliable allegations of the CHS and false or omitted material statements, and that this information should be removed from the probable cause analysis, which would result in a warrant that was not based on probable cause, [id. at 2-3, 7-18]; that the search warrant was overbroad and failed to meet the Fourth Amendment's particularity requirement, [id. at 3, 18-23]; and that the information provided in the affidavit concerned events that occurred in 2016-2017 and was thus stale, [id. at 3, 23-25].

The government opposes the motions to suppress, [Doc. 45], arguing that "even if the agents did not leave the attachments to the warrant with Purbeck, he acknowledges that this technical violation is not grounds for suppression of the evidence"; that Purbeck's challenge under Franks v. Delaware, 438 U.S. 154 (1978), fails for various reasons;[35] that the "search warrant was sufficiently particularized

---

[35] "A challenge to a search warrant on the grounds of falsity or reckless statements in the supporting affidavit is handled pursuant to [Franks, 438 U.S. at 154.]" United States v. Lebowitz, 647 F. Supp. 2d 1336, 1345 (N.D. Ga. 2009), adopted at 1342, aff'd, 676 F.3d 1000 (11th Cir. 2012) (per curiam). "Under Franks, if an affidavit submitted to a judicial officer in support of a request for a search warrant contains 'a false statement [made] knowingly and intentionally, or with reckless

and not overbroad," as it "authorized the seizure of items narrowly tailored to the probable cause detailed in [Agent] Coffin's affidavit, and the statutory citations and specific categories listed in the warrant attachment allowed agents to reasonably ascertain what should be seized," but that "even if the FBI seized some items not covered by the warrant, that is not grounds to suppress evidence"; that

---

disregard for the truth,' and if, stripped of that false statement, the affidavit does not establish probable cause, 'the search warrant must be voided. . . .'" O'Ferrell v. United States, 253 F.3d 1257, 1267 (11th Cir. 2001) (alterations in original) (quoting Franks, 438 U.S. at 155–56). Thus, to prevail on a Franks challenge, a defendant "must establish (1) that information contained in an affidavit was untrue, (2) that inclusion of the untrue information was either deliberate or in 'reckless disregard for the truth,' and (3) that the untrue information was an essential element of the probable cause showing relied upon by the judicial officer in issuing the search warrant." Id. A defendant who brings a Franks motion must make "'a substantial preliminary showing that an affiant knowingly and intentionally included a false statement in an affidavit, or made the false statement with reckless disregard for its truth,'" and "'the false statement was necessary to the finding of probable cause,'" United States v. Maharaj, No. 07-80024-CR-CR, 2007 WL 2254559, at *6 (S.D. Fla. Aug 2, 2007) (quoting Franks, 438 U.S. at 156), adopted at *1. "'The Franks standard is a high one.'" United States v. Nakouzi, No. 3:05CR154(MRK), 2005 WL 3211208, at *5 (D. Conn. Nov. 30, 2005) (quoting Rivera v. United States, 928 F.2d 592, 604 (2d Cir. 1991)). Thus, "'[t]o mandate an evidentiary hearing, the challenger's attack [on the affidavit] must be more than conclusory and must be supported by more than a mere desire to cross-examine.'" Id. (alterations in original) (quoting Franks, 438 U.S. at 171). Negligent or innocent mistakes in a warrant application do not violate a defendant's Fourth Amendment rights. See Franks, 438 U.S. at 171; Maughon v. Bibb Cnty., 160 F.3d 658, 660 (11th Cir. 1998) (per curiam); Madiwale v. Savaiko, 117 F.3d 1321, 1326-27 (11th Cir. 1997). Moreover, "'[i]nsignificant and immaterial misrepresentation[s] or omissions will not invalidate a warrant.'" Maharaj, 2007 WL 2254559, at *7 (citation omitted).

the "warrant was not based upon stale information where Purbeck engaged in illegal activity over a lengthy period of time," with "linkages cited to the months leading up to the issuance of the warrant"; and that "even if this Court ultimately finds that the search warrant was invalid, the evidence should not be suppressed because it was obtained by agents acting in reasonable reliance on a warrant issued by a neutral and detached magistrate," [id. at 4-5]. Purbeck has filed a reply, [Doc. 47], and the Court will address the arguments made by the parties.

### a.   Failure to Leave the Search Warrant Affidavit & Attachments

Purbeck, relying on Ninth Circuit precedent, argues that because "the search warrant itself contained absolutely no description of the types of items sought or the place to be searched," but only referred to "'See Attachment A' for the place to be searched and to 'See Attachment B' for the things to be seized," yet "[n]either 'attachment' was shown to [ him] and neither 'attachment' was part of the search warrant left for him at the end of the search when the agents departed," the "search warrant is invalid because it lacked any particularity."[36] [Doc. 38 at 3-5 (citations omitted)]. However, Purbeck also acknowledges that there "appears

---

[36] Although Purbeck claims that the search warrant "contained absolutely no description of the . . . place to be searched," [Doc. 38 at 3 (citation omitted)], the Court notes that the face of the search warrant described the place to be searched by identifying the address of Purbeck's residence in the caption, see [Doc. 41-2]; (Def. Ex. 14); see also [Doc. 28-6], and therefore, as the government points out, his assertion in this regard "is flatly wrong," [Doc. 45 at 6].

to be some doubt under Ninth Circuit precedent whether the exclusionary rule (i.e., suppression of evidence) is the appropriate remedy for the failure to serve a warrant that is otherwise valid in all material respects." [Id. at 6 (citations omitted)]; see also [Doc. 47 at 3 (citation omitted) (asserting that "Ninth Circuit precedent appears not to support suppressing evidence because of a failure to leave a complete copy of the search warrant with the subject of the warrant")]. In response, the government points out that "Purbeck does not seem to dispute that FBI agents left a copy of the search warrant with him as well as a detailed multi-page inventory of items seized from the residence, which he signed," but instead claims "that the attachments were not included with the search warrant" and therefore contends that because the "search warrant itself contained absolutely no description of the type of items sought or the place to be searched," the search warrant was invalid, but his "argument is without merit." [Doc. 45 at 5-6 (citations and internal marks omitted)]. The government also points out that Purbeck "acknowledges that suppression is not a remedy for this alleged violation" unless he can demonstrate legal prejudice or that any non-compliance was intentional or in bad faith, and that since Purbeck "has failed to demonstrate that he suffered any prejudice or, alternatively, bad faith on the part of the agents, any alleged failure to provide the search warrant attachments at the time of the search is at best a ministerial violation that does not warrant suppression of the evidence." [Id. at 7-

9 (footnote and citations omitted)].  For the reasons that follow, the Court agrees

with the government.

"On its face, the Fourth Amendment does not require that a copy of the

warrant be served on the person whose premises are being searched."  United

States v. Hector, 474 F.3d 1150, 1154 (9th Cir. 2007) (footnotes and citation omitted).

Rather, Rule 41 of the Federal Rules of Criminal Procedure provides that an

"officer executing the warrant must give a copy of the warrant and a receipt for

the property taken to the person from whom, or from whose premises, the

property was taken or leave a copy of the warrant and receipt at the place where

the officer took the property."  Fed. R. Crim. P. 41(f)(1)(C).  "The key premise

underlying the presentation requirement [was] that absent such presentation,

individuals would stand no real chance of policing the officers' conduct,"

however, "the Supreme Court decided *United States v. Grubbs*, 547 U.S. 90 [(2006)]

. . ., which specifically rejected the policing rationale."  Hector, 474 F.3d at 1154

(alterations, citation, and internal marks omitted).  Following the decision in

Grubbs, "the only legitimate interest served by the presentation of a warrant

appears to be . . . to head off breaches of the peace by dispelling any suspicion that

the search is illegitimate," but "[t]his interest does not implicate the seizure of

evidence described in the search warrant nor would it be vindicated by

suppression of the evidence seized." Id. at 1155 (internal citation and marks omitted).

Moreover, "[v]iolations of Rule 41[] are essentially ministerial in nature and a motion to suppress should be granted only when the defendant demonstrates legal prejudice or that non-compliance with the rule was intentional or in bad faith." United States v. Marx, 635 F.2d 436, 441 (5th Cir. Unit B 1981) (citations omitted).[37] "In order to show prejudice in this context, a defendant must show that because of the violation of Rule 41 he was subjected to a search that might not have occurred or would not have been so abrasive had the rule been followed." Id. (citation omitted). Purbeck has not shown either type of prejudice, and he has not argued that the FBI agents' actions "constituted a deliberate and intentional disregard of Rule 41[.]" Id.; see also [Doc. 38 at 3-7; Doc. 47 at 1-3]. Instead, it is undisputed that the agents left a copy of the warrant and an inventory list with Purbeck at the conclusion of the search, see [Doc. 38 at 4], and accepting Purbeck's allegation that he was not provided the attachments to the warrant but only the cover page of the warrant, see [id. at 3-4],[38] "the warrant was valid and served the

_____

[37] In Stein v. Reynolds Sec., Inc., 667 F.2d 33, 34 (11th Cir. 1982), the Eleventh Circuit adopted as binding precedent decisions of Unit B of the former Fifth Circuit.

[38] The Court notes that in Purbeck's civil action, he alleged that "when the agents searched his home, he was given a warrant with an attachment which may have contained a description of the place to be searched . . . and possibly the items to be

purpose of providing notice to [ Purbeck] that the officers were executing a search under the color of law," <u>United States v. Smith</u>, 424 F.3d 992, 1006 (9th Cir. 2005). Although providing only the face page of the warrant without its attachments violates "Rule 41(1)(C)'s requirement to deliver a complete copy of the warrant," Purbeck "contends neither that the violation here was fundamental nor that he was prejudiced by it," and he has not shown "a deliberate disregard of the rule," and therefore, suppression [is] not warranted in this case," <u>United States v. Manaku</u>, 36 F.4th 1186, 1190-91 (9th Cir. 2022) (per curiam) (citations and internal marks omitted).  That is, "[a]ssuming, as here, that a valid warrant has been obtained, the decision to present or not present the warrant bears little on the validity of the search," and suppression is "not an appropriate remedy in this case[.]"  <u>Hector</u>, 474 F.3d at 1155.  Accordingly, Purbeck's suppression motion premised on this basis is due to be denied.  <u>See</u> <u>Manaku</u>, 36 F.4th at 1191; <u>United States v. Henry</u>, 939 F. Supp. 2d 1279, 1290 (N.D. Ga. 2013) (finding defendant had not "satisfied his burden of demonstrating that the search would not have occurred or would have been conducted differently if the requirements of Rule

---

seized but not the affidavit" and that he was "only allowed to hold the warrant for mere moments" before it was removed.  <u>Purbeck v. Wilkinson</u>, Case No. 1:21-cv-00047-BLW, 2021 WL 4443318, at *6 (D. Idaho Sept. 27, 2021) (alteration in original) (citation and internal marks omitted).

41(f) had been followed, or that law enforcement's violations were committed in bad faith" and that suppression was therefore not warranted on this basis).

### b. Probable Cause & Purbeck's *Franks* challenge

Purbeck argues that the search warrant affidavit included references to illegally obtained information and also contained reckless or intentional omissions with regard to IP addresses, the CHS, and Bitcoin data and that certain paragraphs in the affidavit should therefore be removed. See [Doc. 38 at 7-18]. Consequently, Purbeck contends that once the offending portions of the affidavit are removed, the warrant lacks probable cause for its issuance. [Id. at 2-3]. For the reasons that follow, the Court is unpersuaded by Purbeck's arguments and finds that Agent Coffin's affidavit established probable cause to support issuance of the search warrant for his residence.

"The Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and that evidence exists at the place for which the warrant is requested." United States v. Betancourt, 734 F.2d 750, 754 (11th Cir. 1984) (citing Zurcher v. Stanford Daily, 436 U.S. 547, 558 (1978)); see also United States v. Cadet, Criminal Action Nos. 1:11-CR-00522-WBH-LTW, 1:11-CR-00113-WBH-LTW, 2013 WL 504892, at *4 (N.D. Ga. Jan. 16, 2013) (citation omitted), adopted by 2013 WL 504815, at *1 (N.D. Ga. Feb. 8, 2013), aff'd, 574 F. App'x 917 (11th Cir. 2014) (per curiam)

(unpublished).  That is, "[p]robable cause to search a residence requires some nexus between the premises and the alleged crime."  United States v. Joseph, 709 F.3d 1082, 1100 (11th Cir. 2013) (citation and internal marks omitted).  "Probable cause deals 'with probabilities[, which are] . . . . the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  Illinois v. Gates, 462 U.S. 213, 241 (1983) (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)); see also United States v. Spann, No. 15–20070, 2015 WL 1969111, at *3 (S.D. Fla. May 1, 2015) (citation omitted), aff'd, 649 F. App'x 714 (11th Cir. 2016) (per curiam) (unpublished).[39]

The Eleventh Circuit has explained the Court's review of the sufficiency of a search warrant as follows:

> When called upon by law enforcement officials to determine the legitimacy of search warrants and their supporting affidavits, issuing magistrates and reviewing courts alike must strike a delicate balance between constitutional guarantees against excessive intrusions into

---

[39] "[T]he term probable cause, . . . means less than evidence which would justify condemnation. . . . It imports a seizure made under circumstances which warrant suspicion."  New York v. P.J. Video, Inc., 475 U.S. 868, 876 (1986) (alterations in original) (citations and internal marks omitted).  "Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision."  Id. (citation and internal marks omitted).  That is, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules," Gates, 462 U.S. at 232, and "[c]ertainty has no part in a probable cause analysis," United States v. Frechette, 583 F.3d 374, 380 (6th Cir. 2009) (citation omitted).

areas of individual freedom and the Government's need to access and to secure relevant evidence in criminal prosecutions. In particular, issuing magistrates are given the unenviable task of making "firing line" decisions that attempt to encourage availment of the warrant process while simultaneously striving to protect citizens from unwarranted governmental interference. In recognition of the difficulty inherent in discharging this responsibility, reviewing courts lend substantial deference to an issuing magistrate's probable cause determinations.

United States v. Miller, 24 F.3d 1357, 1363 (11th Cir. 1994); see also United States v. Atencio, Case No. 1:21-cr-0058-DCN, 2022 WL 1288734, at *13 (D. Idaho Apr. 29, 2022) (citation omitted). "Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner[.]" Miller, 24 F.3d at 1361 (citation omitted); see also United States v. Ventresca, 380 U.S. 102, 109 (1965). Instead, "a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." Miller, 24 F.3d at 1361 (citation omitted); see also Ventresca, 380 U.S. at 109; United States v. McCullough, Criminal Indictment No. 1:11–CR–136–JEC/AJB–01, 2012 WL 11799871, at *13 (N.D. Ga. Oct. 9, 2012) (citations omitted), adopted by 2014 WL 3955556, at *2 (N.D. Ga. Aug. 13, 2014). Furthermore, "[t]he fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause." United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985) (citations omitted); see also Adams v. Williams, 407 U.S. 143, 149 (1972) (citation

omitted).  The burden of establishing that a search warrant is defective is upon Purbeck. United States v. Lockett, 533 F. App'x 957, 965 (11th Cir. 2013) (per curiam) (unpublished) (citation omitted) ("When a search is conducted pursuant to a warrant, the burden is on the defendant to show that the warrant is invalid."); see also Franks, 438 U.S. at 171.

### i.    The CHS

Purbeck contends that the agents "relied heavily" on the allegations of a CHS to establish probable cause for the search warrant and Agent Coffin "improperly bolstered the CHS, cloaking her in an inappropriate measure of credibility" by "stating that the CHS was 'found to be reliable' without explaining how or why she was reliable," by "stating that the CHS [was] 'motivated by patriotism to the United States and a willingness to assist the FBI with cyber investigative matters,'" and by "stating that the CHS 'was able to acquire the information directly through his/her employment.'"  [Doc. 38 at 8-9 (quoting [Doc. 41-2 at 9 n.1])].  In particular, Purbeck contends that because the CHS is a psychologist from New York, "who operated under the alias of 'Dissent'" and whose "side hobby is writing about online breaches and hacking issues on [a] website[]" that describes her as "an independent investigative journalist and free-lance reporter," Agent Coffin "should have told the Magistrate Judge in Idaho that [the] CHS was a psychologist who engages in online sleuthing as a hobby and was

offering her conjecture about a possible connection between Lifelock and TDO." [Id. (citation and internal marks omitted)]; see also [id. at 10-11]. Purbeck also contends that while he initially claimed to "Dissent that he was 'thedarkoverlord' about whom she spoke, he promptly retracted that statement mere hours later because he had not realized there was someone calling themselves 'TDO' and 'TheDarkOverlord,' and [ he] was definitely not part of TDO/TheDarkOverlord" and that he also "re-affirmed that he was not part of TDO in a subsequent email to Dissent" and that Agent Coffin therefore "should have told the Magistrate Judge when seeking the warrants [] that, while Lifelock claimed to be 'thedarkoverlord you speak of,' he immediately clarified that he was not part of TDO . . . once he determined that there already was a hacking group operating under that name, something that he determined and clarified in under 24 hours." [Id. at 11 (quoting [Doc. 41-1 (Purbeck Decl.) at 8-9 ¶¶ 11-14])]. Thus, Purbeck asserts that "[b]ecause the CHS' reliability was misrepresented to the Court and because law enforcement did not tell the Court that Lifelock had adamantly denied any connection to TDO . . ., the passages in the search warrant affidavit regarding information gained from the CHS should be removed and the existence of probable cause re-assessed." [Id. at 12].

Although Purbeck argues that the affidavit did not provide sufficient facts establishing probable cause to support issuance of the search warrant because the

affidavit did not include sufficient information about the reliability of the CHS, and in fact misrepresented the CHS's reliability, the "'relevant considerations in the totality of the circumstances,'" are the CHS's veracity and basis of knowledge, and "'a deficiency in one may be compensated for . . . by a strong showing as to the other.'"  United States v. King, 233 F. App'x 969, 972 (11th Cir. 2007) (per curiam) (unpublished) (alteration in original) (citation omitted); see also Gates, 462 U.S. at 238.  Indeed, "the veracity and basis of knowledge inquiries should be applied in a common-sense, practical manner, not in a rigid or technical fashion." United States v. Miller, 753 F.2d 1475, 1479 (9th Cir. 1985) (per curiam) (citations and internal marks omitted).  While "[i]t is true that the affidavit does not provide substantial independent information to assist in assessing the veracity of the source[] of information," a magistrate judge's finding of probable cause may be upheld "where the deficiency in the area of veracity was compensated for by a showing of basis of knowledge."  United States v. Abbell, 963 F. Supp. 1178, 1193 (S.D. Fla. 1997) (citation and internal marks omitted).

The affidavit specifically stated that the CHS had provided information to the FBI since September 2017, which the FBI had found to be reliable, and that she directly communicated with both TDO and Lifelock.  [Doc. 41-2 at 9 ¶ 15 & n.1, 11-12 ¶¶ 25, 27, 13 ¶¶ 30-31, 14 ¶ 34].  Thus, the affidavit clearly stated the basis of the CHS' knowledge was direct communication with two separate individuals

who identified themselves as TDO and Lifelock, see [id.], and Purbeck has acknowledged that he communicated with the CHS, see [Doc. 41-1 at 8-9 ¶¶ 11-14]. Although Purbeck takes issue with the statement that the CHS acquired the information through her employment, pointing out that she works as a psychologist and that she really acquired the information through her "side hobby [] writing about online breaches and hacking issues on [a] website," [Doc. 38 at 8], his explanation that the CHS describes herself as an independent investigative journalist and free-lance reporter undermines his argument that Agent Coffin's statement about the CHS was misleading, see [Doc. 45 at 12 n.7 (citation omitted)]. Moreover, any purported misrepresentation by failing to disclose that the CHS was employed as a psychologist is "immaterial to probable cause," and "[i]nsignificant and immaterial misrepresentations or omissions will not invalidate a warrant." United States v. Mercery, 591 F. Supp. 3d 1369, 1378 n.20 (M.D. Ga. 2022) (citation and internal marks omitted).

Similarly, although Purbeck maintains that Agent Coffin should have included a statement about Purbeck's retraction of the TDO claim in his affidavit, the affidavit specifically stated that TDO "claimed to the CHS that Lifelock was [] an imposter and not a part of TDO," [Doc. 41-2 at 14 ¶ 34], and the affidavit made clear that TDO and Lifelock were different individuals despite the fact that Lifelock initially told the CHS that he was "thedarkoverlord you speak of," [Doc.

41-1 at 8 ¶ 11], and the Court finds unpersuasive Purbeck's arguments about why his specific retraction of his initial claim to be TDO should also have been included in the affidavit or that the omission somehow renders the statements offered in paragraph 34 false or a material misrepresentation.  Moreover, Purbeck has not disputed other statements from the CHS included in the affidavit based on email communications with Lifelock in which Lifelock claimed responsibility for theft of records and extortion of victims, see [id. at 11-12 ¶ 25],  and even putting aside paragraph 34 in its entirety, "[w]hen considered in a practical and common sense way, the statements in the affidavit[] excluding those from the [CHS in paragraph 34], clearly establish probable cause," United States v. Prather, CRIMINAL CASE NO. 3:18-cr-00013-TCB-RGV, 2019 WL 3402037, at *8 (N.D. Ga. July 11, 2019) (citations and internal marks omitted), adopted by 2019 WL 3387099, at *1 (N.D. Ga. July 26, 2019).  Indeed, as the government points out, the affidavit provided "ample probable cause to show that the cybercriminal and extortionist Lifelock [was] the same Lifelock who was selling stolen data on Alpha[B]ay," even after taking away any reference to communications with the CHS, [Doc. 45 at 13-14 (footnote omitted)], and therefore there was a "fair probability" that the evidence sought would be found in the place searched, Gates, 462 U.S. at 238.  Accordingly, Purbeck's motion to suppress evidence obtained from execution of the search warrant based on this ground is without merit.

## ii.  **AlphaBay Messages**

Purbeck also argues that while paragraph 28 of the affidavit "refers to email messages that the government obtained from Alpha[B]ay, and [p]aragraph 42 refers to a private message sent by [ him] on the Alpha[B]ay platform," these "were [ his] private email messages[] and he ha[d] a right against government intrusion upon them," and thus, the government's "seizures and searches of these messages [without a search warrant] violate[d] the Fourth Amendment's proscription against unreasonable and warrantless seizures and searches." [Doc. 38 at 12-13 (citation and internal marks omitted) (quoting [Doc. 41-2 at 12 ¶ 28, 16 ¶ 42])]. Purbeck therefore contends that these "paragraphs should be stricken from the warrant application." [Id. at 13.  The government responds that Purbeck had "no reasonable expectation of privacy in data held by a third-party criminal darknet marketplace," [Doc. 45 at 14-15], that "was seized and dismantled by law enforcement on or about July 5, 2017," [Doc. 44 at 15 (citations omitted)], and therefore, his request to exclude these paragraphs "should be denied," [Doc. 45 at 15].

"There are two complementary theories under which the fourth amendment limits governmental action," one of which "is a property-based theory, under which the government is prohibited from trespassing into a location where a person has a property interest," and the other, which "is a privacy-based theory,

under which the government cannot invade a location where a person (1) has a subjective expectation of privacy and (2) that privacy expectation is objectively one that society will recognize as reasonable." United States v. Sigouin, 494 F. Supp. 3d 1252, 1261-62 (S.D. Fla. 2019) (citation omitted) (citing United States v. Jones, 565 U.S. 400, 406-07 (2012)). "'The concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of the authorities.'" United States v. Streett, 363 F. Supp. 3d 1212, 1278 (D.N.M. 2018) (quoting United States v. Jacobsen, 466 U.S. 109, 122 (1984)). "'Determining whether society would view the expectation as objectively reasonable turns on whether the government's intrusion infringes on a legitimate interest, based on the values that the Fourth Amendment protects.'" Id. (quoting California v. Ciraolo, 476 U.S. 207, 212 (1986) (alteration in original) ("explaining that '[t]he test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity,' but instead 'whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment'"). "Thus, whether society will recognize a certain expectation of privacy does not turn on whether the hypothetical reasonable person would hold the same expectation of privacy, but rather on whether the expectation of privacy is justified or legitimate." Id. (citing Smith v. Maryland, 442 U.S. 735, 739 (1979)).

93

That is, the "Supreme Court in *Rakas v. Illinois*[, 439 U.S. 128, 144-45 n.12 (1978),] reasoned that society [was] not prepared to recognize as reasonable an expectation of privacy in a burglar robbing a summer cabin during the offseason," because the Court did "not believe that society would recognize as reasonable a privacy expectation which, at least in contemporary society, would benefit only criminals," United States v. Alabi, 943 F. Supp. 2d 1201, 1287 (D.N.M. 2013), aff'd, 597 F. App'x 991 (10th Cir. 2015) (unpublished).

The government points out, [Doc. 45 at 15 (citation omitted)], that AlphaBay, which was a "hidden website [that] served as a marketplace for illegal goods," was "designed to facilitate illicit commerce hosted on the site by providing anonymity to its users," and "[n]ot only were the goods and services offered on AlphaBay overwhelmingly illegal on their face, but the illicit nature of the commerce conducted on the website was openly recognized in the AlphaBay online community and on the site itself," United States v. 2013 Lamborghini Aventador LP700-4, Case No. 1:17-cv-00967-ljo-sko, 2018 WL 3752131, at *2-3 (E.D. Cal. Aug. 8, 2018) (citation omitted). According to Agent Coffin's affidavit, the AlphaBay darknet marketplace was seized by law enforcement on or about July 5, 2017, and "FBI agents lawfully seized electronic devices and/or electronically stored information, related to Alpha[B]ay pursuant to Mutual Legal Assistance requests to foreign countries," [Doc. 41-2 at 11 ¶ 24 & n.3], and the government persuasively

argues that "Purbeck cannot meet his burden [of demonstrating that he had a reasonable expectation of privacy in his AphaBay communications] because any expectation of privacy that he had in the messages was objectively unreasonable due to AlphaBay's patently illicit nature," [Doc. 45 at 15 (citation omitted)]; see also United States v. Stanley, 753 F.3d 114, 121 (3d Cir. 2014) (footnote omitted) (explaining that the "dubious legality of [defendant's] conduct bolster[ed the] conclusion that society would be unwilling to recognize his privacy interests as 'reasonable,'" which was particularly true since "the purpose of [defendant's] unauthorized connection was to share child pornography"). Moreover, Agent Coffin's affidavit indicates that these messages were discovered upon his "review of information collected from AlphaBay," [Doc. 41-2 at 12 ¶ 28], and by "using the AlphaBay platform" to review messages sent "to another AlphaBay user," [id. at 16 ¶ 42], following the lawful seizure of the AlphaBay darknet marketplace by law enforcement, [id. at 11 ¶ 24 & n.3], and Purbeck has not shown otherwise.[40]

---

[40] In any event, Purbeck lacks standing to contest the seizure of AlphaBay's records from which his emails and/or messages were recovered. See United States v. Bennett, CRIMINAL ACTION NO. 1:20-cr-00481-SCJ-RDC-3, 2022 WL 18670371, at *5-6 (N.D. Ga. Aug. 10, 2022) (citations and internal marks omitted) (finding defendant lacked standing to challenge the production of records by third-party banks and service providers, since "the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to [g]overnment authorities"), adopted by 2023 WL 420714, at *4 (N.D. Ga. Jan. 26, 2023); United States v. Boukamp, 551 F. Supp. 3d 704, 710-11 (N.D. Tex. 2021) (citation and internal marks omitted) (rejecting defendant's argument that he had

"Courts that have considered whether an individual has a reasonable expectation of privacy in electronic communications the individual has transmitted, generally treated electronic communications like mailed letters," and, "while it is well established that letters are in the general class of effects protected by the Fourth Amendment . . . if a letter is sent to another, the sender's expectation of privacy ordinarily terminates upon delivery."  United States v. Stratton, 229 F. Supp. 3d 1230, 1241 (D. Kan. 2017) (second alteration in original) (citations and internal marks omitted); see also United States v. Lifshitz, 369 F.3d 173, 190 (2d Cir. 2004) (citation omitted) (noting that individuals may not "enjoy such an expectation of privacy in transmissions over the Internet or e-mail that have already arrived at the recipient").  Therefore, Purbeck "lost any reasonable expectation of privacy in his messages once they were delivered to the recipient," another AlphaBay user on the AlphaBay platform that the FBI lawfully seized, and "the Fourth Amendment does not apply to any communications that other [AlphaBay] users

_____

a "privacy interest in his personal communications through Discord, Inc. which were seized and searched," since he had failed to explain "how his expectation of privacy extend[ed] to the contents of a third-party's property," and explaining that while defendant may have believed his text conversations with another on Discord were private, his expectation was not objectively reasonable and he therefore lacked standing to challenge the viewing of the private messages with him though another's Discord account).

received." Id.  Accordingly, the Court rejects Purbeck's argument that paragraphs 28 and 42 of the affidavit should be stricken from the warrant application.

### iii.   Bitcoin Wallets and Clusters

Purbeck also contends that paragraphs 29, 37, and 44 of Agent Coffin's affidavit, which relate to the number of Bitcoin addresses that were in a Bitcoin cluster, should be stricken because "there is nothing to support Agent Coffin's representation about the relatively limited number of bitcoin addresses in each bitcoin cluster," but in fact, "at least with respect to paragraph 37," which references a Bitcoin cluster used to fund the AlphaBay vendor bond, he analyzed his Bitcoin wallet and determined "that this cluster actually contains 500 bitcoin addresses, not 32 bitcoin addresses, as represented by law enforcement to the Magistrate Judge."  [Doc. 38 at 13-14 (citation omitted)].  Purbeck asserts that "[a]s shown by the audio of the search warrant application, the Court in Idaho was very interested in the number of bitcoin addresses, to the point that the Court recessed the application hearing to allow law enforcement to research further the number of bitcoin addresses in each cluster" and "[o]nly after hearing the limited number of bitcoin addresses allegedly present in each cluster did the Court find probable cause and issue the warrant."  [Id. at 14 (citation omitted)].  He further asserts that the large discrepancy he has shown with respect to paragraph 37 "raises significant doubt as to whether the number of bitcoin addresses in the other

clusters are as limited as what law enforcement represented to the Court," and that he is thus entitled to a <u>Franks</u> hearing. [<u>Id.</u> at 14-15].

The government responds that Purbeck's "challenge rests on his fundamental misunderstanding of a Bitcoin cluster, as opposed to a cryptocurrency wallet," and that he "cannot establish the materiality of this alleged misstatement." [Doc. 45 at 15]. In particular, the government explains that while Purbeck "focuses on the number of addresses in his Bitcoin wallet," Agent Coffin's testimony before Judge Bush was with regard to Bitcoin clusters, which "is a collection of addresses likely controlled by the same individual as identified through analysis of the publicly available blockchain," and that Purbeck's "claim that his wallet contained 500 Bitcoin addresses has no bearing on the number of Bitcoin addresses in the [Bitcoin cluster] . . . within Purbeck's wallet." [<u>Id.</u> at 16 (citations omitted)]. The Court agrees.

Bitcoin "is a form of virtual currency, not issued by any government, bank, or company" that "can be purchased from [Bitcoin] virtual currency exchanges using conventional money," and it "is sent to, and received from, [Bitcoin] addresses." <u>United States v. Dove</u>, Case No. 8:19-cr-33-CEH-CPT, 2021 WL 838737, at *2 (M.D. Fla. Mar. 5, 2021) (citations and internal marks omitted). "Users may operate multiple [Bitcoin] addresses at any given time, thereby allowing the possibility of using a unique [Bitcoin] address for every transaction." <u>Id.</u> (citation

omitted); <u>see also</u> [Doc. 41-2 at 8 ¶ 13]. Agent Coffin explained that "[t]o transfer Bitcoin to another address, the payor transmits a transaction announcement, cryptographically signed with the payor's private key" and "[o]nce the payor's transaction announcement is verified, the transaction is added to the blockchain, a decentralized public ledger that records all Bitcoin transactions" and "logs every Bitcoin address that has ever received a Bitcoin[.]" [Doc. 41-2 at 8 ¶ 13]. "Although the identity of the [Bitcoin] address owner is generally anonymous, analysis of the blockchain can often be conducted to identify the owner of a [Bitcoin] address." <u>Dove</u>, 2021 WL 838737, at *2 (citation omitted); <u>see also</u> [Doc. 41-2 at 8 ¶ 13]. "Blockchain analysis companies conduct this analysis by developing large databases that group [Bitcoin] transactions into 'clusters' through the analysis of data underlying [Bitcoin] transactions." <u>Dove</u>, 2021 WL 838737, at *2 (citation omitted). "Consequently, law enforcement can utilize third-party blockchain analysis software to locate [Bitcoin] addresses that transact at the same time and 'cluster' these addresses together to represent the same owner." <u>Id.</u> (citation omitted). Thus, as the government contends, [Doc. 45 at 15-16], Purbeck misunderstands the distinction between a Bitcoin cluster, which is found within his cryptocurrency wallet, and the wallet itself, and for this reason, his argument in this regard is without merit, <u>see</u> <u>Matter of Search of Multiple Email Accts. Pursuant to 18 U.S.C. § 2703 for Investigation of Violation of 18 U.S.C. § 1956</u>, 585

F. Supp. 3d 1, 7-8 (D.D.C. 2022); <u>United States v. 155 Virtual Currency Assets</u>, Civil Action No. 20-cv-2228 (RC), 2021 WL 1340971, at *2–3 (D.D.C. Apr. 9, 2021).

## iv. <u>IP Addresses</u>

Purbeck also requests that the Court strike paragraphs 49, 50, 52, 53, and 54 of Agent Coffin's affidavit regarding the coverage and resolution of IP addresses. [Doc. 38 at 15-18]. First, Purbeck maintains that paragraphs 49 and 50, which refer to IP address 67.60.251.160, and state that it "is registered to Cable One [], an Internet Service Provider that provides service to the Meridian, Idaho area," [Doc. 41-2 at 17 ¶¶ 49-50], while "[t]aken literally, . . . is true, but [] is highly misleading," because the IP address "comes back to Nampa, Idaho, not Meridian, Idaho," which is about 11 miles from Meridian and also is serviced by Cable One. [Doc. 38 at 15-16 (citation omitted)]. Purbeck asserts that this is a "material omission," since Agent Coffin led Judge Bush to believe that there was an IP address directly connected to Meridian, Idaho. [<u>Id.</u> at 17]. Similarly, Purbeck asserts that paragraphs 52, 53, and 54 refer to IP address 67.61.55.127 and state that it is registered to Cable One, "an Internet Service Provider that provides service to the Meridian, Idaho area" but that it is "registered in Wharton, Texas." [<u>Id.</u> at 16 (citation and internal marks omitted)]. He contends that "[w]hile it may be true that Cable One[ ] is the registered user of [this] IP address [] and while it may be true that Cable One[ ] provides services to the Meridian, Idaho area, it also is true

that Cable One[ ] provides services to Nampa, Idaho, and Arizona, Illinois, Mississippi, Missouri, Oklahoma, and Texas," and that this "material omission" also misled Judge Bush in believing that there was an IP address connected to Meridian, Idaho. [Id. at 17 (footnote omitted)].

The government correctly points out that while the affidavit does not include information as suggested by Purbeck, he "has not made an offer of proof that [Agent Coffin] omitted that information intentionally or with reckless disregard of the truth," United States v. Kelly, CRIMINAL CASE NO.: 2:20-CR-030-SCJ-JCF, 2021 WL 1379516, at *7 (N.D. Ga. Jan. 12, 2021) (citation omitted), adopted by 2021 WL 1377987, at *1 (N.D. Ga. Apr. 12, 2021), and in any event, Purbeck's argument in this regard also fails because, as the government asserts, "the challenged statements are not necessary to a finding of probable cause." [Doc. 45 at 18]. Indeed, these paragraphs were not the only information in the affidavit that established probable cause for the issuance of the search warrant as Agent Coffin specifically averred that Cable One records identified the subscriber of IP address 24.117.83.148 as Purbeck with the target residence as the service address. See [Doc. 41-2 at 19 ¶ 59].[41] "When considered in a practical and common sense

---

[41] While Purbeck points out that the "issue about an IP address returning to somewhere other than Meridian, Idaho occurs again in [p]aragraphs 58 and 59," since those paragraphs reference two different IP addresses, 24.117.83.148 and 24.117.84.148, the latter of which returns to Sioux City, Iowa, and that the

way, the statements in the affidavit, excluding those [about the IP addresses 67.61.55.127 and 67.60.251.160 providing service to Meridian, Idaho], clearly establish probable cause," <u>Danner v. United States</u>, No. 5:12–cv–08041–VEH–JHE, No. 5:07-cr-370-VEH-RRA, 2015 WL 251307, at *8 (N.D. Ala. Jan. 20, 2015), adopted at *1; <u>see also</u> <u>United States v. Green</u>, CR. NO. 1:16cr131-WKW, 2018 WL 3451580, at *7 (M.D. Ala. Apr. 30, 2018) (Even "disregard[ing] the information . . ., there are sufficient facts in the affidavits to support a finding of probable cause"), adopted by 2018 WL 3448224, at *1 (M.D. Ala. July 17, 2018).  Accordingly, Purbeck "has not supported his contention that the omission of information concerning [the ] IP address[es] was material to the probable cause determination or that [Agent

---

statement that "24.117.84.148 provides service to the Meridian, Idaho area," is therefore "false," [Doc. 38 at 17 n.6 (citing [Doc. 41-2 at 19 ¶¶ 58-59])], the government maintains that the "reference to IP address 24.117.84.148 in paragraph 59 of the affidavit  was indeed a clerical error and should have instead stated that IP address 24.117.83.148 provides service to the Meridian, Idaho area," [Doc. 45 at 19 (emphasis omitted)], and Purbeck acknowledges that if this was "simply a scrivener's error, thereby making the statement false, but negligently so, [it] would preclude a challenge under <u>Franks</u>," [Doc. 38 at 17 n.6].  Because "[n]egligent or innocent mistakes in a warrant application do not violate a defendant's Fourth Amendment rights," <u>United States v. Manning</u>, CRIMINAL ACTION NO. 1:19-cr-00376-TWT-RGV, 2021 WL 5236660, at *10 (N.D. Ga. Aug. 20, 2021) (citations omitted), adopted sub nom. <u>United States v. Davis</u>, CRIMINAL FILE NO. 1:19-CR-376-4-TWT, 2021 WL 5232480, at *1 (N.D. Ga. Nov. 10, 2021); <u>United States v. Daniel</u>, CRIMINAL FILE NO. 1:19-CR-376-2-TWT, 2021 WL 5232484, at *1 (N.D. Ga. Nov. 10, 2021); adopted sub nom. <u>United States v. Sterling</u>, CRIMINAL FILE NO. 1:19-CR-376-3-TWT, 2021 WL 5280567, at *1 (N.D. Ga. Nov. 12, 2021), Purbeck's <u>Franks</u> challenge in this respect fails.

Coffin's] omission of that information was done knowingly or recklessly," <u>Kelly</u>, 2021 WL 1379516, at *7, and his argument therefore fails.

### c. Particularity and Overbreadth

Purbeck contends that the "search warrant suffered from lack of particularity and overbreadth" because "there [was] no time frame or period of time that restricts the government's search" and that the warrant authorized the agents to "seize anything regardless of date," which was "exactly what they did," rendering the warrant "an illegal general warrant." [Doc. 38 at 20-21 (citations omitted)]. He also contends that Attachment B included certain paragraphs that were "not supported by probable cause and/or fail[ed] to provide the executing law enforcement officers with sufficient information and guidance to find the sought items, thereby turning the warrant into an illegal general warrant." [Id. at 21 (citation omitted)].

"In order for a search to be reasonable, the warrant must be specific." <u>United States v. Maali</u>, 346 F. Supp. 2d 1226, 1239 (M.D. Fla. 2004) (citations omitted), <u>aff'd sub nom.</u> <u>United States v. Khanani</u>, 502 F.3d 1281 (11th Cir. 2007). "Specificity has two aspects: particularity and breadth," with particularity meaning "that the warrant must clearly state what is sought" and "[b]readth deal[ing] with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." <u>Id.</u> (citations and internal marks

omitted); see also United States v. Banks, 556 F.3d 967, 972–73 (9th Cir. 2009) (citation omitted); United States v. Weinstein, 762 F.2d 1522, 1530-31 (11th Cir. 1985). "The scope of the warrant, and the search, is limited by the extent of probable cause . . . . [P]robable cause must exist to seize all items of a particular type described in the warrant and [t]hus, the concept of breadth may be defined as the requirement that there be probable cause to seize the particular thing named in the warrant." Lebowitz, 647 F. Supp. 2d at 1351 (alterations in original) (citations and internal marks omitted). "The breadth requirement, therefore, prevents general, exploratory rummaging in a person's belongings." Id. (citation and internal marks omitted).

As to Purbeck's first argument regarding the lack of a time constraint on the items to be seized, [Doc. 38 at 20-21], the warrant "set forth sufficient limitations on the items to be seized" by authorizing the seizure of evidence, instrumentalities, fruits and contraband "of particular federal crimes, and also enumerated [] illustrative categories of items," United States v. Jacobson, 4 F. Supp. 3d 515, 524 (E.D.N.Y. 2014) (footnote omitted); see also [Doc. 41-2 at 30-33]. That is, the "reference to particular offenses and the use of an illustrative list of items to seize sufficiently particularized the warrants," and the "lack of any temporal limitation . . . [is not] dispositive." Jacobson, 4 F. Supp. 3d at 524, 526 (citation omitted). "Although a warrant's failure to include a temporal limitation on the things to be

seized may, in certain circumstances, render a warrant insufficiently particular," the "complexity and duration of the alleged criminal activities render a time frame less significant than in a case that required a search for a small set of discrete items related to one or only a few dates." Id. at 526 (citation and internal marks omitted). In the present case, there is no doubt that "the crimes under investigation [are] complex and concerned a long period of time, not simply one or two dates of criminal activity," and therefore, "the absence of a time frame [does] not render the otherwise particularized warrant[] unconstitutionally general." Id. (citation omitted); see also United States v. Brown, 20-CR-293 (WFK), 2022 WL 4238459, at *12 (E.D.N.Y. Sept. 14, 2022) (second alteration in original) (citations and internal marks omitted) (explaining that "[n]o controlling authority requires a specific time frame to establish particularity, though [s]everal courts . . . have recognized the constitutional questions that are raised by the lack of a specific date range in a warrant," and that "[w]hile a temporal limitation is one indicia of particularity, courts . . . have recognized that the complexity and duration of the alleged criminal activities may render a time frame less significant than in a case that required a search for a small set of discrete items related to one or only a few dates."). In short, "[c]onsidering the specific circumstances and complexities" of the crimes under investigation, the Court finds that the "fact that there was no specific search protocol limiting the time frame of searchable electronically stored information

did not render the warrant overbroad." United States v. Sedlak, 697 F. App'x 667, 668 (11th Cir. 2017) (per curiam) (unpublished) (citations omitted); see also Khanani, 502 F.3d at 1290-91 (rejecting argument that warrant to search computer files was invalid for not including specific written protocols); United States v. Wheat, CIVIL ACTION NO. 1:17-CR-0229-AT, 2022 WL 16851663, at *11 (N.D. Ga. Nov. 10, 2022) (internal marks omitted) (finding that that "the lack of a time limitation" in warrants did not render searches unconstitutional because the warrants "were already adequately particularized based on the subject matter limitation to evidence relating to" the crimes alleged in the affidavit); United States v. Lee, Criminal Action File No. 1:14-CR-227-TCB-2, 2015 WL 5667102, at *10 (N.D. Ga. Sept. 25, 2015) (finding that the warrants were already adequately particularized based on the subject matter limitation to evidence relating to criminal copyright infringement, and therefore an additional temporal limitation was not required).

Purbeck also argues that several categories of the items to be seized listed in Attachment B were either too vague or not supported by probable cause and, therefore, turned "the warrant into an illegal general warrant." [Doc. 38 at 21-23]. "In determining whether a warrant is sufficiently particular," the Court considers "one or more of the following factors: (1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets

out objective standards by which executing officers can differentiate items subject

to seizure from those which are not; and (3) whether the government was able to

describe the items more particularly in light of the information available to it at

the time the warrant was issued." United States v. Adjani, 452 F.3d 1140, 1148 (9th

Cir. 2006) (citation omitted).  Despite Purbeck's arguments to the contrary, [Doc.

38 at 21-23], "the warrant objectively described the items to be searched and seized

with adequate specificity and sufficiently restricted the discretion of agents

executing the search" because the "warrant affidavit began by limiting the search

for evidence of [] specific crime[s]," then "provided the precise identity and nature

of the items to be seized," and "the government described the items to be searched

and seized as particularly as could be reasonably expected given the nature of the

crime and the evidence it then possessed," Adjani, 452 F.3d at 1148-49 (citation and

internal marks omitted).[42]  In sum, the warrant was "not overbroad because [it]

---

[42] The Court notes that while Purbeck challenges the seizure of "[r]ecords and
information relating to the . . . Trade Route[] and Wall Street Market marketplace
and forums," [Doc. 38 at 21; Doc. 41-2 at 30 ¶ 4], arguing that there is "nothing in
the search warrant application [that] authorizes a finding of probable cause as to
anything to do with Trade Route or Wall Street Market," [Doc. 38 at 21], Agent
Coffin's affidavit specifically details that "[i]n emails to the CHS, Lifelock also
claimed to be active on darknet marketplaces other than AlphaBay to include
Trade Route and Wall Street Market" and that his analysis of a Bitcoin cluster
"located 71 transactions between [the Lifelock cluster] and Trade Route, and 2
transactions between [the Lifelock cluster] and Wall Street Market," and that the
"Lifelock AlphaBay vendor also transferred Bitcoin to Trade Route and Wall Street

properly limited the scope of the [g]overnment's search[] to evidence, fruits, and instrumentalities of the [o]ffense[s]"; it "set forth the [g]overnment's basis for probable cause to believe that [Purbeck] committed the [o]ffense[s]"; and the "[g]overnment's search for evidence regarding [Purbeck's] state of mind was not improper [or too vague or broad] because such evidence [was] relevant to whether [Purbeck] 'knowingly' [devised a scheme to defraud and obtain money and property under false pretenses and knowingly and with the intent to defraud, used and trafficked unauthorized access devices]." United States v. Garlick, 22-CR-540 (VEC), 2023 WL 2575664, at *9, 11 n.16 (S.D.N.Y. Mar. 20, 2023) (citation omitted); [Doc. 1 at 6-8 ¶¶ 21-24].[43]

---

Market as claimed by the Lifelock extortionist to the CHS," [Doc. 41-2 at 13 ¶¶ 30-31]. Thus, Purbeck's contention in the regard is without merit.

[43] Purbeck also contends that the "manner in which the agents executed the search warrant far exceeded what was authorized by the warrant" and points to a list of items he contends were seized without authorization by the warrant. [Doc. 38 at 23 (citing [Doc. 41-10])]. The government "disagrees with Purbeck's list," but even so, it argues that the blanket suppression of evidence lawfully seized is not the appropriate remedy for the seizure of some superfluous items. [Doc. 45 at 24 (citations omitted)]. As the Eleventh Circuit has recognized, "it was inevitable that some irrelevant materials would be seized as agents searched through numerous documents for evidence" in an investigation of "crimes that are generally only detected through the careful analysis and synthesis of a large number of documents." United States v. Schandl, 947 F.2d 462, 465 (11th Cir. 1991) (footnote omitted). Purbeck has submitted a list of documents that he contends were improperly seized, [Doc. 41-10], but following a review of the affidavit and Attachment B of the search warrant, [Doc. 41-2], it is not apparent to the Court that all these documents were beyond the scope of items authorized to be seized. For

### d.    Staleness

Purbeck argues that while Agent Coffin "sought the search warrant for [ his] home in late August of 2019," the "averments of illegal conduct that [he] presented to the Court in support of probable cause all occurred in 2016 and 2017, with other activities in 2014 and 2015," and "[n]othing was presented to the Court from which [ it] could determine that [ he] was alleged to have continued with his alleged criminal conduct past 2016 or that he likely still possessed evidence of the alleged crimes the government was investigating."  [Doc. 38 at 24].  As a result, Purbeck

---

example, the vast majority of documents on Purbeck's list pertain to records of the Silk Alpaca Corporation, but Agent Coffin's affidavit connected Purbeck to an email address that included the name "silkalpacacorp" in relation to Bitcoin transactions that were under investigation, [id. at 17 ¶ 48, 18 ¶ 51, 19 ¶ 58], including for potential money laundering offenses, [id. at 20 ¶ 63], and given "the complex nature of the crime[s] being investigated for which the warrant[] [was] authorized," including money laundering offenses, "seemingly innocuous business records may very well be part of the 'paper puzzle' being pieced together," United States v. Nsoedo, CRIMINAL ACTION FILE NO. 1:08-CR-0351-JEC-JFK, 2009 WL 10669746, at *31 (N.D. Ga. July 31, 2009), adopted sub nom. United States v. Orizu, CRIMINAL CASE NO. 1:08-CR-351-04-JEC, 2009 WL 10676403, at *1 (N.D. Ga. Oct. 22, 2009).  Thus, although "a few of the items seized seem of questionable evidentiary value and [ may] fall outside the scope of the authorized search, . . . the vast majority of the items seized fall within the scope of the warrant's authorization" and the "record . . . does not demonstrate that the executing officers' conduct exceeded any reasonable interpretation of the warrant's provisions[;] . . . [therefore,] absent a flagrant disregard of the terms of a warrant, the seizure of items outside the scope of the warrant does not require suppression of items lawfully seized."   Id. (last three alterations in original) (footnote, citation, and internal marks omitted).

contends that the "information presented by the government to obtain the search warrant for his home was based on information almost two years old and certainly stale under the circumstances presented to the court." [Id.].  Contrary to Purbeck's contention, [id. at 23-25], the information provided in Agent Coffin's affidavit was not stale, see [Doc. 41-2].

"For probable cause to exist . . ., the information supporting [] the government's application for a search warrant must be timely, for probable cause must exist when the [] judge issues the search warrant."  United States v. Harris, 20 F.3d 445, 450 (11th Cir. 1994) (citations omitted); see also United States v. Sanders, No. 1:12-cr-373-WSD-ECS, 2013 WL 3938518, at *2 (N.D. Ga. July 30, 2013) (citations omitted); United States v. Bushay, 859 F. Supp. 2d 1335, 1378 (N.D. Ga. 2012) (citations omitted), adopted at 1355.  "There is no particular rule or time limit for when information becomes stale."  United States v. Bervaldi, 226 F.3d 1256, 1265 (11th Cir. 2000) (citations omitted).  Instead, "[t]o evaluate staleness claims, [the Court] look[s] at the unique facts of each case and may consider the maturity of the information, [the] nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched."  United States v. Deering, 296 F. App'x 894, 898 (11th Cir. 2008) (per curiam) (unpublished) (citation and internal marks omitted); see also United States v. Rojas-Coyotl, Criminal Action No. 1:13-cr-0128-

AT-AJB, 2014 WL 1908674, at *5 (N.D. Ga. May 13, 2014) (citation omitted), adopted at *1.

In United States v. Touset, 890 F.3d 1227, 1238 (11th Cir. 2018), the Eleventh Circuit held that evidence which "suggested that [the defendant] likely received child pornography electronically and had child pornography stored on his electronic devices" was not stale after "a year and a half," reasoning that "probable cause of involvement in *electronic* child pornography remains even longer because deleted files can remain on electronic devices," and "information that a person received electronic images of child pornography is less likely than information about drugs, for example, to go stale because the electronic images are not subject to spoilage or consumption," id. (citations and internal marks omitted). Similarly, because this case involves electronic transmissions in relation to a computer hacking scheme, "the question of staleness [in this context] is unique," United States v. Henry, Criminal Case No. 1:13-CR-0049-SCJ, 2013 WL 3064178, at *2 (N.D. Ga. June 18, 2013) (citations and internal marks omitted); see also United States v. Coon, No. 10–CR–110A, 2011 WL 1871165, at *3 (W.D.N.Y. May 16, 2011) (citations omitted) (explaining that "numerous courts have recognized that digital files remain on computers for extensive periods of time, even if they have been deleted" and "forensic experts can often recover deleted computer files," thus "many courts have suggested that the staleness issue in the context of digital evidence is

somewhat unique, and the passage of time does not necessarily render the evidence stale"), and the Court is persuaded that the affidavit supplied ample evidence to "overcome any issue of staleness," Cano v. Sec'y, Dep't of Corr., Case No. 8:17-cv-2436-T-60JSS, 2020 WL 6134225, at *12 (M.D. Fla. Oct. 19, 2020).[44]  In short, "the nature of the criminal activity being investigated supported a finding of timeliness," United States v. Kellogg, Criminal Action No. 1:12–CR–383–1–CAP, 2013 WL 3991956, at *16 (N.D. Ga. Aug. 1, 2013), and therefore, Purbeck's staleness argument is without merit.

### e.  Good Faith

Even if Agent Coffin's affidavit had failed to establish probable cause to support the search warrant, the government contends that Purbeck's motion to suppress should still be denied because the agents who searched the residence relied in good faith on the search warrant.  [Doc. 45 at 26-27].  Under United States

---

[44] Moreover, as the government points out, [Doc. 45 at 25-26], Agent Coffin specifically averred in his affidavit that as recently as June 2019, Purbeck had accessed his Coinbase account from an IP address connected with his residence and that "[c]omputer files or remnants of such files can be recovered months or even years after they have been downloaded onto a digital device, deleted, or viewed via the internet" and that "[e]lectronic files downloaded to a digital device can be stored for years at little or no cost," [Doc. 41-2 at 16 ¶ 45, 18-19 ¶¶ 56-59, 20 ¶¶ 64-65].  Therefore, as the government asserts, Agent Coffin "presented ample facts to Judge Bush to conclude that there was probable cause that [his residence] still contained evidence of the criminal offenses, despite the fact that Purbeck [allegedly] began his criminal conduct years earlier."  [Doc. 45 at 26].

v. Leon, 468 U.S. 897, 919-21 (1984), "the exclusionary rule should not be applied to exclude evidence seized pursuant to a defective search warrant if the officers conducting the search acted in 'objectively reasonable reliance' on the warrant and the warrant was issued by a detached and neutral magistrate[.]"  United States v. Sharp, Civil Action File No. 1:14–cr–229–TCB, 2015 WL 4641537, at *14 n.18 (N.D. Ga. Aug. 4, 2015) (citation and internal marks omitted), adopted at *5; see also United States v. Robinson, 336 F.3d 1293, 1295-96 (11th Cir. 2003) (citation omitted).

There are four situations in which the Leon good faith exception does not apply and suppression is warranted:

> (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.

United States v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002) (citation and internal marks omitted).  None of the circumstances precluding the good faith exception apply here as, for the reasons already discussed, Purbeck's allegations of false or

reckless information under <u>Franks</u> are without merit, and there is nothing in the record that even hints that Judge Bush, who reviewed the affidavit and asked further questions of Agent Coffin in open court prior to signing the search warrant, engaged in any misconduct or abrogation of judicial responsibility, and as already discussed, the affidavit set forth sufficient probable cause, and in any event is not "so lacking . . . as to render official belief in its existence entirely unreasonable." <u>Id.</u> (citation and internal marks omitted). Moreover, the warrant was facially valid in that it described in sufficient detail the residence to be searched and the items to be seized and was signed by a magistrate judge. <u>See</u> [Doc. 41-2]; <u>see also</u> <u>United States v. Travers</u>, 233 F.3d 1327, 1330 (11th Cir. 2000) (citation omitted) (finding warrant "was not 'so facially deficient—*i.e.*, failing to particularize the place to be searched or the things to be seized—that the executing officers could not have reasonably presumed it to be valid'"). Thus, despite Purbeck's argument to the contrary, [Doc. 47 at 14], the law enforcement agents executing the warrant were justified in believing in its validity, and evidence seized during the execution of the search warrant would not be subject to suppression under the good faith exception even if the warrant had not been supported by probable cause. <u>See</u> <u>Massachusetts v. Sheppard</u>, 468 U.S. 981, 989-90 (1984). Accordingly, it is **RECOMMENDED** that Purbeck's motions to suppress searches and seizures

arising out of the August 21, 2019, search of his residence, [Docs. 26 & 38], be

**DENIED**.

## D.  Motions to Suppress Email Searches, [Docs. 27 & 39]

Purbeck moves to suppress evidence obtained pursuant to three search

warrants and one Order issued pursuant to 18 U.S.C. § 2703(d) for records

associated with his Gmail, Apple iCloud, and AOL accounts; evidence obtained

from the search of thumb drives and a CD taken from his possession pursuant to

a search warrant issued in 1:21-MC-1981; and evidence obtained from a January

13, 2022, search of a recently decrypted computer that was seized from his

residence on August 21, 2019.  [Docs. 27 & 39].  The government opposes Purbeck's

motions, [Doc. 44], and Purbeck has filed a reply, [Doc. 46], and for the reasons

that follow, the motions, [Docs. 27 & 39], are due to be denied.

### 1.    *Statement of Facts*

On July 15, 2019, the Honorable Justin Anand, United States Magistrate

Judge for the Northern District of Georgia, issued an Order, pursuant to 18 U.S.C.

§ 2703(d) ("§2703(d) Order"), for certain records and other information associated

with Purbeck's email account of "rpurbeck@gmail.com," filed under seal at Case

No. 1:19-MJ-0591.  See [Doc. 28-12].  Thereafter, on August 2, 2019, Agent Coffin

obtained three search warrants from the Honorable Linda T. Walker, United States

Magistrate Judge for the Northern District of Georgia, for three email accounts,

"rpurbeck@gmail.com," stored at a premises controlled by Apple, Inc., filed under seal at Case No. 1:19-MC-1185, [Doc. 41-3]; "jrjboise82@aol.com," stored at a premises controlled by Oath Inc., filed under seal at Case No. 1:19-MC-1186, [Doc. 41-4]; and "rpurbeck@gmail.com" and "robpurbeck1@gmail.com," both of which were stored at a premises controlled by Google, LLC, filed under seal at Case No. 1:19-MC-1187, [Doc. 41-5]. Agent Coffin submitted an affidavit to obtain each of the warrants, [Doc. 41-3 at 2-33; Doc. 41-4 at 2-30; Doc. 41-5 at 2-30], as well as attachments describing the information that the provider was required to disclose pertaining to the email accounts and identifying which items of information from within the required disclosure would be subject to seizure by the government, [Doc. 41-3 at 35-42; Doc. 41-4 at 32-38; Doc. 41-5 at 32-38].

Following the execution of the search warrant at Purbeck's residence on August 21, 2019, FBI agents seized various items, including computer equipment, electronic storage devices, cell phones, and financial documents. See (Def. Ex. 14). Subsequently, Purbeck contacted the FBI via telephone and traveled to Atlanta on September 9, 2019, to participate in a proffer session with the FBI, prosecutors, and his defense attorney. [Doc. 28-16 at 5 ¶¶ 13-14]; see also (Sept. 1 Tr. at 39, 42-43, 134; Sept. 2 Tr. at 115, 182, 190). Thereafter, on December 11, 2019, Purbeck contacted the FBI and advised that several thumb drives and a CD at his house were missed during the execution of the August 21, 2019, search warrant, and on

116

December 18, 2019, he brought these thumb drives and the CD to the FBI in Boise, Idaho.  [Doc. 28-16 at 5-7 ¶ 15]; see also (Sept. 1 Tr. at 134-36; Sept. 2 Tr. at 188-89; Gov. Ex. 7).  On September 30, 2021, Agent Coffin obtained a search warrant from the Honorable Alan J. Baverman, United States Magistrate Judge for the Northern District of Georgia, to search these thumb drives and CD that Purbeck provided to the FBI on December 18, 2019, which was filed under Case No. 1:21-MC-1981.  See [Doc. 28-16].  On January 13, 2022, the government notified Purbeck that it recently had been able to decrypt one of his computers that was seized during the execution of the August 21, 2019, residential search warrant, and this computer was searched pursuant to that residential warrant.  See [Doc. 44 at 5].[45]

## 2.  *Analysis*

Purbeck moves to suppress the evidence obtained from these various searches, arguing that this district lacked jurisdiction to issue the § 2703(d) Order and the warrants for his email accounts, [Doc. 39 at 3-13]; that the § 2703(d) Order should have been issued only upon a showing of probable cause that was absent

---

[45] The August 21, 2019, residential search warrant was issued under Case No. 1:19-MJ-10519-REB, see [Doc. 41-2], but Purbeck points out that the government advised him that it had searched the computer on January 13, 2022, pursuant to a search warrant under the Case No. 1:19-MJ-10514-REB, which has not been produced to him, [Doc. 39 at 20].  The government has since clarified that "this computer was searched pursuant to the residential search warrant issued in 1:19-MJ-10519-REB, and [that] the reference to 1:19-MJ-10514-REB [was] a typographical error in an agent report."  [Doc. 44 at 6 n.1].

from the application, [id. at 13-14]; that the search warrants were based on illegally obtained information, as well as information excludable under Franks, [id. at 15-18]; that the search of the thumbs drives and CD under Case No. 1:21-MC-1981 should be suppressed as fruit of the poisonous tree, [id. at 18-19]; and that the recent search of his computer on January 13, 2022, should be suppressed for all the reasons related to the residential search warrant, as well as its untimeliness, [id. at 20]. The government opposes Purbeck's motions, [Doc. 44], and Purbeck has filed a reply in support of his motions to suppress, [Doc. 46]. The Court will address the arguments presented by the parties.

### a. Preliminary Jurisdictional Issue

Purbeck argues that "[w]ith respect to the §2703(d) Order for [ his] gmail account from Google and with respect to the three search warrants for [ his] various email accounts, this Court lacked jurisdiction to issue this order or these warrants because it was not a district court that had jurisdiction over the offense being investigated as to [ him] in July/August, 2019 when seeking these orders and warrants." [Doc. 39 at 4]. In particular, Purbeck maintains that with regard to the § 2703(d) Order, there are no allegations regarding crimes in Georgia, "much less the Northern District of Georgia," as the "only reference to the Northern District of Georgia is in paragraph 11 of the application when it says that Bitpay, an Atlanta-based bitcoin payment processor, processed some bitcoin transactions

118

from 'Studmaster 1'—a different account from Lifelock, but one that law enforcement alleged was controlled by the same person as Lifelock" and that "[n]othing about the Studmaster 1 bitcoin transactions with Bitpay are alleged to have been illegal." [Id. at 4-5].  He thus asserts that "based on the application for the §2703(d) Order, it is impossible for this Court to have jurisdiction over any crime involving [ him] such that it would be a court of competent jurisdiction[.]" [Id. at 5].  He further maintains that a "similar, but slightly different[,] problem[] exists with the three search warrants," since "Lifelock is not alleged to have committed any crimes against anyone in Georgia, much less in this district," and while "Bitpay transactions are alleged again, [] this time there is no mention that Bitpay is an Atlanta-based (or Georgia-based) entity, or otherwise has any ties to this district."  [Id. at 5-6].  Thus, Purbeck asserts that "[w]ithout this Court being a court having jurisdiction over the offenses alleged against [ him] in the search warrant applications at the time the search warrants were issued, this Court was without jurisdiction to issue those warrants under Rule 41 of the Federal Rules of Criminal Procedure or 18 U.S.C. §[]2703."  [Id. at 12-13].

The government responds that while Purbeck's "argument is premised on Federal Rule of Criminal Procedure 41, which sets forth geographic limitations on federal judges' authority to issue search warrants," Congress "created an independent statutory basis for federal judges to issue legal process for records

119

related to electronic communications under the Stored Communications Act ('SCA'), codified in relevant part at 18 U.S.C. § 2703, and Judges Anand and Walker properly exercised their authority under the SCA to issue the legal process in question." [Doc. 44 at 7]. The Court agrees.

Purbeck relies on Federal Rule of Criminal Procedure 41, which provides that "a magistrate judge with authority in the district . . . has authority to issue a warrant to search for and seize a person or property located with the district," Fed. R. Crim P. 41(b)(1), to support his argument that the three search warrants and the § 2703(d) Order are void for lack of jurisdiction, [Doc. 39 at 3-13]; see also [Doc. 46 at 1-3]; however, he "fails to address the broader geographic authority conferred by the [SCA] . . . in the context of a search warrant for stored electronic communications from an appropriate service provider," United States v. Gutierrez, Case No.: 3:17-cr-225-J-32MCR, 2018 WL 6579409, at *6 (M.D. Fla. Aug. 30, 2018) (footnote, citation, and internal marks omitted), adopted as modified by 2018 WL 5839867, at *3 (M.D. Fla. Nov. 8, 2018), aff'd, 810 F. App'x 761 (11th Cir. 2020) (per curiam) (unpublished). That is, while Rule 41(b)(1) "governs a Magistrate Judge's search warrant authority generally," the SCA, which "includes various provisions specifically addressed to the methods by which law enforcement agencies may seek to obtain, and the authority the courts have to approve, records of stored wire and electronic communications," specifically

"provides that a government entity may require a provider of electronic communications or remote computing services to disclose the contents of stored wire or electronic communications, and other information, by way of a warrant using the procedures described in the Federal Rules of Criminal Procedure, issued 'by a court of competent jurisdiction.'" United States v. Mozee, CRIMINAL CASE NUMBER:1:15-CR-00434-WSD-JSA, 2016 WL 11440139, at *1-2 (N.D. Ga. June 14, 2016) (quoting 18 U.S.C. § 2703(a)-(b)), adopted by 2016 WL 3679986, at *2 (N.D. Ga. July 12, 2016).

"The term 'court of competent jurisdiction' is a statutorily-defined term, which includes 'any district court of the United States (including a magistrate judge of such court),' that either 'has jurisdiction over the offense being investigated,' or is in the judicial district where the service provider is located or where the records are stored." Id. (emphasis omitted) (quoting 18 U.S.C. § 2711(3)(A)(i)-(ii)). Thus, while Purbeck's argument "as to the limits of a judge's authority under Rule 41" may be correct, "this argument fails to address the broader geographic authority conferred by the SCA in the context of a search warrant for stored electronic communications from an appropriate service provider." Id. (citations omitted). Thus, the issue is whether this Court had jurisdiction over the offense being investigated. See 18 U.S.C. § 2711(3).

In the present case, as the government points out, "[e]ach of the affidavits in support of the search warrants provided a sound jurisdictional basis for the judges to issue the warrants based on the alleged offense being investigated," including that "each affidavit explained that email records were sought to assist the investigation of a computer hacking and extortion scheme, through which Purbeck was believed to have posted for sale stolen personal information, including that of 397,000 patients located in Georgia, and received payments in connection with the stolen information"; that "each affidavit included descriptions of undercover transactions that occurred within the District";[46] and that each of the "affidavits mentioned multiple transactions processed from an AlphaBay vendor account linked to Purbeck that were processed by an Atlanta-based Bitcoin payment

---

[46] Indeed, each of the affidavits alleges that the FBI, "while located within the Northern District of Georgia, bought 300 Georgia health care provider records from TDO for $1,000," [Doc. 41-3 at 9 ¶ 12; Doc. 41-4 at 10 ¶ 13; Doc. 41-5 at 10 ¶ 13], and "[n]o personal acts by a defendant within the district are required; even a government agent's conduct is sufficient to cement jurisdiction," United States v. Monroe, 350 F. Supp. 3d 43, 47 (D.R.I. 2018) (footnote and citation omitted) (citing United States v. Chi Tong Kuok, 671 F.3d 931, 938 (9th Cir. 2012) ("affirming validity of prosecution where undercover agent's conduct occurred in the district"); United States v. Stokes, No. 6:12–CR–03091–MDH–1, 2014 WL 2895409, at *2 (W.D. Mo. June 26, 2014) ("finding prosecution within district proper as investigating agent received obscene images on a computer within the district")), aff'd, Nos. 19-1869, 19-1872, 2021 WL 8567708 (1st Cir. Nov. 10, 2021). Moreover, "18 U.S.C. § 3237 provides that any offense begun in one district and completed in another may be prosecuted in any district where the offense was begun, continued or completed." United States v. Sklaroff, 323 F. Supp. 296, 315 (S.D. Fla. 1971).

processor." [Doc. 44 at 9-10 (citing [Doc. 41-3 at 3-4 ¶ 5, 8-9 ¶¶ 8-12, 17-18 ¶¶ 38-40; Doc. 41-4 at 4 ¶ 6, 9-10 ¶¶ 9-13, 19 ¶¶ 39, 41; Doc. 41-5 at 3-4 ¶ 5, 8-10 ¶¶ 8-13, 19 ¶¶ 39, 41])].  Additionally, the "§ 2703(d) [O]rder[ also ] was properly issued because it sought records related to the same criminal offense under investigation."  [Id. at 10 (citing [Doc. 28-12])].  Thus, the Court rejects Purbeck's argument that this Court lacked jurisdiction to issue the § 2703(d) Order and search warrants.

### b.  § 2703(d) Standard

Purbeck also argues that because the "email account information and the §2703(d) Order in this case is much more akin to the cell phone data that the United States Supreme Court found in Carpenter v. United States, 138 S. Ct. 2206 . . . (2018) required probable cause before the government could obtain that information," the probable cause standard "should have governed the §2703(d) request for his email account records" and that suppression is warranted because "there was no probable cause to sustain the issuance of an order to obtain his email records." [Doc. 39 at 14].  Purbeck's argument, however, may be summarily rejected because, as the government contends, "in an application for a § 2703(d) order, [ it] does not need to provide facts supporting a finding of probable cause," but rather, "all that is required is that the [g]overnment present 'specific and articulable facts showing that there are reasonable grounds to believe that . . . the records or other

information sought[] are relevant and material to an ongoing criminal investigation.'" [Doc. 44 at 11 (quoting 18 U.S.C. § 2703(d))]; see also United States v. Beaudion, 979 F.3d 1092, 1101 (5th Cir. 2020) (explaining that "[n]owhere does § 2703 require a showing of probable cause"); United States v. Moreno-Vasquez, No. CR 18-549-TUC-CKJ (LAB), 2020 WL 1164970, at *2 (D. Ariz. Mar. 11, 2020) (citation and internal marks omitted) (explaining that under "the SCA, the government needed to demonstrate only a reasonable belief that the data was relevant and material to an ongoing investigation" and that it "does not require a probable cause showing"); United States v. Alahmedalabdaloklah, No. CR-12-01263-PHX-NVW, 2017 WL 2839645, at *6 (D. Ariz. July 3, 2017) (alteration, citations, and internal marks omitted) (explaining that "the standard for determining the validity of the § 2703 Orders is whether the § 2703(d) Orders are based on an application offering 'specific and articulable facts showing there are reasonable grounds that the contents of a wire or electronic communication are relevant and material to an ongoing criminal investigation" and that "courts have described this standard as an intermediate one—higher than that required for a subpoena, but lower than that of probable cause"). In short, § 2703(d) "is clear and does not require the level of specificity [Purbeck] demands," as the government "was only required to present 'specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic

communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation,'" and "[i]t did just that." United States v. Rhodes, CASE NO. 1:19-CR-0073-AT-LTW, 2020 WL 9461131, at *4 (N.D. Ga. June 18, 2020) (citations omitted), adopted by 2021 WL 1541050, at *2 (N.D. Ga. Apr. 20, 2021).[47]  Accordingly, the § 2703(d) Order was valid and issued upon the appropriate finding by Judge Anand, and the Court rejects Purbeck's contention that probable cause was required for the § 2703(d) Order in this case.

### c.  *Franks* **Challenge to the Search Warrants**

Purbeck argues that certain paragraphs in each of the affidavits submitted to obtain the three search warrants should be excluded from consideration and that once removed, the warrants lacked probable cause for their issuance.  [Doc. 39 at 16-18].  In particular, Purbeck contends that paragraphs related to "email/direct messages that the government obtained from Alpha[B]ay" and "private message[s] sent by [ him] on the Alpha[B]ay platform," as well as the paragraphs related to the typographical error in the IP address in which both 24.117.83.148 and 24.117.84.148 were referenced should be excluded from consideration and probable cause should be reassessed. [Id. at 16-17 (internal

---

[47] Although Purbeck relies on Carpenter, 138 S. Ct. at 2220, "[t]he Supreme Court described its decision as 'a narrow one,'" as it "addressed only historical cell site data," Rhodes, 2020 WL 9461131, at *2 (citation and internal marks omitted), and the Court declines to broaden its ruling.

marks omitted)]. For the same reasons discussed previously, these arguments fail, and Purbeck has failed to make the requisite showing for a <u>Franks</u> hearing.[48]

### d. Search Pursuant to Warrant No. 1:21-MC-1981

Finally, Purbeck argues that the "illegal searches and seizures of the devices covered under [s]earch [w]arrant No. 1:21-MC-1981 [], which authorized the government to search a CD and various thumb drives, as described in that

---

[48] Purbeck also argues that because certain paragraphs in the search warrant applications were "all directly derived from the §2703(d) Order for [ his] email account," these paragraphs should be excluded since he "has challenged the legality of [the] §2703(d) Order[.]" [Doc. 39 at 18]. However, having rejected Purbeck's arguments with regard the § 2703 Order, this argument likewise fails. Furthermore, as the government contends, [Doc. 44 at 10 n.3], even if Purbeck was correct and the warrants were invalid, the agents who executed the warrants reasonably relied on their validity, and therefore, evidence seized pursuant to the warrants is not subject to the exclusionary rule, see <u>Leon</u>, 468 U.S. at 926; <u>Martin</u>, 297 F.3d at 1313–17 (finding good faith exception applied where "the affidavit contained sufficient indicia of probable cause to enable a reasonable officer to execute the warrant thinking it valid" and where the issuing judge "did not cross the line and wholly abandon his judicial role"); <u>United States v. Taxacher</u>, 902 F.2d 867, 871-72 (11th Cir. 1990) (explaining the limited circumstances in which the <u>Leon</u> good faith exception does not apply); <u>Gutierrez</u>, 2018 WL 6579409, at *6 n.9 (concluding that "[e]ven if the judges erred in issuing the ping orders (which they did not)," the "officers obtained the evidence through objective good faith reliance on the ping orders" under <u>Leon</u>). Similarly, "the Court notes that the good faith exception . . . would likely apply [to the § 2703(d) Order]." <u>Rhodes</u>, 2020 WL 9461131, at *4 n.4. Purbeck argues that the good faith doctrine does not apply because the Court "was misled by false information," [Doc. 46 at 14]; however, for the reasons previously discussed, Purbeck's arguments fail, and any evidence seized pursuant to the warrants is not due to be suppressed on the basis that the warrants themselves were invalid.

warrant," should be suppressed because "the entire affidavit in support of probable cause is premised on information that was gained as a result of earlier searches and seizures that [ he] has challenged as illegal." [Doc. 39 at 18 (citations omitted)]. He also asserts that the "government's possession of the items covered by [s]earch [w]arrant No. 1:21-MC-1981 are the fruits of the poisonous tree from the government's earlier searches[.]" [Id. at 19]. However, because this search warrant at issue did not rely upon the fruit of any illegal searches and seizures,[49] as previously discussed, there is no basis for suppression of the evidence obtained pursuant to this warrant.[50]

---

[49] Under the doctrine of the "fruit of the poisonous tree," "evidence . . . discovered as a result of an earlier [constitutional] violation is excluded as tainted" in order to discourage future police misconduct. Missouri v. Seibert, 542 U.S. 600, 612 n.4 (2004). "[T]ainted fruit can grow only on poisonous trees," however; "that is, . . . derivative evidence may be excluded as tainted only when the court has actually found a prior constitutional violation." Bruno v. Cunningham, No. 03 Civ. 937(MBM), 2004 WL 2290503, at *12 (S.D.N.Y. Oct. 8, 2004) (citation omitted); see also id. (citing Oregon v. Elstad, 470 U.S. 298, 312 (1985)) ("Absent an underlying wrong, the fruit-of-the-poisonous-tree doctrine simply does not apply."). The Court has not found evidence of a prior constitutional violation in this case, and therefore, Purbeck's argument here is without merit.

[50] Similarly, Purbeck's argument as to search warrant No. 1:19-MJ-10519-REB fails, and while Purbeck also argues that the January 13, 2022, search of his computer pursuant to the residential warrant issued on August 19, 2019, was untimely and "outside the period during which a search based on that search warrant could lawfully take place," [Doc. 39 at 20], Rule 41(e)(2)(B) specifically authorizes "the seizure of electronic storage media or the seizure or copying of electronically stored information," and "[u]nless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant," Fed. R.

## III.   CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Purbeck's motions to dismiss and to suppress evidence and statements, [Docs. 25, 26, 27, 30, 38, & 39], be **DENIED**.[51]

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 18th day of May, 2023.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

Crim. P. 41(e)(2)(B). The rule further provides that the time for executing such a warrant "refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review." Id.  Consistent with Rule 41, the residential warrant here did not place a time limit on the off-site copying and review of the records obtained pursuant to the warrant. See [Doc. 41-2].  Thus, the search of Purbeck's computer on January 13, 2022, was timely.

[51] This Report, Recommendation, and Order is being filed under seal because several of the briefs and exhibits submitted in connection with the motions addressed herein are under seal.  However, the Court is not convinced that it should remain under seal, and it will be unsealed unless a motion to maintain it under seal is filed within **thirty (30) days**, demonstrating good cause for the Report, Recommendation, and Order to be sealed.